<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  HITACHI CONSUMER ELECTRONICS  *    Civil Docket No.
                                  *    2:10-CV-260
 4  VS.                           *    Marshall, Texas
                                  *
 5                                *    April 11, 2013
    TOP VICTORY ELECTRONICS       *    8:30 A.M.

 6
                      TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE

 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:         MR. OTIS CARROLL
                               MR. PAT KELLEY
11                             Ireland Carroll & Kelley
                               6101 South Broadway
12                             Suite 500
                               Tyler, TX   75703
13
                               MR. MARTIN BLACK
14                             MR. JEFFREY EDWARDS
                               MR. VINCENT GALLO
15                             MS. SHARON GAGLIARDI
                               Dechert
16                             2929 Arch Street
                               Cira Centre
17                             Philadelphia, PA   19104

18                             MR. JEFFREY PLIES
                               Dechert
19                             300 West 6th Street
                               Suite 2010
20                             Austin, TX   78701

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:        MS. SHELLY HOLMES, CSR
                            MS. SUSAN SIMMONS, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX   75670
                            903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          MR. MARK SAMUELS
                            MR. BRIAN BERLINER
                            MR. VISION WINTER
                            MR. JORDAN RAPHAEL
                            MR. JOHN WOO
                            O'Melveny & Myers
                            400 South Hope Street
                            Los Angeles, CA   90071

                            MR. DERON DACUS
                            The Dacus Firm
                            821 ESE Loop 323
                            Suite 430
                            Tyler, TX   75701

                            MR. TODD LANDIS
                            MR. ERIC KLEIN
                            Akin Gump Strauss Hauer &
                               Feld
                            1700 Pacific Avenue
                            Suite 4100
                            Dallas, TX   75201

                            MR. DANIEL MOFFETT
                            Akin Gump Strauss Hauer &
                               Feld
                            300 Convent Street
                            Suite 1600
                            San Antonio, TX   78205

              * * * * * * * * * * * * * * * * * * * * * * * * * *

                    P R O C E E D I N G S

              (Jury out.)

              COURT SECURITY OFFICER:  All rise.

              THE COURT:  Be seated, please.

              All right.  At this time, I'll ask the

Plaintiffs to go to the podium and read into the

evidence the preadmitted exhibit numbers that were used

1  before the jury as part of yesterday's evidence.

2                    MS. GAGLIARDI:  Good morning, Your Honor.

3                    THE COURT:  Good morning.

4                    MS. GAGLIARDI:  Plaintiffs submit the

5  following evidence:  PTX 97, 201, 202, 404, 522, 523,

6  1268, and 1385.

7                    THE COURT:  Is there objection from the

8  Defendants to those exhibit numbers?

9                    MR. DACUS:  No, Your Honor.

10                    THE COURT:  All right.  They'll be

11  considered part of the record, and I'll hear the same

12  from the Defendants.

13                    MR. WINTER:  Good morning, Your Honor.

14  Vision Winter for the TPV Defendants.

15                    Defendants would like to move in DTX 805,

16  807, and 808.

17                    THE COURT:  All right.  Are there

18  objections from the Plaintiff?

19                    MS. GAGLIARDI:  No, Your Honor.

20                    THE COURT:  Those will be considered part

21  of the record of the case.

22                    Thank you, Counsel.

23                    Anything further, Counsel, before we

24  bring in the jury and call the next witness?

25                    MR. DACUS:  Only to alert the Court, Your

1  Honor, that I believe both parties expect that we'll

2  finish the evidence tomorrow morning, and for logistics,

3  I wanted to alert the Court to that and what the Court's

4  expectation is with respect to a charge conference and

5  closing.

6            THE COURT:  Well, I have reviewed the

7  submission from both parties as to the proposed charge

8  and verdict form.  My practice is to do it in a two-step

9  process.  Some of you may be familiar with this.  Some

10  of you may not.

11            But my intentions are to hold an informal

12  charge conference in chambers and have an informal

13  discussion with counsel for both sides as to their

14  submission, any proposed changes I might have, and give

15  the Court a sense of what are your most critical points,

16  what are your less critical points in the charge.

17            Afterward, having taken into

18  consideration the input from both sides on all the

19  issues, then the Court will consider and generate a

20  second draft submitted to the parties and hold a formal

21  charge conference at which, on the record, counsel may

22  object and urge their objections as to any portion of

23  the charge which the Court will either sustain or

24  overrule and the result of that process will be the

25  charge submitted to the jury.

1              It's my intention, assuming we can make

2    the time work, to charge the jury and allow them to

3    retire to begin deliberations before the end of this

4    week.  If they are back Monday continuing to deliberate,

5    that's fine.

6              If they're able to do it early enough to

7    where they can reach a verdict Friday evening, that's

8    fine, too.  If they want to stay late Friday evening,

9    I'll accommodate them to the extent our resources and

10   staff will allow me.  We'll cross that bridge when we

11   get to it.

12             But if you-all can finish the evidence,

13   including the rebuttal and be ready for closing

14   arguments and the charge to the jury tomorrow morning,

15   then I would hope we can do that in the afternoon and

16   get the case to the jury before we go home Friday, all

17   right?

18             MR. DACUS:  So that I'm clear, Your

19   Honor, any informal charge conference, the expectation

20   would be to hold that early afternoon tomorrow?

21             THE COURT:  We may hold that late today.

22             MR. DACUS:  Fair.

23             THE COURT:  We'll just see.

24             MR. DACUS:   Yes, sir.  Thank you.

25             THE COURT:  All right.  If there's not

```
 1  anything further, then, Mr. Shadden, if you'd bring in
 2  the jury, please.
 3                  COURT SECURITY OFFICER:  All rise for the
 4  jury.
 5                  (Jury in.)
 6                  THE COURT:  Good morning, Ladies and
 7  Gentlemen.  Have a seat, please.
 8                  All right.  Defendant may call their next
 9  witness.
10                  MR. LANDIS:  Your Honor, Defendants will
11  call Scott Lery.
12                  Mr. Lery was subject to the Rule, so he
13  is outside the courtroom, and he has not been sworn.
14                  THE COURT:  All right.
15                  (Witness enters the courtroom.)
16                  THE COURT:  Mr. Lery, if you'll come
17  forward, our courtroom deputy seated in front of me will
18  administer the oath to you.
19                  Sir, if you'll come around here.
20                  (Witness sworn.)
21                  THE COURT:  Now if you'll come around and
22  have a seat.
23                  All right.  Mr. Landis, you may proceed.
24                  MR. LANDIS:  Thank you, Your Honor.
25          SCOTT ALLEN LERY, DEFENDANTS' WITNESS, SWORN
```

<u>DIRECT EXAMINATION</u>

<u>BY MR. LANDIS</u>:

    Q.   Good morning, Mr. Lery.

    A.   Good morning.

    Q.   Could you please state your full name for the record.

    A.   Scott Allen Lery.

    Q.   Mr. Lery, could you tell the jury a little bit about yourself?

    A.   Yes.  I live in Northern California.  I'm married to a beautiful woman, Carrie, for 11 years, 12 years now.  We have five children, mostly young adult children, but they're always going to be children to us.

        And I have a -- educationally, I have a bachelor's degree of science in electrical engineering in computer science from the University of California Berkeley.

        I also have a master's degree from University of California San Diego, and that is in communication systems and theory.

    Q.   Now, Mr. Lery, do you currently work as an engineer?

    A.   Yes, I do.  I have my own engineering consulting business.

    Q.   Mr. Lery, have you ever testified in court

1  before?

2      A.   I have not.  It's my first time.

3      Q.   Well, we'll try to make it easy for you.

4      A.   Thank you.

5      Q.   Mr. Lery, we asked you here today to talk to

6  you a little bit about some of your work history and

7  particularly your work history at one company called

8  General Instrument.

9           Can you tell the jury when you started at

10 General Instrument?

11     A.   I started in late June of 1990.

12     Q.   And when you started at General Instrument,

13 what were you asked to do by the company?

14     A.   I was asked to design and help build an HDTV

15 system for over-the-air broadcast television.

16     Q.   Did that system have a name, sir?

17     A.   Yes.  We called it DigiCipher.

18     Q.   When you arrived at General Instrument, how

19 did you go about designing the system?

20     A.   Well, first, I was handed a -- what I call a

21 system document that gave a -- a description of -- of

22 the system that we were to -- to build and -- and

23 further design, and I had to do some research in that

24 for what was out there in the academic community, things

25 like that.

```
 1        Q.   I believe you were handed, when you took your
 2   seat there, what's been marked as Defendants' Exhibit
 3   599.  Do you have that, sir?
 4        A.   Let's see.  Yes.  This is it.  Okay.
 5        Q.   Do you recognize this document?
 6        A.   Okay.  Take a quick look here.
 7             Oh, yeah, yeah.  Yes, I do.
 8        Q.   How do you recognize this document?
 9        A.   This document was given to me a day or two
10   after I arrived at GI by my supervisor at that time.
11        Q.   Now, you've had your deposition taken in this
12   case; is that true, sir?
13        A.   Yes.
14        Q.   And during that deposition, I believe you were
15   asked about another document that had a different date
16   on it.  Do you recall that?
17        A.   Yes, I do.
18        Q.   As you sit here today, are you reasonably
19   certain that the document you have as Defendants'
20   Exhibit 599 is the -- the document that you were given
21   when you arrived at General Instrument?
22        A.   Yes, I do.  I am.
23        Q.   Now, I believe you testified earlier that you
24   called this a system document.  Can you explain to the
25   jury why you call it a system?
```

1    A.   Well, it's kind of like analogous to an

2  architectural land.  It doesn't have all the --

3  necessarily all the nuts and bolts and where things go,

4  you know, down to the last detail, but it -- but it does

5  give an overall, you know, 3,000-foot view of how the

6  blocks of the system, important blocks, functional

7  blocks, are put together.

8    Q.   Now, during -- or when you arrived at General

9  Instrument and you were given this document, did you

10 become aware at any time that the document was to be

11 maintained in confidence?

12   A.   No.

13   Q.   Did you become aware at any time that the

14 information contained in the document was to be

15 maintained in confidence?

16   A.   No.  No, sir.

17   Q.   Now, during your time at General Instrument,

18 did you learn about General Instrument's practice for

19 when they did want to maintain a document in confidence?

20   A.   Yeah.  They were -- like most companies, if

21 you had something that was kept -- kept for the company

22 eyes only, so to speak, you were told that, you know,

23 these doc -- the documents on a particular project, they

24 were to be kept, you know, a lot of times just in your

25 office.

1         But more so, they were also stamped, all the

2    pages were stamped sometimes to where you couldn't even

3    read the print, but, you know, they were stamped General

4    Instrument proprietary or something to that nature.

5         Q.   Does the document you have before you as

6    Defendants' Exhibit 599, is that one stamped General

7    Instrument proprietary or have any other confidential

8    label?

9         A.   Certainly not that I can see and I don't ever

10   remember there being one.

11        Q.   Now, to your knowledge, did General Instrument

12   ever publicize the DigiCipher system?

13        A.   Sure did.  They're very proud of it.  And

14   everybody was jumping for joy when I got there.

15        Q.   During your time at General Instrument, did

16   you ever see any press releases about the DigiCipher

17   system?

18        A.   Yes, I did.  I might say that I was given the

19   press release Xeroxed from a newspaper probably about

20   the same time I got this document.

21        Q.   Once you received the document, what did you

22   do with it?

23        A.   Well, you know, these are my plans, and so I

24   needed to study them and figure out, you know, how I was

25   going to really build -- help design and build this

1  system, help build it.

2          And so I just sat down at my desk and studied

3  it and tried to get a few more other resources brought

4  in.  I also talked to some other people, you know,

5  around General Instrument about it, you know, things of

6  that nature.

7      Q.   Did you work alone on this project?

8      A.   No, not at all.

9      Q.   Who else did you work with?

10     A.   I worked very closely with a person by the

11 name of Chris Heegard.

12     Q.   Was Mr. Heegard an employee of General

13 Instrument?

14     A.   No.  He was a consultant.

15     Q.   Did Mr. Heegard have access to the system

16 information that was contained in Defendants' Exhibit

17 599?

18     A.   Yes, very much so.  I mean, I needed the help,

19 and this document was -- oh, let me back up a little

20 bit.

21         Chris Heegard was my office mate, and so we

22 worked very close together.  And this document was at

23 least discussed quite a bit, and we had this thing out

24 all the time in the office laying around and talked

25 about it a lot.

1      Q.    Now, after analyzing the system contained in

2   Defendants' 599, what did you and Mr. Heegard conclude?

3      A.    We concluded that the system in this document

4   would not meet the coverage requirements that existed

5   under the then current analog television broadcast

6   system.  It wouldn't reach the same number of people.

7      Q.    And what did you do about that?

8      A.    Well, we had to do some design, and -- and we

9   came up with a different better system that would meet

10   those -- the requirements I mentioned, and we were

11   actually trying to achieve much better than that.

12      Q.    Was that new system ever built and

13   demonstrated?

14      A.    Yes.  It was demonstrated in April of 1992.

15      Q.    Thank you, Mr. Lery.

16              MR. LANDIS:  That's all the questions I

17   have.

18              THE WITNESS:  Thank you.

19              THE COURT:  Cross-examination?

20                  CROSS-EXAMINATION

21   BY MR. BLACK:

22      Q.    Just one quick question, Mr. Lery.

23              You testified at deposition about three weeks

24   ago, correct?

25      A.    Correct, sir.

1    Q.    And at that time, you said that you did not

2  know when the error correction system that's described

3  in that document was publicly known, right?

4    A.    I don't recall saying that, sir.  Could you

5  refresh my memory?

6    Q.    Sure.

7         QUESTION:  Do you know when the

8  DigiCipher error correction system that's described in

9  that June 8th paper became publicly known?

10         The witness:  I do not.

11         Do you recall that?

12    A.    Actually, I do not recall that, but give me a

13  moment.

14    Q.    We can put it up on the screen.

15    A.    Oh.

16    Q.    Right here at the bottom:  Do you know when

17  the DigiCipher error correction system that's described

18  in that June 8th paper became publicly known?

19         I do not.

20         Do you see that?

21    A.    I do.

22    Q.    Thank you.

23         MR. BLACK:  That's all the questions I

24  have, Your Honor.

25         THE COURT:  Redirect?

1          MR. LANDIS:  Thank you, Your Honor.

2                  REDIRECT EXAMINATION

3    BY MR. LANDIS:

4       Q.   Mr. Lery, with respect to the question you

5    were just asked, is it -- is it true that you just don't

6    know the exact date as to when it became publicly known?

7       A.   Well, would -- I guess I'm not sure about what

8    publicly known means.  It was certainly in this

9    document.  This document was known by certainly the

10   government agency that this was submitted to -- public

11   agency it was submitted to.

12           I -- I -- I honestly can say that, you know,

13   it was in this document.  I don't know when this

14   document was given to the public, so to speak.  I mean,

15   I just know that it was readily available to anybody at

16   GI, and the government agency had a copy of it.  And as

17   far as the -- the -- a detail like that, the error

18   correction system, I can only, you know, speculate.

19           I don't really know exactly when people knew

20   about -- it would be more -- the question would be about

21   how many people knew about this document.

22      Q.   Sir, let me ask you just one more question.

23      A.   Okay.

24      Q.   Mr. Heegard knew about that document?

25      A.   Oh, yes.

1     Q.   He knew about the error correction system,

2   correct?

3     A.   Oh, very much so.  That's his specialty.

4     Q.   Thank you.

5          MR. LANDIS:  No more questions, Your

6   Honor.

7          THE COURT:  Additional cross?

8          MR. BLACK:  Just a little bit, Your

9   Honor.

10                 RECROSS-EXAMINATION

11   BY MR. BLACK:

12     Q.   You said Mr. Heegard was working in the office

13   next to you?

14     A.   No.  He was my office mate.  He was 4 feet

15   away.

16     Q.   He was in the office with you.  Was that in

17   General Instrument in San Diego?

18     A.   Correct, sir.

19     Q.   And that facility in San Diego, that was

20   notorious for its high level of secrecy, wasn't it?

21     A.   Not to my knowledge.

22     Q.   General Instrument certainly didn't want its

23   confidential system that were under design, the work you

24   were doing, to be provided to just anybody, right?

25     A.   Not initially.

1       Q.    At the time that the work was being done, it

2  was confidential, wasn't it, sir?

3       A.    At what -- what work was being done, sir?

4       Q.    Your work that you were doing at General

5  Instrument in system design was not the kind of

6  information that you would be able to provide to a third

7  party, right?

8       A.    After a couple weeks, when we decided to

9  change the system, so to speak, then that work became

10  confidential.

11              MR. BLACK:  Thank you, Your Honor.  I

12  have no further questions.

13              THE COURT:  Additional direct,

14  Mr. Landis?

15              MR. LANDIS:  No more questions, Your

16  Honor.

17              THE COURT:  All right.  You may step

18  down, Mr. Lery.

19              THE WITNESS:  Thank you.

20              THE COURT:  Defendants, call your next

21  witness.

22              MR. BLACK:  Your Honor, Defendants call

23  Dr. Cliff Reader.

24              THE COURT:  Has Dr. Reader been sworn?

25              MR. LANDIS:  Yes, sir.

1          THE COURT:  Please have a seat, sir.

2          MR. LANDIS:  May I proceed, Your Honor?

3          THE COURT:  You may.

4    CLIFFORD READER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

5                    DIRECT EXAMINATION

6    BY MR. LANDIS:

7      Q.   Good morning, Dr. Reader.  How are you?

8      A.   Good morning.  Thank you.

9      Q.   Could you please state your full name for the

10   record.

11     A.   Clifford Reader.

12     Q.   Is it okay if I call you Dr. Reader?

13     A.   Please do.

14     Q.   Dr. Reader, why are you here today?

15     A.   I'm here to give my opinions as an expert

16   regarding a TPV -- whether TPV infringes the '243

17   patent.

18     Q.   Now, Dr. Reader, is being an expert witness

19   the only thing you do?

20     A.   No.  I do a variety of work.  I -- I work in

21   business development and marketing and product planning,

22   and I also do purely technical work.

23     Q.   And, Dr. Reader, when you do that other work,

24   other than being an expert witness, do you get paid for

25   it?

1      A.   Yes, I do.

2      Q.   Do you get paid for your work here today?

3      A.   Yes, I am.

4      Q.   How much are you being paid?

5      A.   My rate is $400 an hour.

6      Q.   Now, Dr. Reader, have you formed any opinions

7  as to whether TPV infringes Claims 4 and 5 of the '243

8  patent?

9      A.   Yes, I have.

10     Q.   What are those opinions?

11     A.   In my opinion, based on my analysis, TPV does

12  not infringe Claims 4 and 5 of the '243 patent.

13     Q.   In forming those opinions, have you considered

14  who would be a person of ordinary skill in the art with

15  respect to the '243 patent?

16     A.   Yes, I have.

17     Q.   Who would that be, in your opinion?

18     A.   So a person of ordinary skill in the art in

19  this case would be someone who has a bachelor's degree

20  in electrical engineering or computer science, and

21  someone who has three years of experience in the design

22  and implementation of real-time video display systems.

23     Q.   Now, before we get down to your opinions and

24  the bases of these, I think the jury members would like

25  to know a little bit about you.

1          Can you tell them how old you are?

2     A.    I'm 63.

3     Q.    Are you married?

4     A.    I have a lovely wife, who is a native of

5  Southern California, and we're going to celebrate our

6  25th wedding anniversary this year.

7     Q.    Congratulations.

8     A.    Thank you.

9     Q.    Now, based on your accent, I think the jury

10  members can tell you're not from Marshall, Texas.  So

11  where are you from?

12     A.    So I grew up in England just outside of

13  London.

14     Q.    And do you live in England right now?

15     A.    No.  I -- I've lived here in the States for 40

16  years now.  I've been a citizen for 30 years.

17     Q.    Did you get your education in England?

18     A.    Well, I did my undergraduate degree at the

19  University of Liverpool in England, and then I went on

20  to do my Ph.D. at the University of Sussex in England.

21     Q.    What brought you to the United States?

22     A.    Well, I started doing my research work at the

23  University in Sussex, and I quickly learned that all of

24  the leading effort in my field was here in the United

25  States, and in particular, there was an image-processing

institute at the University of Southern California.

And so, in fact, I -- I went to USC in Los Angeles, and I did all of the research work for my Ph.D., you know, in -- in L.A.

Q.   Now, I know it takes a lot to get a Ph.D. What did you have to do?

A.   Well, the requirement to get the Ph.D. was to perform original research and then to document that in a thesis, and the thesis, in practice, comprised a book that was over a hundred pages long.

Q.   Did -- did you have to write such a book?

A.   Yes, I did.

Q.   Did the book have a title?

A.   Yes.  It was called Orthogonal Transform Coding of Still and Moving Pictures.

Q.   That sounds pretty technical to me.

Would the members of the jury still be using what's in that book today?

A.   Well, we -- we were doing a lot of fundamental research work in that timeframe, and some of the work that I did forms the basis for the digital video we use today.  So if you play a DVD movie or if you watch a broadcast television program in our digital television today, then some of the work that I did lies underneath that digital video that you're enjoying.

1    Q.    Now, what did you do after you graduated from

2  USC?

3    A.    Well, I was offered a job in -- in the United

4  States and I started work for Ford Aerospace in Palo

5  Alto, working in the image-reconnaissance area.  And for

6  some years, I worked in -- in military imaging.  And

7  then later on, in the 1980s, digital imaging began to be

8  used in other scientific applications, like medical

9  imaging, for example.

10    Q.    After your work in the aerospace and

11  medical-imaging industry, what did you do next?

12    A.    Well, around the -- around the end of the

13  1980s, there was really a fundamental change in my

14  field, because semiconductor technology reached the

15  point at which it became possible to use digital video

16  techniques in such a small number of chips that you

17  could build consumer products at a reasonable price.

18          And so the whole field really underwent a

19  change, and I started working in the semiconductor

20  industry designing chips to do digital video for

21  consumer applications.

22    Q.    During this time, did you have a chance to

23  participate in any international groups pertaining to

24  your field?

25    A.    Yes.  Taking -- I mean, taking advantage of

1   this, you know, new available technology, there was a

2   standardization effort begun called MPEG, and I joined

3   MPEG in support of the work that I was doing to design

4   chips.

5        Q.   And can you tell the members of the jury what

6   MPEG stands for?

7        A.   Yes.  It stands for moving pictures experts

8   group.

9        Q.   Who are the types of people or organizations

10  that would join a group such as MPEG?

11       A.   Well, MPEG was an international

12  standardization effort, and so the -- the delegates to

13  MPEG were typically research scientists who came from

14  corporate research labs and people who came from

15  universities.

16       Q.   Did you ever have a leadership role in -- in

17  MPEG?

18       A.   Yes.  I was asked to actually be the leader of

19  the United States delegation to MPEG.  We were -- we

20  were a very large delegation.  The United States had

21  about two-thirds of the delegates in MPEG, and I was the

22  leader of that U.S. delegation, representing U.S.

23  interests in this forum.

24       Q.   So would it be fair to say that all the

25  companies and people that were part of MPEG, they

1  trust -- entrusted you to represent them before the

2  international community?

3       A.   Yes.  That's right.

4       Q.   Now, we've heard a lot about another

5  organization called the ATSC.

6            Did you have any involvement with the ATSC?

7       A.   Well, the ATSC, in the late 1980s, was kind of

8  a parallel activity compared to what was going on in

9  MPEG.  So the ATSC was an activity established by the

10 U.S. Government with a goal to provide the U.S. with a

11 new national high-definition television system.

12           Now, in the late 1980s, everybody in that

13 activity was focused on analog television technique.  So

14 they really were trying to extend the old NTSC analog

15 system to high definition.  And that was different from

16 what we were doing in MPEG, which was to focus on

17 digital television work, but that changed very radically

18 when General Instrument made its proposal to the ATSC

19 for an all-digital, high-definition television system.

20           And indeed, you know, the other parties who

21 were proposing high-definition systems, most of them

22 migrated towards doing digital solution too.  So what

23 happened is, you know, I -- as the head of the U.S.

24 delegation to MPEG, I -- I proposed that these two

25 activities should actually converge and that it would

1  make sense if we took the two activities and they --

2  they came together.

3        And indeed, that's what ended up happening,

4  because in the -- in the event the ATSC group adopted

5  the emerging MPEG standard and worked with us.  And so

6  the MPEG 2 standard forms the basis of the ATV -- ATSC

7  television system we use today.

8      Q.   Now, Dr. Reader, during your career, have you

9  ever had a chance to work on what the jury's heard about

10 a little device called a system-on-a-chip?

11     A.   So in 1990, I told you I went to work in the

12 semiconductor industry, and I started working for a

13 company called Cipher Semiconductor, designing a chip

14 that could implement these new MPEG standards.

15       Now, this -- this kind of device that I was

16 doing then was really a forerunner of system-on-a-chip

17 we see on today, because system-on-a-chip means

18 integrating what used to be multiple chips or multiple

19 components, integrating all of those together.  And that

20 was something that I and my competitors started doing

21 around that timeframe.

22     Q.   Now, have you continued to work in the video

23 processing field today?

24     A.   Yes.  I've continued the work -- throughout

25 the '90s, I was working in the semiconductor field, as I

said.  At the end of the -- at the end of that decade, I

was working for a company that made de-interlacer chips

that were sold to television manufacturers and the

manufacturers of DVDs.  So progressive televisions or

progressive DVD players were the market that we were

addressing back then.

Q.   Dr. Reader, based on your work experience and

education, would you consider yourself as one of skilled

in the art in the area of digital video signal

processing as it relates to televisions?

A.   Yes, I do.

Q.   All right.  Let's get back to your opinions.

I believe you said earlier you were here to talk about

the -- the '243 patent; is that correct?

A.   That's correct.

MR. LANDIS:  Can we put up Plaintiffs' 4,

please?

Q.   (By Mr. Landis) Do you recognize Plaintiffs'

Exhibit No. 4?

A.   Yes.

Q.   What is that, sir?

A.   So this is the face page of what we're calling

the '243 patent.

Q.   Have you had a chance to review the '243

patent in detail?

1      A.   Yes, I have.

2      Q.   Can you tell the jury generally what the '243

3  patent is about?

4      A.   Well, we can see the title of this patent is

5  Digital Broadcast Receiver Unit, and the digital

6  broadcast receiver unit, according to the '243 patent,

7  includes multiple video processing sections, and each of

8  those processes the incoming video signal, according to

9  a specific video signal format.

10      Q.   Now, what did you do to form your opinions in

11  this case?

12      A.   So I read the patent and studied it very

13  carefully.  I read the file history at the Patent Office

14  that's related to this patent.  And then I looked at the

15  technical documentation for the accused products.  And I

16  read those documents carefully, and I compared those to

17  what is claimed in the '243 patent claims.

18      Q.   Now, Dr. Reader, this case has been about TVs.

19  Did you examine the TVs?

20      A.   Not physically, no.

21      Q.   Why not?

22      A.   Well, because, you know, the -- the technology

23  that we're talking about here, all the capability that

24  we're talking about here is actually embedded in the

25  system-on-a-chip that's inside the TV.

1          So the thing we need to focus on is that

2    system-on-a-chip.

3        Q.    Now, Dr. Reader, I'm holding up before the

4    jury, which is Defendants' physical Exhibit 17.

5          Is this the system-on-a-chip that you're

6    talking about?

7        A.    That's an example of one, yes.

8        Q.    Did you examine all of the system-on-a-chips

9    in this case?

10       A.    I examined the system-on-a-chips from the

11   various chip manufacturers that provide those SOCs

12   inside the TPV TVs.

13       Q.    Did you examine the physical chips themselves?

14       A.    Well, I -- I -- I didn't literally look at,

15   you know, the physical device, because, you know, all

16   you can see there is it's a piece of plastic with some

17   metal pins coming out of it, so I -- I didn't do that.

18   No.

19       Q.    So can you tell the jury specifically what the

20   documentation you looked at was?

21       A.    Well, the chip manufacturers provide documents

22   called datasheets, and the datasheets are a description

23   of how the chips actually work, and that's what I looked

24   at.

25       Q.    We're going to look at some of those

1  datasheets later, Dr. Reader.

2          Now, Dr. Reader, can you tell the -- the --

3  the jury what claims are being asserted against TPV?

4      A.   Claims 4 and 5 are being asserted.

5              MR. LANDIS:  And if we go to Column 7 of

6  Plaintiffs' Exhibit 1, can we blow up the lower part of

7  Column 7, please?

8      Q.   (By Mr. Landis) The bottom, is that Claims 4

9  and 5, sir?

10     A.   That's correct.

11     Q.   What kind of claims are Claims 4 and 5?

12     A.   Claims 4 and 5 are called dependent claims.

13     Q.   Why are they called dependent claims?

14     A.   Because these claims depend from an

15  independent claim, in this case, Claim 1.

16     Q.   Now, when I look at Claim 5, it says a unit as

17  claimed in Claim 4.  What does that mean?

18     A.   Well, it means that the limitation in Claim 4

19  is dependent on -- I'm sorry -- I'm sorry.  Let me start

20  again.

21          The -- the limitation that you see expressed

22  in Claim 5 is dependent upon Claim 4, and then Claim 4,

23  in turn, has a limitation and the claim is dependent on

24  Claim 1.

25              So we must take all of the limitations of

1   Claim 1 in addition to the limitations in Claim 4 and

2   Claim 5 in order to interpret and understand Claim 5.

3              MR. LANDIS:  Your Honor, may I have a

4   moment to set up an exhibit?

5              THE COURT:  You may.

6        Q.   (By Mr. Landis) Now, Dr. Reader, I just put on

7   the easel here I think what we're looking at in Column

8   1.

9              Is this the claims that you analyzed in this

10  casing?

11       A.   Yes, I did.

12       Q.   I'd like to talk to you a little bit about --

13  well, before I get there, do you have an opinion as to

14  whether or not the TPV products accused of infringement

15  in this case -- in this case infringe Claim 4 of the

16  '243 patent?

17       A.   Yes, I do.

18       Q.   What is your opinion?

19       A.   The -- based on my analysis, the TPV TVs do

20  not infringe Claim 4.

21       Q.   Why do you hold that opinion?

22       A.   Because they do not infringe Claim 1.

23       Q.   And is there a specific element in Claim 1

24  which you believe is not met by the products?

25       A.   Yes.  The -- the TPV systems -- the TPV TVs do

1  not have the plurality of video processor sections,

2  which is a part of the third limitation of Claim 1.

3      Q.   Now, with respect to Claim 5, do you have an

4  opinion as to whether the TPV products infringe Claim 5

5  of the '243 patent?

6      A.   Yes, I do.

7      Q.   What is that opinion?

8      A.   The TPV TVs do not infringe Claim 5 of the

9  '243 patent.

10     Q.   And why do you hold that opinion, sir?

11     A.   Because, again, they don't infringe all of the

12  limitations of claim -- they do not infringe Claim 1,

13  and, again, because they do not have the plurality of

14  video processor sections required by the third

15  limitation of Claim 1.

16     Q.   Now, before we get in some details about your

17  opinions, I thought it might be helpful if we tried to

18  explain some of this claim language to the jury.  I

19  understand you prepared a little slide show for them; is

20  that true?

21     A.   Yes, I have.

22     Q.   Now, just to remind us again, what is being

23  claimed in Claim 1 of the '243 patent?

24     A.   So as -- as you can see from the language of

25  the claim, it begins by talking about a digital

1  broadcast receiver unit.  And in the preamble, we can

2  see that it's going to receive a digital multiplexed

3  signal stream, and this digital multiplexed signal

4  stream has got multi -- multiplexed signals in it that

5  have been commonly encoded by the same encoding/decoding

6  standard, and that those multiplexed signals include

7  video signals which correspond to a plurality of

8  different video signal formats.

9       Q.   Now, will your slide show help us understand

10  what that means?

11       A.   What I'm going to show first is how in a

12  complete broadcast system, from the television station

13  to your home, this digital multiplexed signal stream is

14  actually created, and then I'm going to show you how the

15  '243 patent describes the receiver operating to receive

16  that signal.

17            So I'm going to begin, as I said, on the

18  broadcast side.  And first, we're going to start at the

19  TV station, and I've chosen to illustrate this using one

20  of the local stations that you have here in Marshall,

21  Texas.  So this is the building that Channel 12, the CBS

22  channel comes from.

23            And if we go to the next slide, please.

24            Then here's the channel lineup for Marshall

25  for the over-the-air broadcasting, and Channel 12 is

1  highlighted in yellow.  That's the CBS channel.  And

2  today, with digital broadcasting, there are three

3  different programs that are broadcasted on this channel.

4        Now, years ago, before we went to digital TV,

5  there would have been one analog CBS program on this

6  channel, Channel 12.  Today, there's three channels

7  there using digital television.  And the first one is

8  the main CBS programming, Channel 12-1; that's a

9  high-definition television program.

10        And in addition, there's two more

11  standard-definition programs, all contained on the same

12  channel called This TV and Bounce TV.

13        And what I'm going to show you now is how the

14  broadcaster actually packs those three channels onto

15  what used to be one original channel.  You can see them

16  at the top of the page here.  I've color-coded them for

17  the blue high-def main CBS program, and the other two

18  programs I've shown in green and red.

19        And I'm going to use the analogy of a train of

20  boxcars to illustrate how this actually happens.  So

21  here's the train, and in the real ATSC system, that

22  actually represents the MPEG 2 transport stream.  And

23  that was defined by the MPEG standard that I told you

24  became a part of the ATSC Standard.

25        So what we actually do to broadcast this

1    signal is break up each program into fragments.  And so

2    what I'm going to show you in my analogy is I'm going to

3    start loading the boxcars of the train with fragments of

4    each of the programs in turn.

5            So first, I'm going to load a piece of the

6    high-definition program into the train, and then I'm

7    going to move the train forward, and I'm going to load

8    another piece of program.  And you can see I'm loading

9    some high-definition again, and you'll see that I will

10   load more high-definition boxcars than the other

11   boxcars, because there's more information in the

12   high-definition signal.  So it will take up more of the

13   train.

14           And then I'm just going to continue this

15   process.  So we'll load the cars with the fragments of

16   these programs.  So we have managed to put all three

17   programs onto the same train; in other words, the same

18   MPEG transport stream by breaking them up and

19   sequentially sending them over the air.

20       Q.   Now, Dr. Reader, before we move onto the '243,

21   is what you just created the multiplexed signal stream

22   in Claim 1?

23       A.   That's right.

24       Q.   So now we're going to bring the train to the

25   receiver?

1    A.    So now what we're going to do is show you what

2 happens when you receive this kind of broadcast

3 television signal with digital television.  So here

4 comes the train, and you can see at the top of the slide

5 here that this is an example of how the '243 patent says

6 that we should perform this sequence of operations.  So

7 what I'm illustrating is that.

8    Q.    And just to be clear for the jury, before we

9 move on, you're not saying that this is how the TPV TVs

10 work; is that correct?

11    A.    That's right.  I'm showing you how the patent

12 says this is supposed to happen.

13    Q.    Okay.  If you could continue on for us.

14    A.    Yes.  And if you could please help me by

15 pointing to --

16    Q.    Sure.

17    A.    -- the claim limitations, because what I'm

18 going to do is step through Claim 1 and show you how the

19 patent describes this sequence of operations.

20         So the -- the first thing that the -- the --

21 the patent says we should do is, we should isolate one

22 video signal from the received digital multiplexed

23 signal.

24         So I'm going to use as an example one of the

25 low-definition or standard-definition channels --

1                    THE WITNESS:  Next slide, please.

2         A.    -- so I'm going to show you what happens if we

3    tune to this TV.

4              Now, that's the green boxcars, and for the

5    first limitation of the claim, we're going to isolate

6    the signal for this TV.  And I'm going to -- in my

7    analogy, I show you unloading the boxcar.  It goes down

8    into this Box No. 5 in the diagram.

9              And then the next limitation of the claim says

10   a decoder to decode this video signal.  So let me move

11   the green information over to the MPEG decoder in Box

12   No. 11, and you see that happening on this slide here.

13             And what we're looking at is -- is Figure 1

14   from the '243 patent.

15             Well, then in the next limitation of the

16   claim, we need a plurality of video processor sections.

17             And in this Figure 1 of the patent, the

18   example is given in which there are three boxes there

19   called 141, 142, and 143.

20             And those are the video processor sections.

21   And there's -- there's -- there's a plurality of them or

22   there's multiple of them, in this example there are

23   three.

24             So now what I'm going to do is, I'm going to

25   bring my green piece of information down to one of those

1  video processor sections.  And the claim limitation says

2  that each of those video processor sections provides

3  video processing according to a different video signal

4  format, okay?

5      Q.   (By Mr. Landis) Now, just to remind the jury,

6  has the Court construed the term video signal format?

7      A.   Yes, it has.

8      Q.   How -- what's the construction that the Court

9  has used?

10     A.   So video signal format has been construed by

11  the Court to be the number of lines and whether the

12  lines are progressive or interlaced.

13     Q.   So using that Court -- using the Court's

14  construction, what does this claim language mean to you?

15     A.   Well, it tells me that -- that each of the

16  video processor sections is going to process the signal

17  according to the number of lines and whether the lines

18  are interlaced or progressive.

19     Q.   And is that what's being shown in Figure --

20  your illustration of Figure 1?

21     A.   That's right.  So in this example, we see that

22  this box 141, which is one of the video processor

23  sections, is going to process according to the number of

24  lines and whether it's interlaced or not, and in this

25  example, the number of lines is 480, and it's an

1    interlaced signal, which is shown with the little letter

2    i.

3        Q.    Now, do you have a -- does this train continue

4    on, sir?

5        A.    Right.

6            So if we continue to watch this program,

7    we'll -- you know, we'll unload another green boxcar,

8    and we'll process the signal the same way.

9            Now, let me show you another example just to

10   make it clear how this system works.

11           What I'm going to show you now is what would

12   happen if we tune to the main high-definition CBS

13   program, which is going to be our boxcars colored in

14   blue.

15           So the same process happens.  We're going to

16   unload the boxcar into the -- using the isolator, decode

17   it with the MPEG decoder, and then we're going to need

18   to process this according to the number of lines and

19   whether the signal is interlaced or progressive --

20   whether the lines are interlaced or progressive.

21           So now you can see that the video processor

22   section that's going to do this is the box labeled 143.

23   It's going to process according to whether the number --

24   I'm sorry -- the number of lines and whether it's

25   interlaced.

1          And in my example here, the number of lines is

2     1,080, which we call 1080, and there's a little i there

3     that shows you this is going to be interlaced.

4          Q.   And so is 143 processing according to the 1080

5     lines and the interlaced?

6          A.   That's right.

7          Q.   And I'm assuming, if we went further, the

8     train would just unload all of the rest of those; is

9     that right?

10         A.   If we continue -- the train, remember, is the

11    MPEG 2 transport stream, and as that stream comes

12    through the digital broadcast receiver unit, we perform

13    that operation on all of the blue boxcars to watch this

14    program.

15         Q.   And -- and, again, to be clear, is it your

16    opinion that the TPV TVs do not operate in this manner?

17         A.   The TPV TVs do not operate this way.

18         Q.   All right.  Dr. Reader, thank you for that.

19              I'd like to now turn our attention back to

20    Claim 1, and in particular to this section that

21    you've -- you've highlighted as being important to your

22    opinions, the plurality of video processor sections.

23              And I think that it would be helpful to the

24    jury if we just kind of broke down the claim language

25    for them.

1               So the first thing we see in the claim

2    language is a plurality of video processor sections.

3               What does that mean?

4        A.    That means that there are two or more video

5    processor sections.

6        Q.    And the next thing we see is with respective

7    video processor sections.

8               Do you see that?

9        A.    Yes.

10       Q.    What does that mean?

11       A.    So each one of the video processor sections is

12   going to do something.

13       Q.    And what is each one of the video processor

14   sections going to do?

15       A.    They're going to do video processing according

16   to a different video signal format.

17       Q.    And, again, video signal format has been

18   construed by the Court to be the number of lines and

19   whether the lines are progressive or -- or interlaced,

20   correct?

21       A.    That's correct.

22       Q.    Now, you were in the courtroom during

23   Dr. Myler's presentation; is that true?

24       A.    Yes, I was.

25       Q.    And do you remember that Dr. Myler discussed a

1  lot about his opinions being based upon receipt of an

2  ATSC signal?

3      A.   Yes.

4      Q.   Can you tell me, in -- in the practical world,

5  in practice, what are the formats of the signals that

6  are broadcast under ATSC?

7      A.   So in -- in the U.S. today for over-the-air

8  broadcasting, there are three formats that are used.  We

9  saw two of them in my example, and there's also a third.

10 So there are -- in total, there's the format called

11 480i, there's another format called 720p, and then

12 there's 1080i.

13     Q.   Now, does the ATSC standard contemplate other

14 formats?

15     A.   Yes, it does, but in the U.S., we only use the

16 three that I just described.

17     Q.   How many formats does the ATSC contemplate?

18     A.   In total, they -- they have 18 different

19 formats.

20     Q.   Now, Dr. Reader, in your opinion, is there any

21 component of the SOCs in the TPV TVs that processes a

22 signal according to both the number of lines and whether

23 the lines are progressive or interlaced?

24     A.   No.

25     Q.   Now, I'd like to discuss the two theories of

1  infringement that Dr. Myler gave to the jury earlier

2  this week.  Do you recall them?

3      A.   Yes.

4      Q.   Dr. Myler's first theory was that the scaler

5  by itself in the SOC in the TPV TVs is a plurality of

6  video processor sections.

7           Do you recall that?

8      A.   Yes, I do.

9      Q.   Now, before I get into the -- into his

10  opinions, do you agree with Dr. Myler that the '24 --

11  that the '243 patent has anything to do with scaling?

12      A.   I agree that it does not have anything to with

13  scaling.

14      Q.   Now, do you agree with Dr. Myler's opinion

15  that the scaler by itself is a plurality of video

16  processor sections?

17      A.   No, I don't agree.

18      Q.   Why not?

19      A.   Because -- because the video processor

20  sections -- well, I'm sorry.

21           Let -- let me -- let me say it this way:

22  Because the video processing in the TPV TVs does not

23  process according to the number of lines and whether the

24  lines are progressive or interlaced.

25      Q.   How many scalers do each of the -- each of the

1    TPV TVs have?

2        A.    They have only one.

3        Q.    And do those scale -- does the scaler run on

4    a -- on a computer program?

5        A.    The scalers are controlled by a computer

6    programs, yes.

7        Q.    Is that program embedded in the chip itself?

8        A.    The way that -- the way that these modern SOCs

9    are designed, they have -- at the very lowest level of

10   the chip, they have some hardware, and then actually

11   embedded inside the chip, they have software code, which

12   is called firmware, because it's embedded in the chip

13   and it's fixed.

14            And so each of the scalers in the different

15   manufacturer's chips is controlled by firmware inside

16   those SOCs.

17       Q.    And is that called firmware because it's fixed

18   and firm?

19       A.    That's right.

20       Q.    Now, Dr. Myler talked about changing some

21   coefficients, and when you do that, you have different

22   programs.  Do you agree with that?

23       A.    I don't agree that -- that simply changing a

24   coefficient changes the program.  There's not multiple

25   programs just because you do that.

1    Q.   So is it your testimony that there's a single

2 scaler with a single program?

3    A.   That's my testimony.

4    Q.   Is there an illustration that you could do for

5 the jury that might help them understand this a little

6 bit better?

7    A.   Yes, I can.

8              MR. LANDIS:  Your Honor, with your

9 permission, could Dr. Reader step down and use a

10 whiteboard, or I could draw it for him, whichever Your

11 Honor wishes?

12             THE COURT:  What I'd rather you do,

13 Mr. Landis, is move over to the bar and have Dr. Reader

14 come down to the other side.

15             MR. LANDIS:  No problem, Your Honor.  I

16 have a separate easel I can put up over there.

17             THE COURT:  If you will, just set it up

18 just next to the statue here, and that way Dr. Reader

19 can just step around the corner.

20             THE WITNESS:  Your Honor, would you like

21 it a little further back so you can see?

22             THE COURT:  Actually, I was anticipating

23 you'd be a little closer, and you'd be leaning over the

24 rail from the other side.  I'm trying to keep you close

25 to the jury box -- I mean, close to the witness chair.

1              MR. LANDIS:  I think that's as close as I

2  can get it, Your Honor.

3              THE COURT:  All right.  Plaintiffs'

4  counsel are free to move where they can see, if

5  necessary.

6              Go ahead.

7    A.   So what I'm going to show you as sort of an

8  example of this, I'm going to show you a very simple

9  equation, and I'm going to show you the equation for

10  calculating the area of a rectangle.

11              So if we start by drawing a rectangle here,

12  then we get the area of the rectangle equals the length

13  times the width, okay?  So we have the length of the

14  rectangle here, and we have the width of the rectangle

15  here (drawing).

16              Now, let's say in my example that I make the

17  length of the rectangle 4 feet, the width of the

18  rectangle 3 feet.  So in that case, I'm going to have an

19  area which equals 4 times 3.  And I know that the area

20  of a rectangle is 12.

21              Now, if I do a second example, I can draw a

22  little rectangle that's somewhat smaller, draw it here,

23  and now let me make the length of this rectangle and the

24  width of this rectangle be, say, 3 for the length and 2

25  for the width.

1        So to calculate the area of the new rectangle,

2    I just simply say the area equals 3 times 2.  And, of

3    course, I get the area of the smaller rectangle.

4        Now, to do that, I use exactly the same

5    equation.  Nothing changed about that.  And all I did

6    was to plug the numbers that I wanted into that same

7    equation, and I get my answer.

8        Now, if I built this into a system, I could

9    design a piece of hardware that -- that would have a

10   multiplier in it that would be capable of calculating

11   length times width.  In either case, I would use that

12   same multiplier.  I'd just plug in different numbers.

13       If I was doing this in software, I could write

14   a software program, just one program that would execute

15   the series of instructions to compute length times

16   width, and I could do that.

17       If I put this inside one of these SOCs, I

18   might have a hardware multiplier in the SOC, and I might

19   have this firmware, this embedded software, that was

20   capable of just plugging in those numbers to the

21   hardware and doing this.  But I have one piece of

22   hardware and I have one piece of firmware to do that.

23   So the scaling operations that happen inside these SOCs

24   that we're talking about here in the TPV TVs operate

25   that way.  They're one scaler.  They have one piece of

1    firmware that controls it.

2             We can plug in a different scale factor.  If

3    we're going from 480 lines to 1080 lines, we can change

4    the scale factor to the right number for that.  And if

5    we're going to 720 lines to 1080 lines, we can plug in

6    the number for that.  But I'm going to have one piece of

7    hardware, and I'm going to have one piece of software

8    that does it.

9         Q.   (By Mr. Landis) Thank you, Dr. Reader.

10             MR. LANDIS:  Your Honor, with your

11   permission, I'll take that down.

12             THE COURT:  Yes, please.

13        Q.   (By Mr. Landis) Now, Dr. Reader, based upon

14   what you just explained to the jury, does the scaler in

15   the TPV TVs meet the plurality of video processors

16   element in Claim 1?

17        A.   No because I only have one scaler.

18             MR. LANDIS:   Your Honor, may I move

19   around to the board, please.

20             THE COURT:  You may.

21        Q.   (By Mr. Landis) So, Dr. Reader, would it be

22   fair for me to put X across at least with respect to

23   Dr. Myler's first opinion about the scaler being

24   multiple video processor sections?

25        A.   Yes.  That would be correct.

```
 1        Q.   Now, I'd like to discuss with you a second --
 2   alternative theory of infringement that Dr. Myler had.
 3             Do you recall what that was?
 4        A.   Yes.  Dr. Myler proposed the -- the idea that
 5   the scaler in the SOCs in the TPV TVs could be one video
 6   processor section, and the de-interlacer in those SOCs
 7   could be another video processor section.  So by that
 8   argument, he claimed that there would be this plurality
 9   of video processor sections.
10        Q.   Do you agree with Dr. Myler?
11        A.   No, I don't.
12        Q.   Why not?
13        A.   Because neither the scaler taken alone nor the
14   de-interlacer taken alone can meet the Court's
15   construction of what a video processor section must be.
16        Q.   Now, just to remind the jury --
17             MR. LANDIS:  Mr. Barnes, can we bring up
18   the Court's claim construction on the screen, please?
19        Q.   (By Mr. Landis) Can you remind the jury what
20   the Court's construction of video signal formats is
21   again?
22        A.   Yes.  It's shown on the right-hand side, so
23   video signal formats is the number of scan lines and
24   whether the lines are progressive or interlaced.
25        Q.   Why does the scaler not process according to
```

1  the Court's definition?

2      A.   Because the scaler is just concerned with the

3  number of scan lines.  The scaler has nothing to do with

4  whether the lines are progressive or interlaced.  It

5  literally doesn't care.  It doesn't process according to

6  whether the lines are progressive or interlaced.

7  So it cannot meet this definition for video signal

8  format.

9      Q.   Now, let's take a little bit closer look at

10  the scaler.

11          MR. LANDIS:  Can you pull up PTX 901,

12  please?

13      Q.   (By Mr. Landis) Do you recognize this

14  document?

15      A.   Yes.  This is one of the datasheets that I

16  referred to earlier, one of the documents that I

17  studied.  This datasheet is for a MediaTek SOC, the

18  MT 5389.

19          MR. LANDIS:  And could we turn to

20  Page 85, Mr. Barnes?

21          And if we could highlight the -- or blow

22  out the equation at the bottom, please?

23      Q.   (By Mr. Landis) What is this equation, sir?

24      A.   So this is the equation which is used to

25  calculate the -- the scaling factor to operate the

1    scaler.

2        Q.    And does interlaced or progressive appear

3    anywhere in this equation?

4        A.    No.  This equation is concerned only with the

5    number of lines.

6        Q.    And this is how the scaler -- all the scalers

7    that you've looked at would operate, correct?

8        A.    Right.  For any of the -- for any of the

9    different manufacturers' SOCs, this is -- this is

10   basically how they operate.

11       Q.    So in your opinion, under any mode of

12   operation, is the scaler a video processor section,

13   according to Claim 1 of the '243 patent?

14       A.    No, it's not.

15       Q.    Now, we looked at a MediaTek datasheet, but

16   does your opinion hold true for all of the SOCs in the

17   TPV TVs?

18       A.    Yes.  I looked at the datasheets for the other

19   SOC manufacturers, and they all operate in the same way.

20       Q.    Let's turn our attention to the de-interlacer.

21            Is the de-interlacer in the SOCs of TPV TVs a

22   video processor section, as that term is used in Claim 1

23   of the '243 patent?

24       A.    No, it's not.

25       Q.    And why do you hold that opinion?

1    A.    Again, because it doesn't process according to

2 both the number of lines and whether the -- the lines

3 are interlaced or progressive.

4              MR. LANDIS:   Mr. Barnes, could you bring

5 up the Court's claim construction again, please?

6    Q.    (By Mr. Landis) So if I heard you right, the

7 de-interlacer does not process according to the number

8 of scan lines; is that true?

9    A.    In this case, yes.

10   Q.    And based on your -- your testimony, is

11 Dr. Myler's second theory of infringement correct?

12   A.    No, it's not.

13   Q.    Why not?

14   A.    Because we -- we're required to have two or

15 more video processor sections.  And as I said at the

16 beginning, neither the scaler nor the de-interlacer is

17 a -- a video processing section, according to the

18 Court's claim construction, and, therefore, we do not

19 have the plurality of video processor sections required

20 to practice this limitation of Claim 1.

21              MR. LANDIS:   Your Honor, may we move

22 around to the board again, please?

23              THE COURT:   You may.

24   Q.    (By Mr. Landis) Based upon what you just told

25 the jury, would it be fair for me to mark another X

1  through the plurality of video processor sections

2  element to show that Dr. Reader's -- I mean, Dr. Myler's

3  section theory of infringement is also incorrect?

4      A.    That would be fair.

5      Q.    Now, based upon your testimony, do you have an

6  opinion as to whether or not Claim 4 of the '243 patent

7  is infringed by the TPV products?

8      A.    Yes, I do.

9      Q.    What is your opinion?

10      A.    My opinion is that Claim 4 of the '243 patent

11  is not infringed by the TPV TVs.

12      Q.    So would it be fair for me to mark an X

13  through Claim 4?

14      A.    Yes, it would.

15      Q.    Now, do you have an opinion as to whether

16  Claim 5 -- let me ask that again.

17            Do you have an opinion as to whether or not

18  the TPV TVs accused of infringement infringe Claim 5 of

19  the '243 patent?

20      A.    Yes, I do.

21      Q.    What is your opinion?

22      A.    It's my opinion that Claim 5 of the 2 -- '243

23  patent is not infringed by the TPV TVs.

24      Q.    Would it be fair for me to mark an X through

25  that claim as well?

1    A.   Yes, it would.

2    Q.   And just so we're clear, the basis for your

3 opinion is, is that the SOC in the TPV TVs do not have a

4 plurality of video processor sections as required by

5 Claim 1 of the '243 patent; is that correct?

6    A.   That's correct.

7              MR. LANDIS:  Your Honor, I have no

8 further questions.

9              THE COURT:  Cross-examination?

10                  CROSS-EXAMINATION

11 BY MR. BLACK:

12    Q.   Dr. Reader, you're the first of three legal

13 consultants that we're going to hear from from the

14 Defendants, correct?

15    A.   I'm sorry.  I haven't paid attention to that.

16 I don't know that I'm --

17    Q.   Do you know Mr. Wechselberger who will be

18 testifying?

19    A.   I do know him.  Yes.

20    Q.   Do you know him from prior cases that you've

21 worked on?

22    A.   Yes, I do.

23    Q.   You've worked on quite a lot of legal cases,

24 haven't you?

25    A.   I've worked on a number of legal cases.  Yes.

1    Q.   You sent us a CV.  I think it had 10 or 11

2  pages of legal consulting positions that you have taken

3  on and discharged; is that right?

4    A.   I don't know that it's that much, because as I

5  mentioned at the beginning, I do a fairly broad range of

6  consulting, so not everything on my CV can be called

7  legal consulting.

8    Q.   Well, you've represented over 40 clients in

9  various consulting and testifying matters as an expert

10  in the patent litigation, right?

11    A.   I've represented over more than 40 clients --

12  not represented.  I've worked for over 40 clients in a

13  number of different tasks.  Some of them, as I've said,

14  involved business development and marketing work, and

15  some are purely technical work.

16    Q.   Is it fair to say that in the past 8 years

17  that you've been a consulting expert and testifying

18  expert in patent litigation for over 40 clients?

19    A.   I don't know if it's -- I don't think that's

20  literally true.  I think my CV talks about the number of

21  cases in which I've been a testifying consultant, and

22  that number is something like 12 or 13.

23    Q.   Were you a session speaker at the 2011 NAB

24  show?

25    A.   Yes, I was.

1           MR. BLACK:  Can we have the ELMO up,

2   please?

3       Q.   (By Mr. Black) Can you read that, sir?  This

4   is your summary CV for the show, isn't it?

5       A.   That's -- that's my bio for that show.  Yes.

6       Q.   Yeah.  And -- and the yellow highlighted

7   portion says:  For the past eight years, Dr. Reader has

8   been a consulting expert and testifying expert in patent

9   litigation for over 40 clients; isn't that right?

10       A.   That's what it says.

11       Q.   That is your job, isn't it?  Consulting in

12   legal cases, right?

13       A.   No.  I -- I do a broad range of consulting.  I

14   do what my clients hire me to do.

15       Q.   You've testified 12 or 13 times in patent

16   litigation matters; is that right?

17       A.   I've been -- I've testified at trial three

18   times prior to this, and I have written expert reports

19   in 12 or 13 cases.

20       Q.   And in all those cases, you concluded that the

21   Patent Office got it wrong and that the patents were

22   invalid, correct?

23       A.   That's true, but that doesn't represent the

24   scope of the work that I do.  It's not representative of

25   the type of work that I do or the number of cases or the

1   types of clients that I deal with.

2          For example, right now I have four clients

3   that I'm helping to assert their patents through

4   licensing or through litigation.  And one of the things

5   that I do is get very much involved in patent licensing

6   through patent pools.

7          In 1993 to 1994, one of the things that I did

8   that was related to the MPEG standard was to be the

9   expert who compiled the first list of essential patents

10  for the MPEG LA pool.  And LA means licensing authority.

11         So I do a lot of work in licensing, and I am

12  the director of a patent pool right now.

13         And in the last few weeks, I just started

14  working on forming another patent pool to license

15  patents for profit.

16     Q.   Can you remember what my question was?

17     A.   I don't remember which question you -- you

18  want to refer to.

19     Q.   You've given -- you have not provided an

20  opinion to the jury in this case that the '243 patent is

21  invalid.  You accept the validity of that patent, don't

22  you, on behalf of TPV?

23     A.   I've not provided an opinion about the

24  validity of this patent in this case.

25     Q.   You're here only to talk about infringement,

1   right?

2       A.   Today, what I have talked about are matters of

3   non-infringement.

4       Q.   And it's your word against Professor Myler's,

5   right?

6       A.   No.  It's my opinion, as an expert, based upon

7   the analysis of the patent, its prosecution history, and

8   all of the technical documentations for the SOCs in the

9   TVs.

10      Q.   Now, in reaching your opinions, you did not do

11  any testing, correct?

12      A.   I didn't test the TVs in this case.

13              MR. BLACK:  Could you put up Slide 73

14  from Dr. Myler's slides?

15      Q.   (By Mr. Black) You heard Dr. Myler's testimony

16  that he confirmed his opinions by setting up a testing

17  protocol and working with Mr. Lamm, who did actual tests

18  of actual products in this case, correct?

19      A.   Correct.

20      Q.   Are you aware, sir, because you've been

21  sitting in the courtroom, that Hitachi accuses TPV of

22  infringement with respect to more than 11 million

23  televisions, correct?

24      A.   If you say so, yes.

25      Q.   You did not test a single one of those units,

1  did you?

2       A.   As I said in my discussion earlier, there is

3  actually in this case a focus on the technology that's

4  embedded inside the SOCs that are in those televisions,

5  so the behavior of those 11 million televisions really

6  comes down to just this handful of designs from the

7  different SOC manufacturers.  That's all.

8       Q.   But you didn't do anything to test the

9  behavior of the televisions, right?

10      A.   Not for this case, no.

11      Q.   You mentioned that Dr. Myler had two -- excuse

12  me -- Professor Myler.  He's entitled to the title I

13  think.  Don't you?

14      A.   If you wish -- I -- I -- I'm an adjunct

15  professor at a university myself, but...

16      Q.   That's great.

17           Now, Professor Myler testified to two modes of

18  infringement.  You kind of reversed them there.  One of

19  them has to do with the -- what's inside the scaler,

20  which is actually quite a complex situation, isn't it?

21      A.   I'm sorry?

22      Q.   There's a lot of stuff going on inside the

23  scaler, more than drawing boxes of 4 by 3 and 3 by 2;

24  isn't that right?

25      A.   No.  Scalers are -- scalers are actually

1  pretty -- pretty simple devices.  I mean, a scaler just

2  needs to simply do some mathematical operations, very

3  simple operations that just simply multiply and add

4  operations on the lines that -- that are coming through

5  the scaler.

6          I wouldn't -- I wouldn't say it's complex, no.

7  I built the system that did this in 1984.

8                  MR. BLACK:  Can I go to the --

9                  THE COURT:  You may.

10     Q.   (By Mr. Black) Scalers are simple.  You've got

11  a 480 signal coming in, and you have to have a 1080

12  signal coming out, right?

13     A.   Correct.

14     Q.   You've got 480 lines, right?

15     A.   Correct.

16     Q.   You've got 1,080 lines that that screen needs,

17  right?

18     A.   Yes.

19     Q.   You've got to create 600 new lines of picture

20  information, right?

21     A.   Right.

22     Q.   You have to create more picture information

23  than came in; you have to create more lines than came

24  into the system, right?  Isn't that right?

25     A.   That's right.

1       Q.    That's simple, you say?

2       A.    Yes, it is.

3       Q.    A 480 picture has how many pixels going in

4  this direction?

5       A.    I'm sorry.  In the horizontal direction?

6       Q.    Yes.

7       A.    It has 704.

8       Q.    704.

9             And how many in a 1080 picture?

10      A.    1920.

11      Q.    1920.

12            And my math says that that means that you have

13 to create for each line 1196 new pixels, right?

14      A.    Oh, yes, but don't forget, in this case, you

15 know, we really should be just talking about the number

16 of lines because that's what the -- that's what the

17 construction is all about.  It's not really talking

18 about the number of pixels on along the line.

19      Q.    Well, we're just addressing your statement to

20 the jury that it's all very simple.  If you have 704

21 pixels, red, green, blue, whatever colors they are and

22 whatever intensity, and you have to create another

23 1116 -- or what is it -- 1216 pixels.  It's a fairly

24 complex operation, isn't it?

25      A.    No, it's not.  No.  As -- as I said to you

 1  before --

 2      Q.    Thank you.  Thank you, Dr. Reader.

 3           Now, a major point of distinction between you

 4  and Professor Myler is whether there are two video

 5  processor sections in the accused televisions, correct?

 6      A.    He has -- he advanced the idea that there are

 7  multiple video processor sections.

 8      Q.    Right.

 9      A.    And I disagree.

10      Q.    And that's a crucial point of difference

11  between the two of you, right?

12      A.    That's one of the key differences, yes.

13           MR. BLACK:  Could you put up Slide 61

14  from Professor Myler's presentation, please?

15           There we go.

16      Q.    (By Mr. Black) Okay.  Is it your opinion that

17  the scalers in the accused televisions constitute a

18  video processor section or not?

19      A.    No.  The scaler is not a video processing

20  section.

21      Q.    And the construction for this case of video

22  processor section is ordinary meaning to an engineer,

23  correct?

24      A.    One of ordinary skill in the art.

25      Q.    Right.  Ordinary meaning.

1          So we had a slide here.  Do you remember this

2  one?

3      A.    Yes, I do.

4      Q.    And you agree that 480p is a different video

5  format from 1080p, right?

6      A.    480p is an example of one of the formats that

7  the ATSC has -- has defined and broadcasts use, and

8  1080p is another format.

9      Q.    So the answer is yes.

10     A.    That's correct.

11     Q.    And 720p and 480p and 1080p are all different

12  video formats, right?

13     A.    That's right.

14     Q.    So what happens in a TV that receives a 720p

15  signal but wants to display a 1080p signal, that's what

16  we see here, right?

17     A.    We're seeing that scaled up to 1080p, yes.

18     Q.    And the operations that are occurring within

19  the scaler are, in a very simplified version, what we

20  were discussing over here at the easel, right?

21     A.    They are, but, remember, this is not -- this

22  is not performing the processing according to the

23  claim's construction -- Court's construction.

24     Q.    Ordinary meaning, sir.  Is this receiving

25  video?

1      A.    The scaler is receiving video.

2      Q.    Is it sending video to the panel?

3      A.    It's sending video to the panel.

4      Q.    Is it doing processing?

5      A.    It's doing processing, but it's not processing

6  that's required by the third limitation of Claim 1 of

7  the '243 patent.  That's the point.

8      Q.    That's your opinion.

9      A.    That's my opinion.

10      Q.    Thank you.

11            MR. BLACK:  No further questions.

12            THE COURT:  Redirect?

13            MR. LANDIS:  Just one brief question,

14  Your Honor.  Well, I hope one brief question.

15            THE COURT:  I can count to one.

16            MR. LANDIS:  That's why I wanted to

17  clarify quickly.

18                    REDIRECT EXAMINATION

19  BY MR. LANDIS:

20      Q.    Mr. Black just asked you a lot about your work

21  history.  Has anybody at Mr. Black's firm ever hired you

22  to testify in a case?

23      A.    Yes, they have.

24      Q.    Is he in the courtroom?

25      A.    He may be.  I don't see him at the moment, Mr.

1  Plies.

2      Q.    I know Mr. Plies was at the table at one time.

3  Oh, he's back there.  I see him.

4          Have you worked with Mr. Plies before?

5      A.    Yes, I did.

6      Q.    What did he hire you to do?

7      A.    He hired me to assist him in the defense of a

8  case.  He hired me to assist him regarding the

9  invalidity of a suite of patents that were being

10 asserted.

11     Q.    Thank you.

12             MR. LANDIS:  No further questions, Your

13 Honor.

14             THE COURT:  Additional cross?

15             MR. BLACK:  No, Your Honor.

16             THE COURT:  All right.  You may step

17 down, Dr. Reader.

18             Counsel approach the bench, please.

19             (Bench conference.)

20             THE COURT:  Who's next and how long do

21 you expect him to take?

22             MR. DACUS:  A long time.

23             THE COURT:  We'll take a break now, okay?

24             (Bench conference concluded.)

25             THE COURT:  Ladies and Gentlemen, it's

1  expected that the next witness may be of some length, so

2  rather than trying to break during the middle of the

3  time, we're going to take a morning recess at this time.

4          I'll give you 10 or so minutes.  Please

5  stretch your legs, get a drink of water, but don't

6  discuss the case with yourselves or anyone else.

7          If you will just leave your jury

8  notebooks there in your chairs, and we'll see you back

9  here in a few minutes.  You're excused at this time.

10          COURT SECURITY OFFICER:  All rise.

11          (Jury out.)

12          THE COURT:  All right.  We stand in

13  recess.

14          (Recess.)

15          (Jury out.)

16          COURT SECURITY OFFICER:  All rise.

17          THE COURT:  Be seated, please.

18          MR. BLACK:   Your Honor, may we address

19  one matter before we bring in the jury?

20          THE COURT:  What is that, Mr. Black?

21          MR. BLACK:  I just want to know -- for

22  the record, Mr. Wechselberger is the -- with respect to

23  the DigiCipher reference, we don't believe, based on

24  Mr. Lery's testimony, that they've laid a predicate to

25  go forward with a validity case on that reference.

```
 1                    THE COURT:  All right.  I assume this is

 2   for purpose of preserving your record.

 3                    MR. BLACK:  Yes, or if you grant it, we'd

 4   be happy, too, Your Honor.

 5                    THE COURT:  All right.  My intention is

 6   to discuss that during the informal charge conference.

 7                    See, once all the evidence is in, if

 8   there's enough to give it to the jury or not.

 9                    MR. BLACK:  Understood.

10                    THE COURT:  But for now, he'll be

11   permitted to testify.

12                    All right.  If there's not anything

13   further, let's bring in the jury, please, Mr. Shadden.

14                    COURT SECURITY OFFICER:  All rise for the

15   jury.

16                    (Jury in.)

17                    THE COURT:  Be seated, please.

18                    Defendants may call their next witness.

19                    MR. BERLINER:  Defendants call Anthony

20   Wechselberger.

21                    THE COURT:  Come forward.

22                    This witness has been sworn,

23   Mr. Berliner?

24                    MR. BERLINER:  Yes, sir.

25                    THE COURT:  If you'll come along and have
```

1   a seat, please, sir.

2              You may proceed.

3              MR. BERLINER:  Thank you, Your Honor.

4      ANTHONY WECHSELBERGER, DEFENDANT'S WITNESS, SWORN

5                   DIRECT EXAMINATION

6   BY MR. BERLINER:

7      Q.   Good morning, Mr. Wechselberger.

8      A.   Good morning.

9      Q.   Would you please identify yourself for the

10  record.

11     A.   My name is Anthony Wechselberger.

12     Q.   What do you do for a living?

13     A.   I'm the president of a consulting company,

14  Entropy Management Solutions.

15     Q.   And how long have you worked as a consultant?

16     A.   I started Entropy about 13 years ago.

17     Q.   And what does Entropy do?

18     A.   I provide a number of engineering consulting

19  services.  I'm basically a systems engineer.  Entropy

20  provides services for -- for almost any kind of a

21  network that might distribute content, such as a cable

22  TV network, a broadcast television network, satellite

23  networks.

24              First, we have the Internet today, and there's

25  also kind of distribution channels for content over the

1   Internet.  So I'm a communications engineer, my

2   background, anything that moves content from one point

3   to another is the things I do.

4        Q.    And where is Entropy located?

5        A.    I'm in a rural area just north of San Diego in

6   Southern California.

7        Q.    Could you briefly describe for us one of the

8   projects you've handled for your work at Entropy?

9        A.    Well, in terms of -- I mentioned content.

10  Probably the -- first of all, I have a number of

11  different clients, so a lot of names that folks would

12  recognize.  Some of those client names have been

13  Verizon, AT&T, Amazon, Apple Computer, Comcast, Cable

14  Network, Cox Cable Network.

15           So in my corporate background, I've worked

16  with these entities, and I continue to work with them in

17  my consulting field.  But probably the most interesting

18  thing I've done that -- as a consultant, for the past 10

19  years, I've been under contract with six major Hollywood

20  studios helping to push forward a project that they

21  started approximately in 1991 called digital cinema.

22           And digital cinema, the objective is to

23  replace 35-millimeter film in movie theaters.  They're

24  expensive to produce and distribute and bring back after

25  the showing.  So digital cinema produces digital files,

1  which are the result of digital -- digital production,

2  post-production, digital distribution.

3        And the last leg is now being implemented in

4  digital projection.  And so my role with the studios is

5  chief systems architect for the security of these

6  digital files so they can't be stolen.  I represent them

7  at the Society of Motion Picture and Television

8  Engineers, which is an industry consortium, that

9  develops standards for the motion picture industry and

10 the television industry.

11     Q.   Where did you work prior to the time that you

12 were at Entropy?

13     A.   Throughout the decade of the 1980s, I was

14 working in San Diego at a company called Oak

15 Communications.  At Oak, we designed, installed,

16 serviced, and otherwise supported what used to be called

17 broadband network equipment.  And this is equipment for

18 distributing television programs over cable networks or

19 over-the-air broadcasting networks, satellite networks.

20 And our equipment resided at the broadcast location by a

21 satellite uplink or a cable head-end.  We also built the

22 consumer products that went in your home, the set-top

23 box that everybody hates, but in those days, we produced

24 scrambling systems, and these were analog.

25        In the 1990s, the evolution towards digital

1 television took place, and Oak Communications had been

2 sold.  I stayed with the company as -- as an executive,

3 and we turned our attention to all digital product

4 solutions.  And so throughout the entire decade of the

5 1990s, we designed and produced equipment, similar

6 equipment designed for digital distribution.

7          And I was with a second company that was

8 called TV/COM International.  I held various titles

9 there, but most of the period, I was the Executive Vice

10 President and Chief Technical Officer.

11     Q.   So how has your work experience prepared you

12 to testify in this case?

13     A.   Well, for throughout -- certainly, through the

14 decade of the '90s with the arrival of the digital

15 television transition and subsequent to then as an

16 engineer, that's 23-plus years now, my work has evolved

17 around the digital movement of content.

18          And this case is all about digital audio,

19 digital video as content and transmission and reception

20 environment.  And so my background academically is a

21 communications engineer.  My professional background in

22 content distribution and my experience with standards

23 organizations has prepared me to provide opinions.

24     Q.   You just mentioned the word standards.  Can

25 you tell us what you meant by standards?

1       A.    Sure.   Standards are a recipe, if you will,

2  that codifies in writing –– that answers questions of

3  how –– how do I or how to; how to generate a broadcast

4  signal.   In this case, how to compress information, how

5  to add information, how to provide an end-to-end system.

6  End-to-end means the sending end and transmission end

7  and the receiving.   There are a number of supply chains

8  that feed into a given industry that people rely upon.

9        In this case, we've heard a lot about digital

10  television.   You have broadcasters; you have

11  transmission equipment suppliers; you have consumer

12  product manufacturers that make TVs.   And the common

13  denominator that people use are the standards that

14  everybody designs to.

15        And when you do that effectively, you produce

16  compliance, and these various segments interoperate

17  together.   And so the standards is the recipe, the

18  how-to that allows this to happen.

19       Q.    Do you have any personal experience in the

20  development of standards for digital television?

21       A.    Very much so.   At TV/COM, which was formed ––

22  well, the company existed in 1990 with the sale of the

23  old Oak group.   But the revolution, if you will, to ––

24  to reorient the industry toward digital happened in

25  1990.   And we decided that we needed to become a part of

that.

And in 1991, I joined and began to attend the MPEG committees.  We've heard about the MPEG committees from earlier testimony.  There were actually three subcommittees.  I personally attended those meetings about three or four times a year.  Several hundred engineers would come together, and for five intensive days, we worked to develop the rough drafts, and then the -- and then finally, more mature drafts of the actual standards.

And we -- the joke used to be join MPEG and see the world.  We'd meet in New York or Italy or Rome.  And so I was part of this effort through the MPEG committees.

In parallel with the MPEG committees, there were other committees that existed, because they would take the fruits of MPEG, which were just basically the rudimentary foundation of digital television standards, and build upon them to actually finish off the rest of the standards that were necessary to implement a real system.

For example, the ATSC standard-setting body in the U.S. took some -- most of what MPEG provided and then capped it off by adding additional standards for modulation and metadata and other things that went along

1  with that signal.  So you had a fully baked,

2  ready-to-go -- fully ready-to-go standard.  So I was

3  part of MPEG, a contributing member.

4         There was another group that developed to

5  start standards for Europe called the Digital Video

6  Broadcast Group.  I was a member of that.  At TV/COM, I

7  was Chief Technical Officer.  TV/COM had joined the ATSC

8  group as a voting member.  It was my job then to follow

9  the rough drafts of standards specifications that came

10  out of ATSC and vote on them.

11     Q.   Have you published any papers relating to --

12  to this field?

13     A.   I, throughout my career, have participated in

14  a number of industry panels where I've presented papers

15  orally, and I've also published papers.  One in

16  particular I think we have a slide of.

17         This was an article that I wrote in 1993.  I

18  first presented this paper at the National Cable

19  Television Association show in Las Vegas.  The NCTA is a

20  trade show mostly aimed at the cable industry.  That

21  same paper was subsequently -- went to publication in a

22  magazine called Communications Technology.

23         And there are a lot of different aspects of

24  digital television systems, and this particular paper

25  was about promoting a standardized way to provide

security solutions so that the information that goes

over a digital network could be secured or scrambled, if

you will, for like TV applications.

So this was a particular area where Oak

Communications was -- I'm sorry -- TV/COM International

was heavily involved when I was there, so I was

promoting ideas for standardization on encryption.  I

was also promoting, of course, my company.

Q.   What is your technical background?

A.   I have a bachelor of -- bachelor of science

degree in electrical engineering from the University of

Arizona in Tucson, 1974.

I have a master's of science in electrical

engineering from San Diego State University.  I received

that in 1979.

And I also am a graduate of the executive

program for scientists and engineers from the University

of San Diego -- University of California at San Diego.

That was 1984.

Q.   Do you have any of your own patents?

A.   Two -- two issued patents have my name on

them.

Q.   And how do your patents relate to the

technology at issue in this case?

A.   Both of these patents are related to

information that provides encoding and decoding

information for broadcast television pictures, either in

analog and/or digital format.

Q.   So what do you enjoy doing when you're not

consulting?

A.   Well, I work out of a home office, so it's not

unusual for me to get up, put in a full day's work, end

up in front of the news without ever walking outside.

So when it comes to relaxation, it's anything outdoors.

I have a boat in the summertime, and we head for the

Colorado River and boating activities around there.  We

also do a lot of hiking and backpacking throughout the

California area.  My fiance and I are both scuba divers,

so we do that when we get a chance.  International

travel.  I also have a bunch of buds that are San Diego

City firefighters, and if it wasn't for this trial, I'd

be joining them with Texas Motor Speedway this weekend

for NASCAR racing.  So I like to do that too.

Q.   Have you ever testified in court as an expert

witness?

A.   Yes, I have, six times.

Q.   And how many of those times involved questions

of patent infringement?

A.   Three of those cases have involved patent

infringement.

1       Q.    And what was the general subject matter of

2   your previous patent case testimony?

3       A.    All three of those cases related to digital

4   television technology.

5       Q.    Have you served previously as an expert

6   witness for TPV in other cases?

7       A.    I have on two occasions.

8       Q.    Why do you think TPV keeps hiring you?

9       A.    There's a lot of learning curve material to go

10  through when you take on a case, especially things this

11  complicated.  So I've been through the drill with them

12  before.  I understand their technology.  I understand

13  their products.  And so it just made sense for economies

14  and to save time.

15      Q.    And have you always served as an expert on

16  behalf of Defendants in your previous case testimony?

17      A.    Not at all.  I have provided trial testimony

18  on one occasion where I was assisting a patent owner in

19  asserting their patent.  I'm also -- I've got a similar

20  case now, ongoing right now, a different case, where I'm

21  in the middle of writing an expert report for a client

22  who is also going to be -- who has asserted their

23  patent.

24      Q.    So what has the Defendant asked you to do in

25  this case?

1      A.    The Defendant TPV has asked me to provide

2  opinions as to whether their television infringed any of

3  the asserted patent claims, and the other thing they've

4  asked me to do was to study the asserted patents in

5  light of the prior art and provide opinion as to whether

6  those claims are valid.

7      Q.    And are the -- the Hitachi patents that you

8  studied known as at '310, the '375, and the '497

9  patents?

10      A.    That's correct.  I'm responsible for three of

11  the asserted patents.  The '310 -- in this case, the

12  '310 and the '375 share the same disclosure and the same

13  diagrams and the same priority date.

14      Q.    And -- and could you briefly describe the

15  subject matter of the '310 and the '375 patents?

16      A.    Sure.  These two patents relate to video

17  recording technology.  They disclose a playback device

18  and a video-recording device for digital information.

19      Q.    And how about the -- the '497 patent?

20      A.    The '497 patent is about a configure -- about

21  how to build and use a configurable television; that is,

22  a television that is able to receive digital broadcast

23  programming and also receive a supplemental control

24  information channel that configures that TV as to how to

25  process the signals it receives.

1    Q.   Do you have an opinion as to what type of

2 person would qualify as one of ordinary skill in the art

3 with respect to the three Hitachi patents that you

4 studied?

5    A.   Yes.  My opinion of one of ordinary skill is

6 that the individual should have at least a bachelor of

7 science degree in electrical engineering or computer

8 engineering or computer science, and three to five years

9 of industry experience in the area of digital television

10 and the associated systems and equipment that go with

11 digital television.

12    Q.   Would you consider yourself to be a person of

13 at least ordinary skill in the art?

14    A.   I would consider -- consider myself to be one

15 of extraordinary skill in the art.

16    Q.   Why is that?

17    A.   Because I've been working within television

18 transmission and receiving systems and the associated

19 equipment for over 30 -- over 30 years.  And I've been

20 involved with digital television transmission and

21 reception equipment since its initial beginning as it

22 was directed toward the broadcast industry back from the

23 early '90s.

24    Q.   And do you have opinions as to whether the

25 three Hitachi patents that you've studied are valid and

1  infringed?

2      A.   It's my opinion that the three asserted

3  patents are invalid in light of the prior art.  I'm

4  sorry.  That -- that the TPV televisions do not infringe

5  any of the asserted claims.

6          And with respect to validity, it's my opinion

7  that two out of the three patents are invalid in light

8  of the prior art.

9      Q.   And can you describe for me the information

10  that you relied upon in reaching your opinions?

11      A.   Sure.  Of course, many hours of studying

12  the -- the patents themselves and the drawings and the

13  claims, the patent prosecution histories, which provide

14  the dialogue back and forth between the patentee and the

15  Patent Office.

16          I've studied lots of prior art in my research

17  on that to compare it against the asserted claims.  I

18  studied the various -- you've heard the term SOC,

19  system-on-a-chip.  I studied the chip components that

20  comprise the televisions themselves.  Of course, my

21  background in digital television came into play,

22  especially when I turned to study the digital television

23  standards, particularly the ATSC standard, which is of

24  great importance in this matter.

25                  MR. BERLINER:  Mr. Lodge, could you show

1  JTX 2 for me, please?

2      Q.   (By Mr. Berliner) Mr. Wechselberger, can you

3  tell me what this document is?

4      A.   Yes.   This is -- blow it up a little.

5           This is a document which shows various TV

6  brands and models, and that's on the left column.   And

7  in the middle column, it shows the manufacturer of the

8  SOC that's inside that television.

9           And so in this first column, I see the name

10 Broadcom, for example, as the SOC manufacturer.   So it's

11 a list of, I'm assuming, all the accused products which

12 identifies the particular SOC that's inside the TV.

13              MR. BERLINER:   Thank you.   You can take

14 that down.

15     Q.   (By Mr. Berliner) Now, Mr. Wechselberger, are

16 you being compensated for your work on this case?

17     A.   Yes, I am.

18     Q.   What is your rate of compensation?

19     A.   $300 an hour.

20     Q.   How much time have you spent in total to

21 prepare for your time today?

22     A.   I -- about 500 hours.   I don't know exactly,

23 but I started working on this case on and off more --

24 almost -- in 2010, so it's been a couple of years.

25     Q.   Why did you spend so much time?

         A.   Well, you can think about the list of
materials I review that I just went over and recognize a
lot of documents.  I too, like I heard the experts on
the other side, have looked at thousands of pages of
material, but the -- the main thing that dictates how
much time a person like myself spends on a case is how
long and difficult is it to get through all the
information you need to understand before making
opinions.

         I take my work seriously.  And it's important
to be able to not only provide opinions but be able to
tell you why I have those opinions.  And it takes what
it takes.

         Q.   Does your compensation depend in any way on
the outcome of this case?

         A.   No, it does not.

         Q.   So let -- let me ask you a little bit about
the ATSC.  We've heard a lot about the ATSC in this
trial so far.

         Do you consider the three Hitachi patents that
you've studied to be essential to the ATSC standard?

         A.   No, I don't.

         Q.   Why not?

         A.   The ATSC standard took years of development
effort on -- in the first place, in calendar times, it

1  took years.  It took the efforts of literally hundreds

2  of engineers from all over the world.  We heard this

3  morning that the ATSC standard itself incorporates

4  MPEG 2 standards.  I was a part of that MPEG 2 standard

5  process, so when I say it took a lot of effort on the

6  part of hundreds of engineers, I know that because I was

7  one of them.

8            For years, I went to the MPEG 2 meetings.  I

9  followed the development of the standards bodies,

10 sweated the details.  And in my opinion, the teachings

11 of these Hitachi patents provide no solutions that were

12 a part of the particular challenges that we were trying

13 to solve at that time.

14    Q.   Now, you mentioned a few technical terms in

15 your answers so far, and I'd like to take a couple

16 minutes just to explore those.

17            MR. BERLINER:  Could you bring up DD 103?

18    Q.   (By Mr. Berliner) I think one of the terms you

19 mentioned was analog and digital.  And can you explain

20 that for us?

21    A.   Sure.  And, of course, these are

22 characterizations.  The curve on the top and the analog

23 signal as it might have looked for analog television

24 broadcasting, which we've used in this country since

25 the'40s right up until a few years ago.

1          Analog is usually described as a continuously

2    varying smooth signal.  If I'm not too nervous, my voice

3    is producing an analog signal, smoothly -- smoothly

4    delivered, contrasting to digital, which is based on the

5    language of computers, 1s and 0s, sometimes called

6    binary bits.

7          And so the representation on the bottom is

8    what that kind of a signal looks like as it's generated

9    and produced from, for example, a digital television

10   broadcasting station.

11         Now, these aren't 1s and 0s, but it's what the

12   1s and 0s get turned into as a multiplexed programming

13   that is sent from a receiver -- transmitter to a

14   receiver.

15         So it's very discontinuous as you can see,

16   very jagged.  And while that looks like a mess to our

17   eyes, through the beauty of television reception and

18   digital signal processing, that's turned that into

19   crystal clear, high-definition pictures.

20      Q.   And you just used another complicated

21   technical term.  You said multiplexed.  Could you tell

22   us what that means?

23      A.   Sure.  You've -- I was in the Court this

24   morning, and -- and other occasions where people have

25   made the point that digital television technology

```
 1  enables multiple programs to be sent over a single
 2  broadcast channel.  And this is one of the really
 3  attractive characteristics of digital television
 4  technology.
 5          And the way that happens is through a process
 6  of combining the bits from the programs together.  We
 7  saw the train this morning from the boxcars, and that's
 8  an example -- a pictorial example of multiplexing.
 9          So it's the process of combing together and
10  packaging up, in this case, multiple channels of
11  television programming.
12      Q.   Could you explain to the jury how the
13  development of digital television broadcasting came
14  about.
15      A.   Sure.  I have a timeline for that called a
16  digital television timeline.  And the timeline -- the
17  timeline goes across -- yeah, there it is -- goes across
18  the bottom from 1980 to roughly 2000.
19          And I've got a number of technology
20  development areas that I'll quickly talk about.  And the
21  story, actually, in terms of digital television
22  technology, can be traced -- could be traced back a long
23  way, but in concrete terms, at least to the early 1980s,
24  with digital teleconferencing systems.
25          Now, these were audio/visual communications,
```

1   connections between, for example, conference rooms from

2   San Francisco and Los Angeles that businesses could use

3   and have realtime interactions or meetings together.

4           This was not digital broadcasting, but it was

5   digital television.  Digital audio, digital video,

6   compressed digital audio/video with parity and so on.

7   So it was a full communications connection two-way.

8           Another important development was called JPEG.

9   These guys were focused on compression for photographs,

10  and that technology exists now in any digital camera you

11  have.

12          And the important output from JPEG was image

13  compression technology, the technique called discrete

14  cosine transform, was largely developed and worked for

15  still images and was later applied to moving pictures.

16          In fact, it was applied by the MPEG 1

17  committee.  By this timeline, MPEG 1 was a lower

18  performance, all-digital, all-audio technology for

19  recording onto a compact disk, and very early, DVD types

20  of disks.  But it was applied to transmission systems as

21  well.

22          Here's the MPEG 2 Committee that I mentioned,

23  and Dr. Reader mentioned before me, and they were

24  working indeed on three separate standards, video

25  compression standard and audio compression standard and

1  this transport stream, which provided a beautiful

2  solution for multiplexing these streams together.

3          I also mentioned the DVD developments that

4  were aimed at broadcasting solutions for Europe.  And

5  then on the bottom line is this very important line that

6  we'll focus on.

7          ACATS was the advisory committee on advanced

8  TV services.  This was the commission that was generated

9  by the FCC whereby the various companies were promoting

10 analog solutions as you heard this morning.

11         And the key pivotal point on No. 1 shown there

12 is when the General Instrument Company showed up in the

13 middle of 1990 and demonstrated a true high-definition,

14 all-digital broadcasting solution for over the air.

15 That changed the direction of things.

16         The ACATS members, by the end of the year, had

17 all turned their attention into promoting digital

18 solutions, even though they were still competing against

19 each other.

20         The second item shown as No. 2 is where the

21 FCC, recognizing, by the way, that MPEG 2 was going to

22 be successful.  That's a little farther down the MPEG 2

23 timeline there in the middle, 1992, 1993.  MPEG 2 was a

24 total global effort, international bodies coming

25 together, and the effort was going to produce an open

1  standard that everybody would embrace.

2          And so the FCC turned to the ACATS members,

3  who, remember, are still competing, and said, look, guys

4  open standards are the future, and we think the U.S.

5  broadcast standard ought to be not propriety --

6  proprietary but should be open.  Please get together and

7  see what you can do with the best of the best.

8          So as you heard before, they finally did align

9  and codify the best of the best.  And what came out of

10 that was the ATSC standard shown by the triangle right

11 there, the Advanced Telecommunications (sic) Systems

12 Committee standard.

13         The first published for draft comment in 1995,

14 I remember when that came out.  I was a voting member of

15 that group from -- from TV/COM.  And it was approved and

16 later adopted by the FCC as the broadcast standard for

17 the United States.

18     Q.   Now, you mentioned that the group of companies

19 came together.  And -- and did they have a name?

20     A.   Oh, well, there were seven companies that were

21 part of what became known as the Grand Alliance, and I

22 guess the name came from World War II.  But they were

23 companies like General Instrument, AT&T, North American

24 Philips Corp, Massachusetts Institute of Technology,

25 David Sarnoff Research Labs -- I'm sure I'll forget one

1  or two.

2          But they were the Grand Alliance, and they

3  were the ones who capped off what they got from MPEG and

4  what they each contributed as -- from their corporate

5  intellectual property, which became embodied in the ATSC

6  specification.

7      Q.    Okay.  Was Hitachi part of the Grand Alliance?

8      A.    No, they were not.

9      Q.    So did -- did -- you mentioned -- you

10  mentioned MPEG 2, and how did the MPEG 2 standards

11  relate to ATSC?

12     A.    As -- as the timeline shows, there were three

13  initial standards that MPEG 2 worked on:  Video

14  compression, audio compression, and the systems layer,

15  the transport standard.

16          ATSC adopt that video compression standard

17  because as -- by that time, in 1993, it had -- through

18  testing and development and mostly global support --

19  support, it had been shown this was going to be what

20  most of the world was going to embrace as a video

21  compression solution.  So they brought that in.

22          The systems standard, which is the

23  multiplexing technique, was also brought in.  Through

24  the elegance of that standard -- which has been used in

25  a lot of different applications, by the way.

1          That's probably the neatest thing that came

2    out of MPEG because it so wonderfully allows you to

3    develop not just audio and video but any kind of data --

4    computer data, programs, you name it -- can be

5    packetized and put in these boxcars like you saw and

6    made part of the broadcast standard in addition to TV.

7          So the answer to your question is, the value

8    of those standards was recognized, not only by the FCC

9    but the member companies.  And they brought it in and

10   made it part of the standard.

11         So if anything is the backbone of the ATSC

12   standard, it's not these three Hitachi patents.  It's

13   MPEG.

14     Q.    Did Hitachi play any role in the development

15   or adoption of the ATSC Standard?

16     A.    Not to my knowledge.

17     Q.    Now, Mr. Wechselberger, you've given us a

18   description of the history of the ATSC Standard, and

19   could you briefly describe now for the jury how digital

20   television signals are transmitted according to the ATSC

21   standard.

22     A.    Sure.  I have a series of slides.  I'll start

23   simple, and we'll work our way up.  Not too complex,

24   hopefully.

25         But at a high level, an end-to-end system --

1  I've used that term a couple of times -- it simply means

2  a source, a path, and a reception to a transmit antenna.

3  The path is over the air, and the receiver, of course,

4  is in the home.

5          So there's a number of processing steps that

6  must take place at the transmission site and the

7  reception site.  And what you -- without even paying

8  attention to what they are, you can notice a certain

9  amount of symmetry here.

10          Audio and video is a process.  It's combined

11  together.  It's prepared for transmission.  It's

12  transmitted by a thing called modulation.

13          The opposite order happens at the receiver,

14  demodulation.  The signal is cleaned up after

15  transmission, the streams are separated, and then the

16  video and audio information is separately processed.

17     Q.   So let's -- let's take a look at the

18  transmission side in a little bit more detail.  And

19  would you describe that for us.

20     A.   Sure.  Over here on the left, the video

21  information in an analog form and audio typically will

22  come in, and the compression -- sometimes the words are

23  used interchangeably, but encoding in our -- in this

24  case, you can think of encoding as including

25  compression.

1          So it's encoding and compression.  What comes

2   in is analog; what comes out are bits.

3          Now, these bits have been compressed.  I saw

4   the model with the balloons being squashed and blown up.

5   That's where this happens, in this box.  Bits come out,

6   not balloons, obviously.

7          Same for audio.  So you've got two separate

8   streams.  The service multiplex and transport, combines

9   them.  Out come those packets, the boxcars from the

10  train analogy.

11         Channel coding is a real important part of

12  preparing to transmit -- preparing the signal for

13  transmission.  I'll talk more about that in a minute.

14  And the modulation part is the engine that takes this

15  prepared information and injects it into the air through

16  the antenna.

17     Q.   And then what happens at the other side, at

18  the reception side?

19     A.   There's a picture of that.  And as I

20  indicated, we'll -- we'll march through the process

21  steps in reverse.

22         The demodulator is the engine that takes the

23  information off the air and turns it back into

24  information that can be processed digitally.

25         Channel decoding is where the parity error

1   correction functions happen.  We'll talk again more.

2          Transport demultiplexing separates the

3   information so that the audio decompressor and the video

4   decompressor can do their job of regenerating or

5   reconstituting, as it's sometimes called, that

6   information that ultimately ends up coming out through

7   the speaker and showing up on the picture tube.

8          Oh, I guess we don't have tubes anymore.  Flat

9   screen displays.

10      Q.    So why is the ATSC standard so complicated?

11      A.    Well, that's a segue into this error

12   correction issue that I just mentioned.  It turns out

13   that the over-the-air broadcasting channel, these

14   communications that we talked about, distribution

15   channels, that channel is a really tough one.  It's a

16   difficult transmission environment.

17          Lightning provides -- generates what's called

18   ingress interference.  Car ignition noise can cause

19   problems.  The signal bounces off buildings, mountains,

20   moving things like airplanes.

21          And as consumers, we've seen these impairments

22   before ourselves.  In the analog days, we played with

23   the rabbit ears to get the best picture.  You could

24   sometimes see sparklies.  That could be ignition noise.

25   A lot of times you saw multiple edges, like multiple

1  versions of the edge of a building or a person, and

2  that's multipath, and that's reflections off buildings

3  and so forth.

4  　　　　　And so that might be annoying to us in the

5  analog days when we were still watching the movie, but

6  it absolutely destroys a digital signal.  The digital

7  signal will not get through there.

8  　　　Q.   So how does the ATSC solve that problem?

9  　　　A.   The designers of the ATSC recognize -- I mean,

10  we knew all about multipath and ingress and interference

11  and so forth.  Those characteristics were well-known.

12  What wasn't really well-known when the design efforts

13  began for digital television was how to actually build

14  robust protection against this what we call channel

15  impairments.

16  　　　　　And through a process of testing and a lot of

17  heavy-duty analysis and math, it was decided that two

18  kinds of forward error -- what's called forward error

19  correction were going to be needed.

20  　　　　　One's called Reed-Solomon, and one is called

21  trellis coding.  And these provide redundancy to the

22  transmitted signal to -- to impart on it the robustness

23  that's necessary so that it survives that path out to

24  the television set.

25  　　　Q.   So could you explain what you mean by

1  redundancy?

2       A.   It's actually a pretty simple concept.   If

3  we're trying to -- say we were trying to communicate in

4  a very noisy room with a lot of background chatter or

5  what-have-you.

6            You're sitting across the table with somebody,

7  they didn't get the message, you repeat yourself, or you

8  repeat the most important thing you're trying to say,

9  that's redundancy.

10           You're adding something extra to the basic

11 information, the basic message.   And by adding

12 redundancy, you can then put the signal back or recover

13 from channel impairments in this case that takes place.

14      Q.   So let me show you two of the ATSC standards.

15           Can you identify these for me, please?

16      A.   The one on the left is -- is the main ATSC

17 standard.   It's called A53, and it provides the how-to,

18 the recipes for most of the main parts of how to

19 generate an ATSC-compliant signal.   It tells you how to

20 modulate; that is, how to broadcast a signal; it tells

21 you how to compress a signal; it tells you how to add a

22 forward air correction to the signal.

23           The one on the right that's been highlighted

24 is A54.   This is called a recommended practice.

25           The one on the left is just the facts, mainly

1    nothing but the facts.  It's -- it doesn't really

2    highlight -- it gives you all the information you need,

3    but the one on the right complements that, because it

4    breathes life into the one on the left.  It provides

5    recommended ways of implementing hardware.

6              And in this case, we'll reference it because

7    it provides a nice diagram of what it calls a

8    prototypical receiver; that is, what a typical

9    television receiver system needs to have.

10        Q.   And these documents are marked as Defendants'

11   Exhibits 34 and DTX 35.

12             And did you review these two documents in

13   forming your opinions for this case?

14        A.   Yeah.  I've been familiar with these documents

15   for many years, but certainly I reviewed them, and I

16   found them useful tools to do my work here.

17        Q.   So let me show you a couple of figures from

18   these documents and maybe you can identify them for us.

19        A.   Sure.  The one on the top that says

20   transmission came out of the A53 specification.  You

21   remember I said that's the recipe for how to broadcast

22   and generate an ATSC signal.  So this shows the transmit

23   location.

24             The information that's been compressed comes

25   in on the left and goes through a series of important

1    steps.  Each one of these steps changes the signal, does

2    something to it.  It adds error correction that I

3    mentioned.  You see the trellis encoder -- I'm sorry --

4    that's the Reed-Solomon and the trellis, and then

5    finally, the modulator and out the antenna.

6           The counterpart of that diagram that was found

7    and convenient to look at for the receiver is in A54.

8    Once again, off the tuner, you can see the information,

9    and it flows through a number of steps on its way to

10   being constructed into a picture.

11          So there's -- there's -- there's additional

12   information shown on these diagrams that we don't need

13   to pay attention to.  And so I've come up with my own

14   version of these, which deals directly with the issues

15   at -- of interest with respect to the patents.  And

16   that's what these are.

17          Once again, the transmission signal path is on

18   the left.  Follow the left-to-right process for

19   transmission, a number of steps that I'll talk about,

20   out to the antenna; and on the receive side, the reverse

21   undoing of what was done at the transmitter.

22     Q.    And do the -- does the diagram on the bottom

23   actually reflect what's in the televisions?

24     A.    Absolutely.

25     Q.    And how do you know this?

1    A.   Well, for two main reasons.  One, I know it's

2   mandated by the FCC to be able to detect -- well, the

3   FCC doesn't mandate how to build receivers, but if you

4   generate a signal the way it's done at the transmitter,

5   then by virtue of building an ATSC-compliant receiver,

6   you have to do these processes in the television, or you

7   get no picture.  So from a technology standpoint, it has

8   to be this way.

9        Secondly, I've looked at the SOC chips that

10  are the main component in the televisions themselves and

11  confirmed that they perform these functions.

12   Q.   So let's go through the architecture of a

13  television receiver in a little bit more detail.

14  And can you start with the -- can you start with the

15  demodulator?

16   A.   Sure.  And I saw the confusion.

17       You see the little highlight around the

18  demodulator there, the blue.  That is the first stage

19  that the -- that the signal hits when it reaches --

20  comes out of the television into the television tuner.

21  It goes to the demodulator.

22       I described that a moment ago as the engine

23  that takes the energy and the information off the radio

24  signal and turns it into usable digital information.  In

25  this -- in this case, what comes out of the demodulator

1  are called trellis-coded symbols.

2      Q.    So moving on to the trellis decoder, could you

3  explain what that is for us, please?

4      A.    Sure.  And you see the trellis decoder, the

5  second box -- second signal processing box highlighted

6  in blue.  Here's the output from the demodulator, those

7  symbols.  That looks like, by the way, that diagram I

8  showed earlier for the modulated digital thing, I was

9  comparing analog to digital.  And so this is where that

10 comes into play.

11          Now, the trellis decoder is the first of two

12 forward error correction processing steps that are

13 mandated by the ATSC standard.  It takes the information

14 here and performs two -- in two steps a process that

15 pulls the information out of the symbols, turns it into

16 binary bits.  The second take actually applies the

17 forward error correction.  So what comes out is

18 corrected data; in this case, trellis code-corrected

19 data.

20          The second process -- excuse me -- one little

21 thing I should have added.  The word trellis-coding is

22 the one we use as it pertains most of the time to ATSC

23 signals.  Trellis-coding is one of a family of types of

24 codes that perform error correction.  The larger family

25 set it comes from is called convolutional encoding and

1  decoding.

2      Q.   What do you mean by convolutional encoding and

3  decoding?

4      A.   I have to wave my hands in the air a lot, so

5  it would assist me in answering that with the jury if I

6  could write on a whiteboard or something.

7              MR. BERLINER:  Your Honor, would it be

8  acceptable for me to bring the -- this paper over to

9  there to allow him to demonstrate --

10             THE COURT:  Yes, we'll do it the same

11 way, Mr. Berliner.

12             MR. BERLINER:  Thank you.

13             THE WITNESS:  I have permission to --

14             THE COURT:  Yes, you may.

15     A.   And the reason I want to do this is because

16 these are symmetrical processes, and we're looking at

17 the receiver --

18             THE COURT:  Dr. Wechselberger, you're

19 going to have to speak up, since you don't have a

20 microphone.

21             THE WITNESS:  Yes, sir.

22     A.   It's really helpful in describing the decode

23 function if I can also do it at the same time I can use

24 the encode function because these things work in concert

25 together.  So let me very quickly just draw some empty

1  boxes, and then I will fill the boxes in with the

2  information that helps to respond to the question that I

3  was asked.

4         So I'm going to label this trellis and

5  probably be pointing back to this one when we get a

6  little farther in the questioning.  So I mentioned it

7  was a two-step process.  And we see up there that

8  there's these symbols coming in -- I'm sorry.  That's

9  the receiver, and we start at the transmitter.

10        And -- and there's a process called

11 trellis-coding.  That's the first of the steps.  And

12 you've seen a little bit of it early in this week.  I've

13 been in the courtroom, and this business about bits

14 being processed.  In this case with respect to the

15 trellis-coding, two binary bits go in and three bits

16 come out.

17        And there was also a drawing that you were

18 shown earlier in the week from the ATSC spec that had a

19 box on it and some circular signal processing.  It's a

20 little hard to understand how that works, so I thought

21 I'd show it in a slightly different way as we often do

22 as engineers.

23        And inside this first step, there is actually

24 a path that's followed by the bits as they go through

25 this trellis-coder.  They don't just go in and come out.

1  They go chunk, chunk, chunk.

2  THE COURT:  Excuse me.  Excuse me just a

3  minute.

4  Counsel, approach the bench.

5  MR. PLIES:  Yes, Your Honor.

6  (Bench conference.)

7  THE COURT:  It's fine if he wants to use

8  that board to answer your question, but I'm not going to

9  let him get up there and give a 30-minute lecture.

10  MR. BERLINER:  It should be very short.

11  THE COURT:  You're going to have to

12  examine him.  It's an aid to the examination.  It's not

13  a platform in which to lecture.

14  MR. BERLINER:  Okay.

15  (Bench conference concluded.)

16  MR. BERLINER:  Your Honor, could I stand

17  over --

18  THE COURT:  And we do have a hands-free

19  microphone, if you'd like to use it, Mr. Berliner.

20  MR. BERLINER:  I would.

21  THE COURT:  Mr. Shadden, would you hand

22  him that, please.

23  THE WITNESS:  I take it I was hard

24  hearing, so hopefully this helps.

25  MR. BERLINER:  Well, why don't I take

1  that.

2      Q.   (By Mr. Berliner) You were just beginning to

3  explain the first stage of the trellis encoder; is that

4  correct?

5      A.   That's correct.

6      Q.   And can you show how the data moves through

7  the first stage?

8      A.   Okay.  And I was about to explain that it

9  takes a number of steps for the data to go through to be

10 turned from two bits into three, but I also want to step

11 back and say why is it called trellis-coding?

12         Now we can see.  It looks like a trellis, and

13 the bits will come through and follow a different path

14 as they go through this trellis-encoding function.  Now,

15 this is all done under the control of a mathematical

16 algorithm that's actually controlling this inside the --

17 the inside the chips.

18         But you can see that the -- but what I'll tell

19 you is the path that the information takes is a function

20 of the kind of information that goes in, and the magic

21 sauce that takes place is how these two bits gets turned

22 into three, which adds -- which appends the redundancy,

23 adds the -- it provides the redundancy that's in these

24 three bits.  The second -- so that's stage one.

25     Q.   And can you tell us what the second stage is?

1        A.    The second stage is called a

2   bits-to-symbols -- bits-to-symbols mapper.  And what

3   this box does is it produces those symbols that you see

4   up there for the transmit location.

5            Jumping now over to the receiver, which is

6   what's on the board, unsurprisingly, there is another

7   trellis, and this is a trellis decoder.  And in front of

8   it is a symbols-to-bits mapper.

9        Q.    So what happens in the symbols-to-bits mapper?

10       A.    Those symbols that you see up there come in,

11  and they must be transformed into bits, because these

12  silicon chips operate on binary information, which we

13  call bits.  And the main point of doing this is to

14  impress upon the message here is that in the generation

15  of those three bits from the two, there is a complete

16  transformation through this trellis function that takes

17  place.

18            These three bits, if you were to look at them

19  in their bit pattern, look nothing like these two bits

20  that go in.  That's okay, because even though they've

21  been transformed into a completely different kind of a

22  signal, this trellis decoder, through the mathematics

23  that makes it run, will undo that process at the

24  receiver.  And with three bits in will regenerate the --

25  the two bits that come out.  And this performs error

1  correction at the receiver.

2      Q.    Thank you, Mr. Wechselberger.

3              MR. BERLINER:   Thank you, Your Honor.

4      Q.    (By Mr. Berliner) So after the trellis decoder

5  is the data de-interleaver; is that correct?

6      A.    That's correct.   That's the next signal

7  processing stage.   Back again at the transmitter -- I

8  wont' get up and draw it, because we can do the rest of

9  these, I think, easily here.

10             Back at the transmitter, information got

11 interleaved.   And so there is a stage in the receiver to

12 undo that.   It's called a data de-interleaver.

13             And the color-coding here is intended to give

14 a little picture of what that might mean.   What that

15 does mean is that the interleaving process is kind of a

16 randomizing process, so non -- the non-interleaved

17 information looks in a -- in a more -- in the pattern

18 you see.

19     Q.    And what is after the de-interleaver?

20     A.    After the de-interleaver is the Reed-Solomon

21 decoder.   This is the second forward error correction

22 process mandated under the FCC standard.

23             What comes into the Reed-Solomon decoder is

24 the information that came from the encoder at the

25 transmitter.   In this case, it's a combination of two

1  kinds of information.

2         On the left, the blue and the red are audio

3  and video information.  For example, it's the content

4  information.  Appended to the content, literally added

5  to that content information is -- is what's called

6  parity information.  The Reed-Solomon encoder at the

7  transmitter is a parity-adder.  And this is important,

8  because when we look at the patent, you're going to see

9  a diagram which says parity-adder.

10         So the Reed-Solomon is a kind of error

11  correction code that uses parity, and it adds parity to

12  the information.  You can see it.  It's right there.

13  It's those ps.  It's the job of the Reed-Solomon decoder

14  to use that redundant information to fix bit errors.

15         And if we slip to the next slide, we have an

16  example of information that is coming into the

17  Reed-Solomon decoder that has bit errors in it.  That

18  bit should be a 0; that bit should be a 1.  Something

19  happened during transmission to contaminate the

20  information.  And so the algorithm inside the

21  Reed-Solomon decoder is able to find out which bit is

22  wrong and fix it.

23         And so we have the corrected information

24  coming out of the Reed-Solomon decoder.

25      Q.   So how is trellis error correction coding

1  different from Reed-Solomon error correction coding?

2      A.   Right.  Reed-Solomon is a parity-adder

3  process.  You can see the original information, and you

4  can see the parity distinctly being added to it.  After

5  the Reed-Solomon does its work, you don't need the

6  parity bits anymore.  You've corrected the data.

7          Trellis is different.  Trellis is a -- through

8  that convolutional code processor, the trellis encoding

9  that I drew over there transforms the information into

10 something different.  It doesn't have a parity signal.

11 There's no parity addition that takes place.  It's not

12 the way it works.

13     Q.   So what comes after the Reed-Solomon decoder?

14     A.   The next box is called a data de-randomizer.

15 Once again, a randomizing function took place at the

16 transmitter.  It's undone by the data de-randomizer, and

17 we have a recovered transport stream packet at this

18 location.  After all these signal processing functions

19 happen, if everything works right, you've got the boxcar

20 information that we saw earlier.  That's what's here,

21 and that's ready to be bit-expanded.

22     Q.   Now, can you explain again what you meant when

23 you said that the error coding and decoding is a

24 two-layer process?

25     A.   Sure.  And it has to do with the concept of

1 the processing steps that are done at the transmitter in

2 a certain order have to be done also at the receiver but

3 in the reverse order.

4        You have to undo step-by-step what you did at

5 the transmitter.  So it's like putting on your shoes and

6 socks.  You have to put your socks on first.  You have

7 to put your shoes on second.  Later on, it has to happen

8 in the reverse order.  You have to take your shoes off

9 first, then the socks.

10        Same is required of the two-layer error

11 correction processing under the ATSC standard.  It's

12 called a concatenated code, and they're in that order

13 for a reason.  And the receivers have to undo it in just

14 that order.

15    Q.    So would a -- would a digital television work

16 if it didn't have this complex, two-layer coding

17 solution.

18    A.    It absolutely wouldn't work.  The designers of

19 the ATSC system learned this during testing, and that's

20 the reason the standard has two layers in there, to make

21 it work.  I should say to allow it to work.

22    Q.    Now, I'd like to change gears a little bit and

23 talk about the first two of the three patents that you

24 studied, and that's the '310 and the '375 patents.  And

25 these are exhibits, DTX 761 and 762, in your book of

1  materials.

2       So could you describe generally for us what

3  these two patents are about?

4       A.    Yes.   These are the videotape-recording

5  patents.   They involve a playback device which produces

6  digital audio/video information and then a recording

7  device.

8       Right inside at the beginning of the

9  disclosure of a patent, you'll typically find something

10  called a background of the invention.   It sort of steps

11  up and tells you what you're about to learn about.   This

12  background says the present invention relates to a

13  system for transmitting a digital video signal and a --

14  and recording the received video signal.

15       A little bit further down in the background of

16  the invention, it talk -- it calls attention to a

17  particular characteristic that this patent is directed

18  to, and you'll see the term high-speed recording, and

19  it's making the point that the prior art, the other

20  existing VTRs that are out there, they don't do

21  high-speed recording.   And this patent does that.

22       Q.    So you mentioned VTR.   Can you tell us what

23  that is?

24       A.    VTR stands for videotape-recorder.   It's like

25  any kind of tape-recorder, cassette recorders, compact

1  disks, what have you that we've used as consumers.

2  This, however, is a digital device.

3      Q.   And can you explain how the high-speed

4  recording takes place in the '310 and '375 patents?

5      A.   We'll take a look at Figure 1, I believe.

6  Yes, there it is.

7          At the top part of Figure 1 is the playback

8  device.  There's the -- the playback head that the

9  information spools off of, and it goes across a

10  transmission path to the receiving device.  And there's

11  a number of signal processing boxes here, but then

12  there's the recording head shown at the bottom.

13      Q.   So let's -- let's --

14      A.   That's the transmitter, and the next one

15  highlights the receiver.

16      Q.   So does the '310 patent include compressor or

17  error correction circuits?

18      A.   Sure.  And the next slide highlights that

19  compression, and error-coding is indeed part of this

20  patent.  These are digital signals as I mentioned, and

21  you can see the bit -- I'm sorry -- the bit compressors

22  here.  And there's that parity-adder that I mentioned

23  earlier at the transmitter side and then the

24  counterpart.  Things that undo that process at the

25  receiver are shown below.

1    Q.    Now, were you in the courtroom when

2  Mr. Hamilton testified?

3    A.    I was.

4    Q.    And did you hear him talk about Figure 4 of

5  the '310 patent?

6    A.    Yes.  Figure 4 is the particular figure in the

7  patent that he used to describe his alleged infringement

8  on the part of the televisions.

9    Q.    So was the use of error correction or

10  compression something that Hitachi had invented?

11    A.    Absolutely not.  Those concepts of compression

12  of video and audio information and parity addition are

13  standard communications techniques that have been known

14  about for many, many years.

15    Q.    Now, in your preparation for your opinion, had

16  you reviewed the deposition transcripts of the

17  inventors?

18    A.    Yes, I had.

19    Q.    So I'd like to read to you from the deposition

20  testimony of Mr. Hitoaki Owashi, one of the named

21  investors of the '310 and '375 patents.  And then I'll

22  ask you some questions about his testimony.

23         MR. BERLINER:  And if you could, please,

24  show the testimony, starting at Line 13.

25    Q.    (By Mr. Berliner) QUESTION:  And was the use

1  of error correction information on videotape known at

2  the time of your invention?

3                    ANSWER:  It was known.

4                    QUESTION:  Is that something Hitachi

5  invented?

6                    ANSWER:  I don't know accurately who

7  invented that.

8                    QUESTION:  Okay.  But you did not invent

9  that, right?

10                    ANSWER:  That's correct.

11          Mr. Wechselberger, what is your reaction to

12  this testimony?

13      A.   That's completely consistent with my opinion

14  that Hitachi did not invent error correction.

15      Q.   Now, let me show you another excerpt from the

16  deposition testimony of Mr. Owashi.

17                    MR. BERLINER:  And if you could, please

18  go to 116, Line 8.

19      Q.   (By Mr. Berliner) QUESTION:  So it was known

20  at the time of your invention to compress digital video

21  information, correct?

22                    ANSWER:  There existed various

23  compression technologies.

24                    QUESTION:  Which compression technologies

25  are you aware of that existed at the time of your

1  invention?

2            ANSWER:  At the time, I myself had not

3  researched in detail compression technologies, so I

4  don't think I knew specifically what compression

5  technologies there were.

6            QUESTION:  But am I correct in

7  understanding that at the time of your invention, it was

8  known to compress digital video information?

9            ANSWER:  I think that's correct.

10           QUESTION:  And also at the time of your

11  invention, it was known to compress digital audio

12  information, correct?

13           ANSWER:  I think it's correct to say that

14  technology to compress audio was known at the time.

15        Now, Mr. Wechselberger, what is your reaction

16  to that testimony?

17     A.   That testimony is also completely consistent

18  with my opinion that Hitachi did not invent bit

19  expansion of compressed digital or audio signals.

20     Q.   And did you hear Mr. Hamilton testify that

21  Figure 4 illustrates a broadcast television receiver?

22           MR. BERLINER:  If you could return to

23  that slide, please.

24     A.   Yes, I heard him testify to that.

25     Q.   (By Mr. Berliner) And do you agree with him?

1       A.    No, I don't.

2       Q.    Why not?

3       A.    Several reasons.  First, Figure 4 is shown

4  here in its entirety, and if -- and I've put on the

5  screen here what the specification labels Figure 4.  In

6  the spec, when it talks about the diagram -- or the

7  figures, it calls this a recording and reproduction

8  system.

9             Every figure in this patent has a tape head

10 for recording or playback.  There's no suggestion that

11 these processing functions are applicable in the

12 specification.  There's no suggestion it's applicable to

13 a television signal or even a hint.  And the word

14 television doesn't appear anywhere in the spec.

15      Q.    So if Hitachi didn't invent bit expansion or

16 error detection, then what was new about the '310 and

17 '375 patents?

18      A.    As I indicated, the summary of the invention

19 talked about the existing state of the art in digital

20 VTRs at the time, and the other ones that were out there

21 didn't do high-speed -- basically, high-speed dubbing,

22 recording playback, and that this one could.

23      Q.    So would -- the error correction technology

24 that's described here in the '310 and '375 patents,

25 would that work in broadcast television?

1      A.    Absolutely not.

2      Q.    And why not?

3      A.    All -- a couple things I'll say about --

4  first, there's very little disclosed about the actual

5  function of the error correction technology in -- in

6  this patent.  In fact, there's nothing usable given

7  about it.

8          There's a box in the diagram that says

9  parity-adder.  Parity-adders can be extremely simple.

10 In fact, most of the time, they usually are.  So that's

11 all we know is what the patent gives us.  And it shows a

12 couple of particular types of approaches to parity

13 addition.

14         But as I went over with respect to the ATSC

15 system, that requires a lot more than just parity

16 addition, and there's nothing supplied in this patent

17 that -- that provides anything more than simple parity.

18     Q.    Now, Mr. Wechselberger, I'd like now to turn

19 to the claims and talk about the claims.

20             MR. BERLINER:  And -- and, Your Honor,

21 may I approach just to rearrange the -- these devices

22 here?

23             THE COURT:  Yes, you may.

24             MR. BERLINER:  Thank you.

25     Q.    (By Mr. Berliner) I've placed on this board

1  the two assert -- well, the -- the claims or the claim

2  of the '310 patent that's asserted.  I'm showing both

3  Claims 6 and Claims 7 on this board.

4        So, Mr. Wechselberger, did you hear that --

5  did you hear Mr. Hamilton testify that Claim 7 is the

6  claim that is asserted to be infringed?

7     A.    That's correct.  I heard him say that, and

8  since Claim 7 is a dependent claim and depends from

9  Claim 6, it means that in investigating infringement,

10 one has to look at each and every requirement of all of

11 the Claim 6 in conjunction with the additional

12 requirement in Claim 7.

13    Q.    And that's why I've put both Claims 6 and 7 on

14 this board here and also on the screen.  And do you have

15 an opinion as to whether Claim 7 is infringed by the TPV

16 televisions?

17    A.    Yes.  Based on my investigation, Claim 7 is

18 not infringed by the TPV televisions.

19    Q.    So let me ask you a few questions about the

20 claim limitations themselves.

21        Now, this claim, actually Claim 6, includes

22 the limitation:  An error correction signal added

23 commonly to both the video signal and the audio signal.

24        Can you explain how that is shown or described

25 in the patent?

1      A.    Sure.   Now, this claim has require -- excuse

2 me.

3           It's basically about a receiver device, but

4 because it describes the way the transmitted signal is

5 generated, we have to also look at -- from time to time,

6 depending on which claim element we're looking at, we

7 have to look at what happens over at the transmitter to

8 generate that signal.

9           And this particular claim element is talking

10 about an error correction signal that's been added to

11 the signal that's generated.  So we have to go to the

12 transmitter to see what it tells us.

13          And blown up there is the transmitter location

14 with that parity addition Circuit No. 24 that I pointed

15 out earlier.  So we have audio and video compressors

16 feeding their information directly into a parity adder.

17          So that satisfies the requirement of the first

18 claim element that we're looking at -- in -- that

19 satisfies that in the patent.

20      Q.    Now, did you hear Mr. Hamilton testify that

21 this added commonly limitation is met by trellis

22 encoding?

23      A.    Yes.  For the commonly added parity,

24 Mr. Hamilton pointed to the trellis decoding -- trellis

25 encoding/decoding function used in the ATSC standard.

1          Q.   And do you agree with that?

2          A.   I do not agree with that.

3          Q.   And why not?

4          A.   Well, the main reason is -- and we'll take a

5    look now, jumping over to the ATSC standard, again,

6    focusing on the transmit side first, which is where the

7    parity -- where the parity information happens for

8    trellis encoding, there is the trellis encoder.

9          And as I talked about when I drew on the -- on

10   the easel over there earlier, parity encoding is -- does

11   not generate -- I'm sorry -- trellis encoding does not

12   generate a parity signal.  It does not add a parity

13   signal to the signal that's being transmitted.

14         The claims says parity is added.  The name of

15   the game is the claims.  That doesn't happen here.  No

16   error correction signal is commonly added.

17         Q.   So if -- if we move -- return to the claim,

18   another limitation of the claim reads -- I'm sorry --

19   another limitation of the claim reads:  A first expander

20   which bit-expands the video signal of the digital signal

21   corrected by the error corrector in accordance with the

22   first compression method.

23         And how is this shown in the -- in the patent?

24         A.   Okay.  Now, this claim element is directed to

25   the receiver, and so we've gone now to Figure 4.  And

highlighted there is what this patent calls the first

bit-expander, which is for video.

And the error correction box is where my -- my

laser pointer is pointed right now.  And we can see the

bit-expander is indeed expand -- oop -- expanding the

information that's coming out of the error corrector.

So, again, this is how the patent meets the

requirement of this particular claim element.

Q.   So how does this differ from the TPV

televisions?

A.   Well, look at the TPV television, and the

trellis decoder is shown here.  You see the blue

highlight around it.  And the bit-expander is way over

here.

And so I brought attention to the fact that

although the claim says you must bit-expand the signal

that -- the output from the error corrector, which in

this case is the accused trellis decoder.  That doesn't

happen.

There's several signal processing blocks that

stand between the output of the trellis decoder and the

bit-expander.  Every one of these signal blocks process

that signal.

They're there for a reason.  This signal in

the middle is not the same as that one that went in;

1  contrastly this one changes again; this one changes

2  again.

3         So bottom line is, what's being bit-expanded

4  is not the same signal, and I think I highlighted that.

5     Q.   Could you -- could you identify the blocks

6  that are between the trellis encoder/decoder and

7  bit-expander?

8     A.   Oh, sure.

9         There is a data de-interleaver block.  There

10 is a Reed-Solomon decoder block.  There is a data -- a

11 data de-randomizer block.  And then the de-multiplexer

12 sits between the bit-expander and the trellis decoder.

13    Q.   And what is the result of those processing

14 elements being interposed between the trellis decoder

15 and the bit-expander?

16    A.   Well, the bottom line is, the signal that's

17 being bit-expanded is not the same signal that is being

18 error corrected.

19    Q.   So what would happen if we were to feed the

20 output of the trellis decoder directly into the

21 bit-expander?

22    A.   If we look at what would be required to force

23 the accused televisions to meet the requirements of the

24 claim, we'd have to connect the output of the decoder,

25 the error corrector, just as the claim said, to the

1  bit-expander.

2         And you can see what's happened is, we've

3  bypassed all the signal processing steps.  And I've

4  indicated that we must undo at the receiver what happens

5  from the transmitter, and at this point in time, you've

6  just destroyed that processor.  This won't work.

7     Q.    Did you hear Mr. -- Mr. Hamilton testifying

8  about this very point in reference to the connection of

9  the trellis decoder directly to the bit-expanders?

10     A.    I was in the courtroom earlier in the week

11  when he was asked about that, yes.

12              MR. BERLINER:  Your Honor, may I approach

13  to change boards?

14              THE COURT:  Yes, you may, Mr. Berliner.

15              MR. BERLINER:  Thank you, Your Honor.

16     Q.    (By Mr. Berliner) Do you recall seeing this

17  board?

18     A.    Yes, I do.

19     Q.    And maybe I'll just set it up here.  This is a

20  board that was shown during Mr. Hamilton's

21  cross-examination.  And do you recall what he said about

22  it?

23     A.    Well, there's two different questions being

24  answered here, so we have to call attention to the one

25  that's relative here.

1            If you -- I don't want to shine the laser
2    pointer at that, because it could reflect, but if you
3    could help me point out where the trellis decoder is on
4    this -- on this whiteboard up at the top there, he was
5    asked if that output were made -- forced to go -- that's
6    correct -- that purple line.
7        Q.    You mean through the blue line?
8        A.    Through the blue line to the MPEG 2 decoder --
9        Q.    So --
10       A.    -- which is a bit-expander.
11            THE COURT:  All right.  Gentlemen, let's
12   talk one at a time, not talk over each other.
13            Continue.
14            MR. BERLINER:  Yes, Your Honor.
15       A.    So the purple line connects the trellis
16   directly to the bit-expander, which is the MPEG decoder,
17   and he was asked if that would work, and I think his
18   words were literally, that would work, and that's why
19   that red X is there.  It breaks the system.
20       Q.    (By Mr. Berliner) Thank you.
21            MR. BERLINER:  Let me take this down.
22       Q.    (By Mr. Berliner) So the next limitation of
23   Claim 6 reads:  A second expander which bit-expands the
24   audio signal of the digital signal corrected by the
25   error corrector in accordance with the second

1    compression method.

2          And can you explain how the language of the

3    second expander limitation relates to Figure 4?

4       A.    Sure.  This language is -- is the same as what

5    we examined a moment -- or I examined a moment ago with

6    the first bit-expander.  And this time, however, the

7    error-corrected signal is coming to the -- excuse me --

8    the audio expander.

9          So it's the same claim requirement being

10   addressed in the same way by the Figure 4.

11      Q.    And do the TPV televisions have such a second

12   expander?

13      A.    They don't have an expander that operates like

14   this.  They have a second expander, but the signal

15   processing path in the accused televisions is exactly

16   the same as what we saw in the first bit-expander case.

17      Q.    So do the TPV televisions satisfy the added

18   commonly the first expander and the second expander

19   limitations of Claim 6?

20      A.    They do not.

21      Q.    And do we need to go on to consider the

22   additional limitations of Claim 7?

23      A.    No, we don't.

24      Q.    Why not?

25      A.    Because Claim 7 depends from Claim 6.  At

1  least three of the claim elements in Claim 6 are not

2  satisfied by the TPV TVs.  And, therefore, Claim 7

3  cannot satisfy those because it must include all of the

4  requirements of Claim 6.

5          MR. BERLINER:  Your Honor, may I approach

6  the board again?

7          THE COURT:  You may.

8      Q.    (By Mr. Berliner) So would I be able to cross

9  out the error correction signal added commonly

10  limitation from the claim?

11     A.    That's the first one that is not satisfied

12  that I described.

13     Q.    And what was the second one that you

14  described?

15     A.    The second one was the first expander -- a

16  first expander.

17     Q.    And I can cross that out?

18     A.    Yes.

19     Q.    And what was the next limitation that you

20  mentioned?

21     A.    And for the same reason; the second expander

22  is not satisfied.

23     Q.    And did you also say that Claim 7 cannot be

24  met because Claim 6 was not?

25     A.    That is correct.

1      Q.    And then I'll cross that one out.

2            So do you have an opinion as to infringement

3  of Claim 7 of the '310 patent?

4      A.    For the reasons that -- yes.  For the reasons

5  that I've just explained.  In that the claim

6  requirements are not satisfied, Claim 7 cannot be

7  infringed.

8      Q.    So now let's move on to the '375 patent.

9  And did you hear Mr. Hamilton testify that Claims 26 and

10 30 of the '375 patent are asserted to be infringed?

11     A.    Yes, that's what I heard him say.

12     Q.    And are 26 and 30 dependent claims?

13     A.    That's correct.  There's two asserted claims

14 from the '375 patent.  Both of these are also dependent

15 claims, which means that the dependent claim from which

16 they depend, all the requirements of both claim elements

17 must be satisfied to find infringement.

18     Q.    So let's talk about Claims 25 and 26.

19            MR. BERLINER:  And, Your Honor, may I

20 approach to replace the board?

21            THE COURT:  You may.

22     Q.    (By Mr. Berliner) So on this board, I have

23 placed Claims 25 and 26.  So let me start by showing you

24 a side-by-side comparison of Claims 25 and 26, which

25 appear on the right side of this slide, and Claims 6 and

1  7 of the '310 patent that we just discussed a few

2  moments ago.

3        Can you tell me how these two claims differ,

4  two sets of claims?

5     A.   Yes.  And I've got a highlight that helps to

6  jump right to the answer of that.  The claims -- most of

7  the claim element requirements between what we just went

8  through and this new one at 25 and 26 are the same.

9        What are shown here are the differences.  And

10  it -- it -- the differences relate to the information

11  surrounding error correction.  The claim we just

12  finished with had error correction information added

13  commonly to both the audio and video as we saw before.

14        And the requirements this time around are that

15  that information -- parity information meets -- I

16  just -- apparently, when I touched this -- I'm sorry

17  about that.  I just discovered that.  That's -- thank

18  you.

19        Parity information is added to the video and

20  then separately added to the audio.

21     Q.   So the key difference between the sets of

22  claims is that the '310 claims have the added commonly

23  language, and the '375 claims have the separately added

24  language.  Is that a fair characterization?

25     A.   Yes.  That's the only difference.

1    Q.   Okay.  And where would we find this separately

2 added language in the patent?

3    A.   Let's take a look, again, at the transmitter

4 in the patent because that's where the parity functions

5 are added to the transmitted signal.

6         And once again, we are directed to the same

7 three circuit boxes that we saw earlier.  In the

8 previous patent, the patent tells us that parity is

9 added commonly, and now the patent is telling us that a

10 parity is being added separately.

11        And I've looked through this patent spec.

12 There's really no additional detail provided in the

13 written form of the text that explains how it can do

14 both at the same time.  But, anyway, this is where we

15 start, with these -- with these circuits.

16    Q.   Now, Claim 25 includes the limitation:  An

17 error corrector configured to correct an error of the

18 digital information demodulated by the demodulator based

19 on the error correction information.

20        And did you hear Mr. Hamilton testify that the

21 error corrector limitation of Claim 25 is met by the

22 Reed-Solomon decoder in the television?

23    A.   Yes, that's correct.

24    Q.   And -- and do you agree with him?

25    A.   No, I don't.

1        Q.    And why not?

2        A.    Once again, we -- I would like to look at the

3   functions of first the receiver in the patent which

4   satisfies this requirement, and then we'll compare those

5   to what happens in the accused televisions.

6             So Figure 4, again, is the patent receiver.

7   There's the demodulator function, and it is -- the claim

8   asks -- requires that the output of the demodulator go

9   to the error correction block.  That's a direct path.

10       Q.    So how are the accused televisions different?

11       A.    If we could look, then, at the signal

12  processing and -- and under the ATSC standard,

13  highlighted is the demodulator function, and over here

14  we see the accused Reed-Solomon function, and once

15  again, we find that there are signal processing blocks

16  between the output and demodulator and the input of the

17  Reed-Solomon decoder.  There's -- in particular, there's

18  this trellis decoder and followed by the data

19  de-interleaver.

20            And so we find two stages of signal

21  processing, each of which changes the signal.  So by the

22  time that signal gets to the Reed-Solomon decoder, it is

23  no longer this signal that the claim element requires.

24       Q.    So what would happen if we were to feed the

25  output of the demodulator directly into the Reed-Solomon

1    decoder the way the patent has described?

2         A.   If we consider forcing an ATSC receiver to

3    follow the requirements of the claim, we would have to

4    come out of the demodulator and blow past the signal

5    processing blocks that it's supposed to use and directly

6    into the Reed-Solomon decoder.

7              And there's two -- two basic problems here.

8    One is the output of the demodulator isn't bits; it's

9    symbols.  These boxes can't process symbols.  That's why

10   the trellis decoder has a symbols-to-bits translator in

11   it, to get back to binary data.

12             The second reason is that by bypassing

13   required ATSC functions, you destroy the ability of the

14   television system to operate, and this configuration,

15   once again, would not work.

16                  MR. BERLINER:  And may I approach one

17   more time to replace the board?

18                  THE COURT:  You may.

19                  MR. BERLINER:  Thank you, Your Honor.

20        Q.   (By Mr. Berliner) And if I return this board

21   that we looked at a moment ago, is this path between

22   the -- between the demodulator and the Reed-Solomon

23   decoder illustrated?

24        A.   Yes.  This time the output of the demodulator

25   is shown as bypassing those two stages I pointed to on

1  the -- on the projector by that green line and the

2  demodulator output is being fed to the Reed-Solomon

3  decoder.

4          And Mr. Hamilton was asked, with respect to

5  this configuration, what would happen, and his response

6  once again, as shown by the red X, is that on an ATSC

7  receiver, this won't work.

8      Q.    Thank you.

9              THE COURT:  Counsel, approach the bench,

10  please.

11              (Bench conference.)

12              THE COURT:  How much longer do you have,

13  Mr. Berliner?

14              MR. BERLINER:  Probably still another

15  half hour.

16              THE COURT:  Okay.  If you've got a half

17  hour, I'm going to break now, and we'll pick up after

18  lunch.

19              Do you have any idea what your cross is

20  going to be?

21              MR. PLIES:  I'm thinking probably about

22  20 to 30 minutes.

23              THE COURT:  Okay.  Okay.  And after this

24  guy, who's next on your side?

25              MR. BERLINER:  Our damages, Mr. Ugone.

```
 1                    THE COURT:  Okay.  All right.  Well, I'll
 2  break for lunch now.
 3                    MR. BERLINER:  Thank you, Your Honor.
 4                    (Bench conference concluded.)
 5                    THE COURT:  Ladies and Gentlemen, I'm
 6  told that there's considerably more examination of this
 7  witness to come, so it's less than 10 minutes until
 8  noon, so we're going to take this opportunity to break
 9  for lunch.
10                    I'd like to get you back about five
11  minutes until 1:00, and we'll start back at 1:00 o'clock
12  so we can stay on schedule.
13                    Don't discuss the case with yourselves or
14  anyone else.  Otherwise, enjoy your lunch hour, and
15  we'll see you back ready to go at 1:00 o'clock.
16                    You're excused for lunch.
17                    COURT SECURITY OFFICER:  All rise.
18                    (Jury out.)
19                    THE COURT:  All right.  We stand in
20  recess for lunch.
21                    Let me see lead and local counsel in
22  chambers for just a few minutes.
23                    (Lunch recess.)
24                    * * * * * * * * * * * * * * * * *
25
```

1

2                    CERTIFICATION

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10

11   /s/_____             _____
     SHELLY HOLMES, CSR                      Date
12   Official Court Reporter
     State of Texas No.:  7804
13   Expiration Date  12/31/14

14

15   /s/_____          _____
     SUSAN SIMMONS, CSR                  Date
16   Official Court Reporter
     State of Texas No.:  267
17   Expiration Date  12/31/14

18

19

20

21

22

23

24

25