1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3  HITACHI CONSUMER ELECTRONICS  *    Civil Docket No.
                                 *    2:10-CV-260
4  VS.                           *    Marshall, Texas
                                 *
5                                *    April 11, 2013
   TOP VICTORY ELECTRONICS       *    1:00 P.M.
6
                      TRANSCRIPT OF JURY TRIAL
7        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE
8

9  APPEARANCES:

10 FOR THE PLAINTIFF:          MR. OTIS CARROLL
                              MR. PAT KELLEY
11                            Ireland Carroll & Kelley
                              6101 South Broadway
12                            Suite 500
                              Tyler, TX    75703
13
                              MR. MARTIN BLACK
14                            MR. JEFFREY EDWARDS
                              MR. VINCENT GALLO
15                            MS. SHARON GAGLIARDI
                              Dechert
16                            2929 Arch Street
                              Cira Centre
17                            Philadelphia, PA   19104

18                            MR. JEFFREY PLIES
                              Dechert
19                            300 West 6th Street
                              Suite 2010
20                            Austin, TX    78701

21 APPEARANCES CONTINUED ON NEXT PAGE:

22 COURT REPORTERS:          MS. SHELLY HOLMES, CSR
                            MS. SUSAN SIMMONS, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX    75670
                            903/935-3868
25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          MR. MARK SAMUELS
                           MR. BRIAN BERLINER
                           MR. VISION WINTER
                           MR. JORDAN RAPHAEL
                           MR. JOHN WOO
                           O'Melveny & Myers
                           400 South Hope Street
                           Los Angeles, CA   90071

                           MR. DERON DACUS
                           The Dacus Firm
                           821 ESE Loop 323
                           Suite 430
                           Tyler, TX   75701

                           MR. TODD LANDIS
                           MR. ERIC KLEIN
                           Akin Gump Strauss Hauer &
                              Feld
                           1700 Pacific Avenue
                           Suite 4100
                           Dallas, TX   75201

                           MR. DANIEL MOFFETT
                           Akin Gump Strauss Hauer &
                              Feld
                           300 Convent Street
                           Suite 1600
                           San Antonio, TX   78205

                * * * * * * * * * * * * * * * * * * * * * * * * * *

                        P R O C E E D I N G S

                    (Jury out.)

                    COURT SECURITY OFFICER:  All rise.

                    THE COURT:  Be seated, please.

                    Do I understand there's an issue,

Counsel, to be taken up before the jury's brought in?

                    MR. PLIES:  Yes, Your Honor.

1          MR. BERLINER:  Yes, Your Honor.

2          THE COURT:  You may proceed.  I don't

3 know who is the moving on here, so whoever's issue it

4 is, speak first.

5          MR. BERLINER:  I can start.

6          There are some exhibits that I was

7 planning to show the witness from the prosecution

8 history of the patent.  We thought it would make sense

9 to address these with you before we brought the jury

10 back.

11          THE COURT:  Were they included on the

12 exhibit list examined and acted on during pretrial?

13          MR. BERLINER:  Oh, yes.  Yes, Your Honor.

14 They're -- they're on the exhibit list.

15          THE COURT:  Have they been preadmitted?

16          MR. PLIES:  Yes, Your Honor.  They've

17 been preadmitted, but our issue with them is that they

18 don't have Mr. Wechselberger as a sponsoring witness for

19 them, because he doesn't opine upon the report in his

20 report or cite to the document.

21          MR. BERLINER:  Well, we disagree.  He

22 does describe the prosecution history.  He describes

23 what happened in it.  He will not be offering any

24 opinions as to the meaning of what happened, but these

25 are factual matters that occurred in the prosecution of

1  the patents themselves.  And our intent was just to get

2  these factual matters on the record.

3              MR. PLIES:  Your Honor, this is the

4  information disclosure statement whereby the June 8th

5  document was submitted to the prosecution -- to the

6  Patent Office, along with comments about it.

7              And while the witness does have a

8  recitation of prosecution history, this document is

9  nowhere found in the recitation of the prosecution

10  history.  There's no discussion of it whatsoever in his

11  report.  And we don't think he can sponsor the document.

12  He hasn't provided us his opinion about what he's going

13  to say about it.

14              MR. BERLINER:  As I mentioned, he's not

15  going to be offering an opinion.  He did cite to the

16  prosecution history.  I'll acknowledge that he didn't

17  talk about this page of a 600-page prosecution history,

18  and I'm just going to be identifying these pages for the

19  record.

20              MR. PLIES:  All the more reason, Your

21  Honor, that we believe he should have discussed it in

22  his report, because out of a 600-page prosecution

23  history, we don't know what he's going to select and try

24  to put an opinion about.

25              MR. BERLINER:  We've identified the

1   specific pages.  It's in the exhibit book, so I don't

2   think there's any question of which pages I'm going to

3   go to.

4             MR. PLIES:  During his report, you should

5   have, so I could depose him about it.

6             THE COURT:  All right.  Anything else?

7             MR. BERLINER:  No, Your Honor.

8             THE COURT:  Well, if it was taken up

9   during pretrial and preadmitted, then it's freely usable

10  before the jury and doesn't require the witness who uses

11  it to sponsor it.  It's just as if it were something

12  that had been previously used by another witness, and

13  it's shown to a later witness in the trial.

14            Now, this witness is called as an expert.

15  His -- his purpose for being on the stand is to give

16  expert testimony.  So -- and it's not fair to examine

17  him in his capacity as an expert about something that's

18  outside of his report.

19            MR. BERLINER:  Well --

20            THE COURT:  So we've got a little bit of

21  a bifur -- if you want to use the document, show it to

22  him, and identify -- you know, you can use that as if

23  you use any other admitted exhibit in the case, but he's

24  not going to testify about what it means or its -- or

25  his opinion or its effect or anything beyond you showing

1  it to him and him acknowledging what it is.

2          MR. BERLINER:  That was all I had

3  intended to do, Your Honor.

4          THE COURT:  Well, you know, if there was

5  a lack of a sponsoring witness or a requirement that a

6  specific sponsoring witness is the only one properly to

7  use an exhibit, that's an issue that should have been

8  taken up and dealt with during the admission -- the

9  preadmission process during pretrial.

10          That whole process is designed to

11  streamline the trial and avoid arguments over exhibits

12  during the course of the trial.  So with the limitation

13  that he's not to opine about it or explain it or do

14  anything other than identify it, just as if another

15  exhibit had been introduced, and you say, Mr. So-and-So,

16  this has been admitted into evidence; I'd like you to

17  look at it; can you tell me what it is, blah, blah,

18  blah, that's proper.  But to go beyond that is not.

19          MR. BLACK:  Your Honor?

20          THE COURT:  Do you have something,

21  Mr. Black?

22          MR. BLACK:  Yes, Your Honor.  We

23  completely agree that the document's been preadmitted.

24  That's not the issue.

25          This is the document which would relate

1  to the issue that Your Honor said we're not going to

2  have anybody opining in this case with respect to what

3  the Patent Office knew or didn't know or what it did or

4  didn't do with the prior art.

5          The witness -- we have no objection to

6  the document being in evidence, even without this

7  witness talking about it, but I don't believe that this

8  document was discussed in his expert report.  And,

9  therefore, we don't have a rebuttal report on the

10 document.

11          If he says anything about the document,

12 other than this is a document in the case, characterizes

13 it in any way, he's going outside his report.  So we'll

14 stipulate that it's in evidence, but there's no basis

15 for this expert to discuss it, because it's not been

16 mentioned in his report.  That is going clearly beyond

17 the report.

18          MR. DACUS:  Your Honor, may I be heard

19 briefly, because Counsel -- they may not have had the

20 opportunity that I had at the bench yesterday.

21          Remember yesterday, when we said they

22 were going outside the scope of Mr. Bratic's report, and

23 that they did that, and the Court said the use of facts

24 that are in evidence are appropriate as long as you're

25 not giving opinions.

1               And this is exactly the same.  All -- all

2   Mr. Berliner plans to do is show him the document,

3   identify the document, what the words say; no opinion

4   related to the -- to the document or to the effect

5   television.

6               THE COURT:  Well, you know, what you're

7   both saying parrots to a certain extent what I'm saying,

8   but where we may be missing the boat is to the actual

9   degree of particularity of application.  So if you can,

10  Mr. Dacus, tell me what this witness is going to say.

11  Or, Mr. Berliner, tell me what you intend to propound to

12  the witness with this document in hand.

13              MR. BERLINER:  Sure.  I'll tell you

14  exactly what we're going to do with the witness.

15              I'm going to identify certain pages from

16  the prosecution history.  I'll just ask him to identify

17  what is this page.  And then there are portions that

18  I'll ask him to read, or I will read and that will be

19  that.

20              He will not provide any comment on what

21  they mean or -- or opinion as to how it relates to his

22  other analysis.

23              MR. BLACK:  The pages on IDS, he's not an

24  expert in prosecution history.  He hasn't opined on it

25  or even mentioned it in his report.

1          MR. BERLINER:  He can read English,

2 though.

3          MR. BLACK:  They can make argument in

4 closing.  It's fair -- if it's in evidence, we don't

5 have any objection of it's in evidence, but they can't

6 use this expert to talk about a document that's

7 obviously important to them in the case, which he never

8 mentioned in his expert report.

9          We don't have a counter-report on it, and

10 we don't have an expert on prosecution history, and

11 they're trying to create confusion with the jury on this

12 issue.  But the principal objection, Your Honor, is that

13 it's outside the scope of his report for him to even say

14 that this is an IDS that Hitachi submitted and anything

15 about it.  It's outside the scope of his report and

16 prejudicial.

17          MR. BERLINER:  Prosecution history is an

18 exhibit to his report.  It's identified in his report.

19          MR. BLACK:  The fact that there is --

20 there is discussion about the prosecution history, but

21 he left out a discussion of this particular document, I

22 believe, for tactual reasons.

23          MR. BERLINER:  It's part of the factual

24 records of what happened at the Patent Office.

25          THE COURT:  All right.  Gentlemen, if you

1    argue among yourselves, we can do that another time.

2    I've heard enough.

3                It's preadmitted, and I'm going to allow

4    you to show it to the witness just as if I would allow

5    you to use it in closing arguments in front of the jury,

6    if you want to.  But anything that smacks of an opinion

7    or a characterization or an interpretation or a meaning

8    is going to be unacceptable and beyond the bounds of its

9    use at this time.

10                Do you understand, Mr. Berliner?

11                MR. BERLINER:  Yes, sir.  Yes, Your

12   Honor.

13                THE COURT:  All right.  Then we'll handle

14   it in on that basis.

15                Anything further?

16                MR. BERLINER:  No, Your Honor.

17                THE COURT:  Bring in the jury, please.

18                COURT SECURITY OFFICER:  All rise for the

19   jury.

20                (Jury in.)

21                THE COURT:  Welcome back from lunch,

22   Ladies and Gentlemen.  Please be seated.

23                All right.  We'll continue with the

24   direct examination of this witness.

25                You may continue, Mr. Berliner.

1          MR. BERLINER:  Thank you, Your Honor.

2      ANTHONY WECHSELBERGER, DEFENDANTS' WITNESS,

3                    PREVIOUSLY SWORN

4            DIRECT EXAMINATION (CONTINUED)

5  BY MR. BERLINER:

6      Q.   I think when we broke for lunch, I was about

7  to ask you whether the TPV televisions satisfy the error

8  corrector limitation of Claim 25.

9      A.   No.  The accused televisions do not satisfy

10  this claim element.

11      Q.   And we've discussed the error coding

12  differences between Claim 6 of the '310 patent and

13  Claim 25 of the '375 patent.  Do the TPV televisions

14  satisfy the first expander and the second expander

15  limitations of Claim 25?

16      A.   No, they don't, for the same reasons that I

17  explained with respect to the '310 patent.

18      Q.   And do we need to consider the additional

19  limitations of Claim 26?

20      A.   No, we don't.  Since Claim 26 is a dependent

21  claim, the -- all the requirements of Claim 25 are, by

22  definition, included in the requirements of Claim 26.

23      Q.   So do you have an opinion as to the

24  infringement of Claim 26 of the '375 patent?

25      A.   Yes.  My opinion is that Claim 26 is not

1   infringed by the TPV televisions.

2             MR. BERLINER:  Your Honor, may I approach

3   the board.

4             THE COURT:  You may.

5       Q.   (By Mr. Berliner) So if I understand your

6   testimony, I can cross out the error corrector

7   limitation?

8       A.   Yes.

9       Q.   And I can cross out the first expander

10  limitation?

11      A.   Yes.

12      Q.   And I can cross out the second expander

13  limitation?

14      A.   Yes.

15      Q.   And I can cross out the entirety of Claim 26?

16      A.   Yes.

17      Q.   Thank you.

18           So now let's turn to the last claim of the

19  '375 patent, which is -- which is Claim 30.  And let me

20  first start by showing you a side-by-side comparison of

21  Claims 29 and 30 on the right-hand side with the two

22  claims we just spoke about a moment ago, 25 and 26, on

23  the left-hand side.

24           And, Mr. Wechselberger, how do these two sets

25  of claims compare?

1       A.    These two claims compare -- they're almost

2  identical.  There are some mild to moderate language,

3  wording differences between the two claims, an example

4  of which I've provided.

5            For example, on the left, it describes correct

6  an error of the digital information demodulated, and on

7  the right, similar language, correct an error of a

8  digital information which has previously been

9  demodulated.

10           So these kinds of small differences exist

11 between the two patents, and as I stated, Claim 29, with

12 respect to these, it's my conclusion that Claim 29, from

13 a practical standpoint, has all the same requirements as

14 Claim 25.

15      Q.    So do the TPV television satisfy the error

16 corrector, first expander, and second expander

17 limitations of Claim 29?

18      A.    In my opinion, they do not.

19      Q.    And do we need to consider the additional

20 limitations of Claim 30?

21      A.    No, we don't, since Claim 30 is a dependent

22 claim, and in particular, if the three items of Claim 29

23 are not satisfied, then Claim 30 requirements are not

24 satisfied.

25      Q.    And do you have an opinion with respect to

1  Claim 30 of the '375 patent?

2      A.   Yes.  For the above reasons, Claim 30, in my

3  opinion, is not infringed.

4              MR. BERLINER:  And may I again approach

5  the board?

6              THE COURT:  You may.

7              MR. BERLINER:  I forgot to change my

8  board, but I will do that now.

9      Q.   (By Mr. Berliner) This board includes

10 Claims 29 and 30, put it up briefly.  And if I

11 understand your testimony, I can cross out the error

12 corrector limitation, correct?

13     A.   Yes.

14     Q.   The first expander?

15     A.   Yes.

16     Q.   And the second expander?

17     A.   Yes.

18     Q.   And the entirety of Claim 30?

19     A.   Yes.

20     Q.   Thank you.

21              Now, you testified earlier that you had also

22 analyzed the validity of Claim -- the -- the validity of

23 the asserted claims of the '310 and '375 patents; is

24 that correct?

25     A.   Yes.

1    Q.   And what specifically did you do to analyze

2 validity of those patents?

3    A.   I did a survey of prior art that existed

4 throughout the digital television landscape looking for

5 art that could be compared against the asserted claims

6 and then making a comparison against the asserted

7 claims.

8    Q.   So I'd like to read for you another excerpt

9 from the deposition testimony of Mr. Owashi.

10           MR. BERLINER:  And if you would please --

11 please show 136, 1 through 5.

12    Q.   (By Mr. Berliner) QUESTION:  So you were not

13 aware of any systems that include separate video and

14 audio expansion in a recording and transmission system?

15           ANSWER:  My view is that there were no

16 systems that correspond to this invention.

17           Now, Mr. Wechselberger, in your study of the

18 prior art, did you come across any -- any documents that

19 included separate video and audio expansion in a

20 television broadcasting system?

21    A.   Yes, I did, and one document in particular

22 stands out in my mind.

23    Q.   And -- and what document is that?

24    A.   It is the DigiCipher proposal document.

25    Q.   And you're referring to DX 599; is that

1  correct?

2      A.    That's correct.

3      Q.    And what was the DigiCipher proposal that you

4  mentioned?

5      A.    There's a summary -- this is a 34-page

6  document, and there's a summary on the -- as it

7  begins -- I'll just read the opening sentence.

8           General Instrument's DigiCipher System is an

9  all-digital HDTV system that can be transmitted over a

10  single 6-megahertz VHF or UHF channel.

11          So this document discloses a full end-to-end

12  digital television transmission system capable of

13  broadcasting high-definition pictures.

14     Q.    Does the DigiCipher document have a systems

15  diagram?

16     A.    It does.  I believe it's labeled 2.1.

17          THE COURT:  Mr. Berliner, I need you to

18  approach the bench.

19          Counsel, approach the bench.

20          (Bench conference.)

21          THE COURT:  This witness, who was in the

22  chair and just heard everything before I brought the

23  jury back, just proceeded to tell this jury exactly what

24  it meant.  He didn't read it -- he read it, and then he

25  said, this means it does this and this and this.

```
 1              MR. BERLINER:  Your Honor, this is not
 2   the document we were discussing.  The document we were
 3   discussing was the prosecution history, which is -- I
 4   have not shown yet.  That's -- that will -- that's
 5   later.  This is the DigiCipher document itself, what
 6   they were talking about.
 7              THE COURT:  Okay.  I may be -- I may be
 8   mistaken.
 9              MR. BLACK:  Well, because he read the
10   first sentence discussing the DigiCipher system, and
11   there's no evidence that there was an actual working
12   system.  That's a different issue.
13              THE COURT:  Gentlemen, lower your voices.
14              MR. BLACK:  It is not what we were
15   talking about before.  We were arguing about before the
16   other IDS that Hitachi sent to the Patent Office.
17              THE COURT:  All right.  I may be
18   mistaken.  I thought he was taking advantage of
19   something.
20              MR. BERLINER:  No, Your Honor.  We should
21   have classified it.  I just wanted to pre-raise that
22   issue that would come up later.
23              THE COURT:  I've given you a narrow
24   pathway.  I expect you to stay on the narrow pathway.
25              MR. BERLINER:  Yes, Your Honor.
```

1          (Bench conference concluded.)

2          THE COURT:  All right.  Let's proceed

3 with that clarification.

4     Q.   (By Mr. Berliner) Mr. Wechselberger, can you

5 tell me what Figure 2-1 of the DigiCipher document

6 shows?

7     A.   As it's labeled, this is a system block

8 diagram.  On the left is the UHF or VHF transmission

9 location, signal goes over the air to a receiver

10 location television set.

11    Q.   And can you describe the transmitter side of

12 DigiCipher?

13    A.   Yes.  There is a figure that provides some

14 additional detail about the transmitter.  Figure 2.2, we

15 see here the DigiCipher video encoder.  That's the

16 compression for video, along with the compressor for

17 audio.

18          The data streams are set to error.  FEC stands

19 for forward error correction, so there's the error code

20 followed by a demodulator.

21    Q.   And can you describe the receiver side of

22 DigiCipher?

23    A.   Certainly.  Figure 2.3 shows the receiver

24 signals come in from the left through the demodulator

25 through the error correction coder/decoder and to the

1  bit-expanders, which are shown as the digital video

2  decoder and digital audio decoder.

3      Q.   Now, how does DigiCipher compare to the '310

4  and '375 patents?

5      A.   They're almost identical, and in terms of

6  critical functions, in my opinion, they are.  On the top

7  is Figure 4, which is the receiver portion from the

8  patent and on -- right below that, I've put the receiver

9  of the DigiCipher document.

10          And if we see the signal path flow, it shows

11 up -- there it is in red, just to help orient people --

12 for the patent, the receiver information comes in,

13 follows the path, circles back around to the

14 bit-expanders and comes out the left.

15          And the DigiCipher document, the path comes

16 through this way to the bit-expanders.  And I arranged

17 to show a one-to-one correspondence between the key

18 features of both of these.

19          If we can progress through that, I'll show the

20 demodulator highlighting in yellow for both products,

21 followed by the error corrector in both products,

22 followed in turn by the video-expander and the

23 audio-expander for both.

24      Q.   And just to clarify, the top image is taken

25 from the '310 patent, and the bottom one is from the

1  DigiCipher document; is that correct?

2      A.   That's correct.

3      Q.   So, now, let's -- let's return then to Claims

4  6 and 7 of the '310 patent.  And I've -- I've shown the

5  claim on the left-hand side and the DigiCipher document

6  on the right.

7          Do you have an opinion as to whether

8  DigiCipher discloses all elements of Claims 6 and 7?

9      A.   It is -- yes, it is my opinion that DigiCipher

10 does disclose all the elements of Claim 6 and Claim 7.

11     Q.   So let's go through the claim elements one by

12 one.

13         Does DigiCipher disclose an apparatus for

14 processing a transmitted digital signal, including at

15 least one of a video signal and an audio signal?

16     A.   Yes, it does.  There are elements of both the

17 transmitter and the receiver in this first claim

18 element.  So we will look at the system block diagram.

19         There is the apparatus for processing --

20 that's a receiver -- a digital signal, including at

21 least one of a video signal and audio signal.

22         Those come from the transmitter location, of

23 course, as I just described in the details of the

24 encoder block diagram where I showed everyone the video

25 compressor and the audio compressor at the transmitter

1 location.

2     Q.   And does DigiCipher disclose -- oh, let me

3 check off that first element.

4          Now, let me proceed.  Does DigiCipher disclose

5 a receiver which receives the transmitted digital

6 signal?

7     A.   It does show the same diagram again.  On the

8 right is the receiver.

9     Q.   And let me proceed then.  Does DigiCipher

10 disclose the limitations wherein the transmitted digital

11 signal includes video signal bit-compressed by first

12 compression method, an audio signal bit-compressed by a

13 second compression method, and an error correction

14 signal added commonly to both the video signal and the

15 audio signal?

16     A.   Yes, it does.

17          And we can show that, again, from the

18 transmitter encoder block diagram location, the

19 compressors, audio/video, and parity adder.

20     Q.   And does DigiCipher disclose the use of error

21 correction information that is commonly added to the

22 video and audio?

23     A.   Yes, it does.  Thank you.

24          Comparing the added commonly characteristics

25 of the patent, we looked at these blocks before.

1          THE WITNESS:  Thank you for blowing those

2  up?

3      A.   The audio and video compressors.  There's the

4  parity adder in the patent.  The counterpart to that,

5  which matches these requirements in the DigiCipher

6  document, is the -- I'm sorry -- at the -- taken from

7  the encoder of the video compressor, and the streams get

8  put together by the multiplexer, and there's the error

9  corrector in the DigiCipher document.

10     Q.   (By Mr. Berliner) So how does the patent

11  disclose or describe the error correction signal added

12  commonly to both the video signal and the audio signal?

13     A.   That is the part of the diagram that's shown

14  blown up here.  Again, the parity adder is the signal

15  processing circuit that the patent used -- uses to show

16  parity added commonly.

17     Q.   Okay.  So I can check off that element and

18  move on to the next element, which reads:  A demodulator

19  which demodulates the digital signal received by the --

20  the receiver.

21          Does DigiCipher disclose -- disclose that?

22     A.   Yes.  And we could look at the receiver block

23  diagram, please.  There's the demodulator in the

24  DigiCipher document.

25     Q.   Okay.  I'm going to check off that block.

1          And does DigiCipher disclose an error

2    corrector which corrects an error of the digital signal

3    demodulated by the demodulator based on the error

4    correction signal?

5          A.   Yes.  Once again, let's look at the receiver.

6    There is the error corrector in DigiCipher.

7          Q.   The -- the block labeled FEC?

8          A.   That's correct.  Forward error correction

9    decoder, check that one off.

10         Q.   The next element reads:  A first expander

11   which bit-expands the video signal of the digital signal

12   corrected by the error corrector in accordance with the

13   first compression method.

14              Is that shown in DigiCipher?

15         A.   Yes, it is.

16              The receiver, again, please.

17              There is -- the box labeled digital video

18   decoder is the bit-expander, the one shown in the patent

19   for video.

20         Q.   Check that box.  And then we move on to the

21   next element, a second expander, which bit-expands the

22   audio signal of the digital signal corrected by the

23   error corrector in accordance with the second

24   compression method.

25              Is that disclosed by DigiCipher?

1        A.    Yes, it is.  And there is the box labeled

2  digital audio decoder, the second bit-expander.

3        Q.    So we can check off that element as well.

4  Moving on to Claim 7, does DigiCipher disclose the

5  apparatus according to Claim 6 wherein the first

6  compression method utilizes a discrete cosine transform?

7        A.    Yes, it does.  And I've highlighted a section

8  from the document.  From the digital video processing

9  section, we find that the compression technique is

10  discrete cosine transform.

11        Q.    So in your opinion, does DigiCipher disclose

12  all limitations of Claim 7 of the '310 patent?

13        A.    Yes, it does.

14        Q.    And what is your opinion as to the validity of

15  Claim 7 of the '310 patent?

16        A.    It's my opinion that Claim 7, which depends

17  from Claim 6, all the requirements for Claim 7 and

18  Claim 6 are satisfied.  And, therefore, Dig -- Claim 7

19  is invalid in -- and that is fully anticipated by

20  DigiCipher.

21        Q.    So now let's move on, then, to Claims 25

22  and 26, and you've testified already that Claim 25 of

23  the '375 patent is practically identical to Claim 7 of

24  the '310, except for that difference in the language

25  between the separately added and commonly added; is that

1  correct?

2      A.   That's correct.

3      Q.   And Claims 7 -- I'm sorry -- Claim 25 has the

4  separately added language that we talked about earlier?

5      A.   That's correct.

6      Q.   Is this limitation shown by DigiCipher?

7      A.   By itself, not completely shown.  But the

8  concept of adding parity information commonly or

9  separately to a signal that's to be transmitted is

10 commonly known by those of ordinary skill in the art.

11          If you have a data stream or the information

12 bits have been combined, it may make sense in an

13 implementation technique to add it commonly.

14          On the other hand, if the particular data

15 stream has audio and video compartmentalized in some

16 fashion, it may make perfectly good sense to add parity

17 separately.  And so it would be implementation-specific,

18 but it was certainly known to one of ordinary skill in

19 the art.

20     Q.   Are you aware of any prior art references that

21 supply the additional knowledge of separately adding

22 error correction information to video and audio streams?

23     A.   Yes, I can provide a reference for that.

24     Q.   And what is that?

25     A.   This is a United States patent issued to a

1   person -- an inventor.  His name is Shikakura.  This

2   patent ending in '503 has a filing date of March 7th,

3   1989, which predates the filing date of the Hitachi

4   patents.  So this is indeed prior art to the Hitachi

5   patent.

6        Q.   And can you explain what Shikakura discloses?

7        A.   Sure.  It is an information transmission and

8   receiving device for -- for audio and video information,

9   and there's a figure in this patent, which is

10  appropriate for the discussion of separately adding,

11  Figure 2.

12        We see in the box labeled V.  That's video

13  information.  It has its parity appended.  And there are

14  two examples of audio information where apparently

15  parity is added.  And so this figure shows separate

16  parity addition for video and -- and -- and audio.

17       Q.   And let me note for the record that Shikakura

18  is Defendants' Exhibit 615.

19        In your opinion, Mr. Wechselberger, would a

20  person of ordinary skill in the art be motivated to

21  combine DigiCipher with Shikakura?

22       A.   Sure.  If we can take a look, for example, at

23  the title of Shikakura.  It says Digital Information

24  Transmitting and Receiving System.

25        I've indicated that I've looked at this

1  patent, and that information is digital audio and video

2  information.  It's certainly the focus of DigiCipher,

3  digital audio and video information.

4         The abstract of Shikakura, which is on the

5  title page of a patent and shows a little summary of

6  what you're about to learn, when you read the patent,

7  discloses a first error correcting circuit and a second

8  error correcting circuit.  And in the body of the

9  patent, we find that those are put to work in Figure 2

10 by adding parity separately to video and separately to

11 audio.

12        So one of ordinary skill in the art would

13 certainly be motivated to combine these.  Excuse me.

14 They're both oriented toward similar types of processing

15 functions, transmission systems using similar types of

16 digital information.

17    Q.   So in your opinion, does the combination of

18 DigiCipher and Shikakura disclose all limitations of

19 Claim 25?

20    A.   Yes, the combination does.

21    Q.   And moving on to Claim 26, does DigiCipher

22 disclose the first compression method of utilizing

23 discrete cosine transform?

24    A.   It certainly does as I just showed and will

25 show again, the video processing with DigiCipher is

1  discrete cosine transform compression.

2      Q.   So in your opinion, does the combination of

3  DigiCipher and Shikakura disclose all limitations of

4  Claim 26?

5      A.   Yes, the combination does.

6      Q.   So I'll check those off -- that claim off.

7  And what is your opinion as -- as to the validity of

8  Claim 26?

9      A.   It is my opinion that the combination of

10 DigiCipher and Shikakura renders Claim 26 invalid by

11 virtue of being obvious in light of these two prior art

12 references.

13     Q.   So now let's move on then to Claims 29 and 30.

14 And with respect to these claims, you've already

15 testified that they have the same requirements as

16 Claims 25 and 26; is that correct?

17     A.   That is correct.

18     Q.   And what is your opinion as to the validity of

19 Claim 30?

20     A.   For all the reasons I just expressed, for the

21 prior claim that we went through, since, in my opinion,

22 the requirements of Claim 30 are the same, then all

23 these -- all these requirements are also met by the

24 combination of the two references.

25     Q.   And do you have an opinion as to the validity

1  of Claim 30?

2      A.   Yes.   For the reasons I've just expressed, I

3  consider Claim 30 to be invalid by virtue of being

4  obvious in light of the combination of Shikakura and

5  DigiCipher.

6                    MR. BERLINER:  Your Honor, may we

7  approach?

8                    THE COURT:  You may.

9                    (Bench conference.)

10                    MR. BERLINER:  I just wanted to alert you

11  that now I was going to use the document we talked

12  about.

13                    THE COURT:  Okay.

14                    (Bench conference concluded.)

15                    THE COURT:  Proceed.

16      Q.   (By Mr. Berliner) So let me now change

17  subjects, and -- and I'd like to show you the front

18  cover of the '310 patent.

19                    MR. BERLINER:  Can you show DX 761 for

20  me, please?

21      Q.   (By Mr. Berliner) And, Mr. Wechselberger, can

22  you identify this?

23      A.   This is the '310 Hitachi patent that I'd

24  previously been testifying about.

25                    MR. BERLINER:  And would you please go

1  down to highlight this section identified as other

2  publications?

3      Q.    (By Mr. Berliner) Is the digital document you

4  just testified about identified on the front cover of

5  the '310 patent?

6      A.    No, it is not.

7      Q.    Now, let me show you the front cover of the

8  '375 patent.

9              MR. BERLINER:  And if you would please

10  bring up DX 762.

11     Q.    (By Mr. Berliner) And can you identify this

12  document?

13     A.    Yes.  This is the Hitachi patent that we've

14  been calling '375.

15             MR. BERLINER:  And can you bring up the

16  other publications section?

17             Actually, you'll need to go to the second

18  page, which has a continuation of the other publications

19  section.

20     Q.    (By Mr. Berliner) And, Mr. Wechselberger, is

21  the DigiCipher document listed on the cover of the '375

22  patent?

23     A.    Yes, it is.  It's being highlighted currently

24  and shown in yellow on the overhead projector.

25     Q.    Now, you testified earlier that you had

1  reviewed the prosecution histories of these two Hitachi

2  patents; is that right?

3          MR. BERLINER:  You can take this down.

4      A.   That's correct.

5      Q.   (By Mr. Berliner) And what is a prosecution

6  history?

7      A.   A prosecution history is the record of

8  information -- I'm not a lawyer, so I'll describe it the

9  way I use it.

10          It's a record of the -- of the -- all of the

11  stuff that happened during the time that the patent was

12  being applied for.  So the -- the applicant provides an

13  application.  The U.S. Patent and Trademark Office

14  accepts that, and there's a process which -- which

15  assumes at that point -- and there could be information

16  and exchanges back and forth.

17          So the prosecution history is a record of all

18  that, so you can go back and study what happened.

19      Q.   So let me show you a document from the

20  prosecution history of the '375.

21          MR. BERLINER:  If you would, please,

22  bring up DX 15 at Bates 7449.

23      Q.   (By Mr. Berliner) And there's a document on

24  the screen.  Can you just tell me -- can you identify

25  what the document is?

1      A.    The document says Information Disclosure

2 Statement.

3      Q.    And is this a document that was submitted by

4 Hitachi?

5      A.    Yes.  I can see the inventor's name at the top

6 of the document.

7      Q.    Okay.

8            MR. BERLINER:  If you would, please

9 enlarge the paragraph at the bottom that continues onto

10 the next page and starting with the word with.

11     Q.    (By Mr. Berliner) The document reads:  With

12 regard to Document A, entitled DigiCipher HDTV System,

13 and Document B, which is an IEEE publication entitled

14 DigiCipher, All Digital Channel-Compatible HD Broadcast

15 System.

16           Applicants note that the contents of such

17 documents are substantially similar.  However, with

18 respect to Document A, while bearing a date of June 8,

19 1990, applicants are not presently aware of evidence

20 establishing that Document A was publicly accessible

21 before its disclosure in the corresponding IEEE

22 publication of December 1990; and, therefore, do not

23 believe that Document A qualifies as prior art such that

24 the date of June 8, 1990 is not listed in the attached

25 form.

1           Did I read that correctly?

2      A.   Yes.

3                MR. BERLINER:  Can you now go on to Bates

4  7453?

5      Q.   (By Mr. Berliner) And is Document A shown on

6  this page?

7      A.   Yes.  It's the first item next to the letter

8  A, capital letter A.

9      Q.   And does the title of the document match the

10  reference that we've marked as DX 599?

11      A.   Yes.

12      Q.   And let me show you another document from the

13  prosecution of the '375 patent.

14                MR. BERLINER:  If you would, please go to

15  Bates 7579, and if you would, please enlarge the -- the

16  central part of the document there.

17      Q.   (By Mr. Berliner) Do you see the same entry,

18  No. A -- or letter A?

19      A.   Yes.

20      Q.   And does it appear to be crossed out?

21      A.   Yes.  The first four items, including A,

22  have -- have a cross over them.

23                MR. BERLINER:  And can you turn to the

24  next page in this document and enlarge the portion right

25  at the top there?

1    Q.   (By Mr. Berliner) There's a sentence in caps

2  that says:  All references considered, except where

3  lined through, and there's initials T-D.

4         Do you see that?

5    A.   Yes.

6    Q.   Do you -- and do you know what the -- the

7  initials T-D mean?

8    A.   I can see at the bottom of the diagram -- oh,

9  wait a minute.

10    Q.   Strike that.  Why don't I withdraw that

11  question.

12    A.   Okay.

13    Q.   I'll withdraw that question.

14         MR. BERLINER:  Could you identify the

15  field that says Examiner name?

16    A.   Yes.  It's being highlighted in yellow, and --

17  it's being highlighted in yellow.  That is the name of

18  the PTO Examiner.

19    Q.   (By Mr. Berliner) Mr. Wechselberger, please --

20    A.   Okay.

21    Q.   -- wait for me to ask a question.

22    A.   Sorry.

23    Q.   Okay.  So the Examiner name is identified

24  there as T. Dihn.

25         MR. BERLINER:  Okay.  You can take this

```
 1  down.
 2      Q.   (By Mr. Berliner) And I'm going on to be
 3  moving on now to a different subject.
 4          And if you would, please -- now I want to turn
 5  to the fourth patent that you had considered, and this
 6  is the '497 patent, which is Exhibit DX 776 in your
 7  book.
 8          And if you would, please, can you describe
 9  generally what the '497 patent is about?
10      A.   Yes.  It's about a configurable television
11  which is capable of receiving digital television
12  transmissions and a control channel, which is used to
13  control how the receiver processes the digital
14  television signals.
15      Q.   And -- and are you familiar with the term
16  broadcast program picture information from the '497
17  patent?
18      A.   Yes.  I think if you put up the next
19  picture -- thank you -- that's a citation from the
20  abstract.  The abstract tells us that transmitting
21  equipment transmits the broadcast program picture and
22  control information.
23          In this patent, the -- the word broadcast
24  program picture is used throughout, and it simply means
25  a television program like American Idol or any other
```

1 television program.

2     Q.    And can you briefly explain how control

3 information is used by the television in the '497

4 patent?

5     A.    There's a document -- figure in the document

6 which helps to describe that.  On the left, it's a

7 broadcast location transmitter; on the right is the

8 receiver.  This is a TV set under this patent.

9         Information comes in through this path here at

10 the left.  The reception module is like a tuner and

11 demodulator.  It receives the broadcast television

12 picture.

13        The next signal processor is -- is --

14 separates the signals so that the proper audio and video

15 information can go to the decoder, which is the

16 decompressor.

17        And the last processing element is the display

18 unit.  It's a TV picture, producer, flat screen.

19        There's another component called the reception

20 control 114.  This is the device that receives the

21 control information and then in turn returns control

22 information to the reception module and/or the signal

23 separator and/or the decoder.  And this control

24 information then controls how these boxes operate.

25     Q.    And what does the information in the broadcast

1 signal look like?

2     A.    Figure 2 shows us that.   There's an example

3 here of three different broadcast channels, Channel 1,

4 Channel 2, Channel 3.   This is like Channel 8, Channel 9

5 Channel 10.

6         And as we learned about digital television

7 programs, there's digital television transmissions.

8 There can be multiple programs on each channel.   And

9 that's shown in the color coding here.

10     Q.    And what kind of information is contained in

11 the control information?

12     A.    Let me identify the control channel.   It's

13 shown on the bottom, and importantly, there is control

14 channel information for each of the broadcast channels.

15 So this control information would go to that channel.

16     Q.    And -- and what -- what type of information

17 is -- is contained in the control information?

18     A.    Figure 3 of the patent shows us control

19 information, and for every program identified by the ID

20 here, there is then a -- that could be highlighted --

21 there is a set of control information from this table,

22 as an example, that would be associated with that

23 program.

24         There's three kinds of control information

25 disclosed in the patent.   There's picture information.

1  This is control information that would affect how the

2  picture is processed.

3        There's communications information, which is a

4  different kind of control information, which controls

5  how the program is broadcast.

6        And then there's a third type of control

7  information, which we can ignore because it doesn't come

8  into play in the discussions we're having.

9     Q.   So now let's turn to the asserted claims of

10 the '497 patent.

11        And, first of all, were you in the courtroom

12 when Mr. Goldberg testified for Hitachi about this

13 patent?

14    A.   Yes.

15    Q.   And did you hear Mr. Goldberg say that Claims

16 15 and 16 of the '497 patent, which depend from Claim

17 13, are the ones asserted to be infringed?

18    A.   Yes.

19    Q.   And do you have an opinion as to whether

20 Claims 15 and 16 are infringed?

21    A.   I have an opinion.  Based on my investigation

22 and analysis, it's my opinion that neither Claims 15 or

23 16 are infringed.

24    Q.   And were there any constructions of the terms

25 of these claims by the Court that you considered?

1    A.    Yes.   There is one very important construction

2 which the Court has provided.

3         In Claim 13, which is the independent claim,

4 you'll find the phrase broadcast system standard

5 appearing -- repeated up here.

6         And the Court has provided a definition that

7 we can follow to help us understand what Claim 13 means,

8 and that definition is:  A specified set of technical

9 parameters describing how a program is broadcast.

10    Q.    And did you apply the Court's construction in

11 performing your analysis of the '497 patent?

12    A.    Yes, I did.

13    Q.    And -- and how did you apply the construction?

14    A.    The next slide, I'll walk you through that.

15 The key phrase is how a program is broadcast.  And

16 stepping back and thinking about what does it mean to

17 broadcast, what is broadcasting, broadcasting is the

18 launching of a signal through the air from a transmitter

19 to a receiver.  So that is a broadcast.

20         Of course, in real life, there's hundreds of

21 receivers, and so I repeated the phrase down there how

22 to broadcast, and that is the focus that I used in -- in

23 applying the Court's definition to the claim.

24    Q.    And are there other kinds of technical

25 parameters that control different things within the

1   patent than how the program is broadcast?

2        A.    Certainly.   In the -- in the Figure 3 we just

3   looked, I pointed out two different kinds of control

4   information.

5            One I called picture information.   This

6   controls how a picture is processed.   That's not how a

7   program is broadcast.   There is a separate kind of

8   information that the patent calls communication

9   information.   Communication controls how a program is

10  broadcast.

11           So there's basically two buckets in this

12  patent of control information, and only one of those is

13  the subject of the Court's construction.

14       Q.    And could you perhaps give us an example to

15  show how you understand the construction to apply in

16  this case?

17       A.    Sure.   And the example I'll use, I'll use a

18  model.   And let's -- let's -- let's just say that I've

19  got a box to send to somebody, and in this box, I'm

20  going to put something that needs to be assembled like a

21  bicycle.

22       Q.    Mr. Wechselberger, can you speak into the

23  microphone?

24       A.    I'll speak to the mic.

25           And in this box, there's something to be

1   assembled, like a bicycle.  So I'll prepare the parts of

2   the bike, put them in the box, and I'm going to throw in

3   some control -- some assembly instructions into the box,

4   and I'll close the box.

5           Now I have a decision to make.  In sending

6   this box to a recipient in the house up there, I have

7   choices to make.  I could choose Postal Service, FedEx,

8   UPS.  Each choice of delivery method I use is a

9   different way of sending that box to the recipient.

10          Now, in this model, the box represents a

11  television program.  Inside the box are pieces of a

12  bike, but in the model, those are the pieces of a

13  program with the assembly instructions in there.  When

14  the recipient gets the instructions, he knows how to put

15  the bike together.

16          There are similar assembly instructions for

17  the program you get back that I'll show you that has

18  picture information that tells you how to put the

19  picture together.

20          So the box is the television program with the

21  pieces of it.  The delivery trucks represent how the box

22  is sent to the recipient, how the program is broadcast.

23  So in picking one of these delivery options, if we

24  rolled the truck, U.S. mail or FedEx, each one of these

25  represents a different carrier or a different way for

1 how the box gets to the receiver.

2         Making this a little bit more interesting,

3 there might be a time of arrival, 10:00 o'clock for

4 mail, 1:00 o'clock for FedEx, 4:00 o'clock for UPS.

5         Now, time represents an example of a parameter

6 for how the box got to the consumer.  So I've got

7 different parameters associated with different carriers.

8 This is analogous to how a program is broadcast.

9         Now, if I'm the person at the house, and I'm

10 going to have to sign for this box, I need to know --

11 especially if I'm working, I need to know when to come

12 home and be there to sign for that box.  So that's

13 information I have to understand in order to know how to

14 receive the box.

15     Q.    Now, Mr. Wechselberger, let me interrupt you.

16 So how does this example, then, relate to the

17 televisions that are sold in the United States?

18     A.    All right.  We can move along to the next

19 picture then.

20         Oh, all right.  The next picture shows the

21 situation in the United States.  The previous slide had

22 a picture of the patent on it.  So that was what I was

23 talking about with the box and the delivery options, was

24 what the patent describes.

25         In the United States, under the ATSC system --

1  you can roll the truck -- you don't get choices.  You

2  have one choice for how this program is broadcast.

3  That's like having only one choice for how the package

4  is delivered.

5         All broadcasters in the U.S. broadcast how the

6  program is broadcast using the ATSC standard.  It's

7  mandated by the FCC.  There are no choices.

8      Q.    So, Mr. Wechselberger, does that mean that the

9  televisions don't need any control information on how

10  the program is broadcast?

11     A.    That's exactly right.  TVs are manufactured

12  with a target market in -- in mind, that is, the ATSC

13  market, and they know how that program is going to be

14  broadcast.  They don't need to be told anything else.

15     Q.    So could you now relate this back to the

16  figures of the '497 patent?

17     A.    Sure.

18         If we look back at a couple of those figures

19  together, Figure 3 on the bottom was the figure that

20  gave us the two kinds of control information.  The pink

21  information, communication systems information, is how

22  the program is broadcast, and I've shown that being

23  introduced to the reception module in the actual figure

24  of the television.  Because it receives the broadcast

25  signal, it needs to know how that signal is broadcast.

By contrast, the blue information is picture information, and that is instructions for how to process the picture information.  And this would be analogous to the assembly instructions that I put in the bicycle package.

So these all work together in the patent to provide the full complement of kinds of control information that that controller there delivers to the components of the receiver.

Q.   So did you hear Mr. Goldberg identify control information when he testified earlier this week?

A.   I did.

Q.   And let me -- let me show you two ATSC documents.  Actually, strike that.

Maybe you can identify these two documents for me.

A.   Yes.  The one on the left is highlighted A65, and it's called program and system information protocol. We call that PSIP.  That's one of the documents that provides a lot of the -- the information in the tables that Mr. Goldberg was referring to.

The other document is ISO/IEC 13818-1.  This is the MPEG 2 system standard for transport multiplexing that I described earlier.

So these two documents both provide certain

1  kinds of information that's transmitted with a digital

2  television signal.

3      Q.   And were these documents that you had

4  reviewed?

5      A.   Yes.  I -- I reviewed them extensively.

6      Q.   Thank you.

7           And do these documents show the fields that

8  Mr. Goldberg identified?

9      A.   They do.

10     Q.   And are these the fields that Mr. Goldberg had

11 identified?

12     A.   Yes, they are.

13     Q.   And do you agree with Mr. Goldberg's opinion

14 that the control information, the six items of control

15 information here, are a specified set of technical

16 parameters describing how a program is broadcast?

17     A.   No, they aren't.

18     Q.   Why -- why not?

19     A.   Because --

20          THE WITNESS:  If we can have the next

21 picture, please.

22     A.   -- every one of those items relates to this

23 middle box of picture information.  They -- they supply

24 parameters that have values that are -- that are used by

25 such things as signal separators and decompressors.

1         One, for example, he called a stream-type,

2  that was one of the parameters.  That's a decompression

3  parameter, so that would control that box, for example.

4  None of those parameters that he identified have

5  anything to do with configuring the reception module,

6  and therefore, they do not represent examples of control

7  information for how to broadcast a signal or how --

8  following the Court's construction, how the program was

9  broadcast.

10     Q.   (By Mr. Berliner) So if we return now to Claim

11  13 --

12            MR. BERLINER:  And, Your Honor, if I may

13  approach one last time --

14            THE COURT:  You may.

15            MR. BERLINER:  -- to change the board?

16            THE COURT:  You may.

17     Q.   (By Mr. Berliner) And on this board, I have --

18  I have put Claims 13, 15, and 16 of the '497 patent.

19            MR. BERLINER:  Oh, and before I move on,

20  let me just note for the record that the two documents

21  you just testified about were Exhibits DX 756 and

22  DX 758.

23     Q.   (By Mr. Berliner) So returning to the claims,

24  Claim 13 includes the limitation reception means for

25  receiving a broadcast program picture and control

information which are broadcasted in accordance with a
predetermined format, said control information
specifying a broadcast system standard.

        Mr. Wechselberger, is this limitation met by
the TPV televisions?

    A.   No, it is not met by the TPV televisions.

    Q.   And -- and why not?

    A.   Because none of the information identified by
Mr. Goldberg affects how a television signal is
broadcast.  There are not parameters that relate to that
function.

    Q.   And do we need to then consider the additional
limitations of Claims 15 and 16?

    A.   No, we don't.  These are dependent claims, and
since Claim 13 has not been satisfied, neither Claim 15
nor Claim 16 can be satisfied.

            MR. BERLINER:  And, Your Honor, may I
approach the board?

            THE COURT:  You may.  Although the last
time you said it was my last time.

            Go ahead.  Go ahead.

            MR. BERLINER:  I don't know if I can
reach it, but this really is my last time.

            THE COURT:  I'll believe it when I see
it.

 1              MR. BERLINER:  I think I'm going to have

 2  to take this down rather than jump.

 3       Q.   (By Mr. Berliner) But would I be correct in

 4  crossing out the means for receiving?

 5       A.   Yes, you would.

 6       Q.   And how about Claim 15?

 7       A.   You can cross that out because it depends from

 8  Claim 13.

 9       Q.   And how about Claim 16?

10       A.   Same thing, depends from Claim 13 -- 15.

11       Q.   And do you have an opinion as to the

12  infringement of Claims 15 and 16 of the '497 patent?

13       A.   Yes.  It's my opinion that Claims 15 and 16

14  are not infringed by the TPV patents.

15              MR. BERLINER:  Your Honor, I pass --

16       A.   The TPV televisions.  Excuse me.

17              MR. BERLINER:  Your Honor, I pass the

18  witness.

19              THE COURT:  All right.  Ladies and

20  Gentlemen of the Jury, I expect there to be some lengthy

21  cross-examination, given the length of time this witness

22  has been on direct.

23              Therefore, I think this is probably a

24  good place to take an early afternoon break.  I'm going

25  to give you about 10 minutes to stretch your legs.

```
 1   Don't discuss the case.  And we'll have you back in in a

 2   few minutes.  You're excused to the jury room for the

 3   next 10 minutes.

 4                  The Court will stand in recess.

 5                  COURT SECURITY OFFICER:  All rise.

 6                  (Jury out.)

 7                  THE COURT:  The Court will stand in

 8   recess.

 9                  (Recess.)

10                  (Jury out.)

11                  COURT SECURITY OFFICER:  All rise.

12                  THE COURT:  Be seated, please.

13                  MR. BLACK:  Your Honor, may we address

14   one scheduling issue before we bring the jury back?

15                  THE COURT:  All right.  What is that,

16   Mr. Black?

17                  MR. BLACK:  Just a clarification on

18   whether our -- I was talking to Mr. Dacus, and with

19   respect to our rebuttal case, they don't have invalidity

20   defense on some of the patents, and the question is

21   whether we can bring our infringement experts back as

22   part of our rebuttal for short rebuttal testimony.

23   And Mr. Dacus is of the view that we can't, and Mr.

24   Carroll is of the view that we can.  And I just need

25   guidance of the Court.
```

1                        THE COURT:  Well, there are -- I mean,

2    there are issues as to at least some of the patents,

3    correct?

4                        MR. BLACK:  Well, certainly there's -- on

5    the '310 and the '375, there's -- there's invalidity,

6    and we'll obviously have a right to put rebuttal on

7    that.

8                        THE COURT:  No question about that.

9                        MR. BLACK:  On the infringement claims,

10   on the '497 and the '243, the question is whether or not

11   we have the right to put a rebuttal case on with respect

12   to infringement.  I don't see why not, but Mr. Dacus

13   says that's inappropriate.

14                       THE COURT:  Well, the rebuttal case

15   should be confined to the Defendants' case-in-chief.

16   You should use it to rebut the evidence that Defendants

17   have put on.  So if there's evidence that gives rise to

18   a potential for rebuttal in the Defendants' case, then

19   it's appropriate for your rebuttal case.

20                       MR. BLACK:  That was my view, Your Honor.

21   Thank you.

22                       THE COURT:  Just so counsel will know,

23   according to my calculations, the Plaintiffs are at

24   11 hours and 11 minutes, which means you've got less

25   than 2 hours left.

 1                    And the Defendants are at 10 hours and 16

 2    minutes.  So you've got about 2 hours and 44 minutes

 3    left.  So we're getting close on time.

 4                    Anything else before we bring the jury

 5    back?

 6                    Let's bring the jury back in, please, Mr.

 7    Skadden -- Shadden.  Excuse me.

 8                    COURT SECURITY OFFICER:  All rise for the

 9    jury.

10                    (Jury in.)

11                    THE COURT:  All right.  Be seated,

12    please.

13                    And cross-examination of the witness by

14    the Plaintiff.

15                    MR. PLIES:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17    BY MR. PLIES:

18        Q.   Good afternoon, Mr. Wechselberger.

19        A.   Good afternoon.

20                    MR. PLIES:  Mr. Pickett, could you please

21    put up the demonstrative on the screen?

22                    Go to the top, please.

23        Q.   (By Mr. Plies) And, Mr. Wechselberger, can you

24    please identify what's on the overhead?

25        A.   This looks like one of the pages from my -- my

1  website.

2     Q.   And do you know what this page is describing?

3     A.   This is a sampling, without details or dates,

4  of various kinds of legal experiences that I've -- that

5  I've had just to give folks who are trying to figure out

6  what Entropy Management Solutions is about.

7        This provides -- at least from the legal side,

8  this provides a sample of the legal experiences.

9  There's other pages which shows my consulting systems

10  engineering work.

11     Q.   So this page, then, is addressing the work

12  activities you've had in the course of litigations in

13  case support and so forth; is that fair?

14     A.   A subset of that.  It hasn't been updated in a

15  couple of years.

16        MR. BERLINER:  Mr. Pickett.

17     Q.   (By Mr. Plies) So you said it hasn't been

18  updated in a few years.

19        Are there more cases than this that can go on

20  this page?

21     A.   Yes.

22     Q.   Do you know how many cases are on this page

23  now that you've been involved with in terms of

24  litigation activity?

25     A.   No, I don't know.  I don't remember.

1      Q.   All just represent to you -- I counted 32,

2 but, you know, I'm --

3      A.   Okay.

4      Q.   When was this page last updated?

5      A.   Perhaps a year and a half ago, perhaps longer.

6 Not more than two years ago.

7      Q.   How many more litigation cases would be added

8 to the list, if you added the ones from a year and a

9 half -- since a year-and-a-half ago?

10     A.   I really don't know.  Perhaps 10 or 12.

11     Q.   10 or 12.  Okay.  So -- and how far back does

12 the list go?

13     A.   The list would go -- again, these are

14 samplings of items that I thought might be of particular

15 interest to people, but I started doing this kind of

16 work in -- in, I believe, the year 2000, and I don't

17 know if that -- if any of those early cases are

18 reflected here or not.

19     Q.   Sir, what percentage of your -- what

20 percentage of your income in the last couple of years

21 has been from being a technical expert in court cases?

22     A.   Well, I had a similar question asked me during

23 my deposition, and if this is the same -- I don't know

24 if this is the same, but I struggled with it as well,

25 because I wasn't sure what you meant.

1          For example, when you say court cases, there's

2    a lot of work I do that never comes close to the

3    courtroom.  So I don't know if you need to include that

4    or not.

5          Q.   Do you recall the entry you gave me at the

6    deposition was 70 to 80 percent?

7          A.   70, 80 percent of my income comes from -- I

8    think I said assistance to the legal community.

9          Q.   And that would include these 32 plus 12 or,

10   what-have-you, litigation matters that you've been

11   involved with?

12         A.   Yes.

13              THE COURT:  Speak up a little bit,

14   please, Mr. Wechselberger.

15              THE WITNESS:  Okay.

16         Q.   (By Mr. Plies) Now, just to clarify something,

17   do you recall at your deposition when I asked you how

18   many times you've been an expert in the litigation

19   manner on the side of TPV, and you told me it was at

20   least between three to five times.

21              And then when Mr. Berliner asked you, I think

22   was the same question a little earlier today, I think

23   you said twice.  And I just wanted to get some

24   clarification on how many times it was.

25              Two, three, five times you've represented or

1   been on the same side as TPV?

2       A.   Well, I know when the question came up at my

3   deposition, I wasn't prepared for it and I guessed.  The

4   thing about my work with this client is the work has

5   come.  There will maybe be a flurry of activity and then

6   will go dormant for six to eight months.  I'd be asked

7   to do something again, and I would do some work, and it

8   would go away.  And sometimes it would come back, in

9   effect, be for a different case.

10              THE COURT:  Mr. Wechselberger, that's not

11  the question.  That's not even close to the question.

12  Try to answer the question.

13      A.   The question is why is there discrepancy?

14      Q.   (By Mr. Plies) Yeah.  And today, you have --

15  what's the number?  Two, three, five?

16              I just want to get clarification.

17      A.   As best I know, it's two.

18      Q.   Okay.  And over a sort of what --

19      A.   Plus this one.

20      Q.   So this makes it a third at least?

21      A.   Yeah.

22      Q.   Okay.  And over what period of time have you

23  been involved in litigation matters on the side of TPV?

24  Has it been two years, three years, five years?

25      A.   I would guess somewhere between three,

1  three-and-a-half.  Three, three-and-a-half.

2      Q.    Do you have any other clients that retain you

3  as often as TPV has?

4      A.    I think at least one.

5      Q.    Out of the 40-some-odd cases and clients

6  you've listed on your webpage?

7      A.    Yes.

8      Q.    Mr. Wechselberger, what's a re-examination

9  proceeding?

10      A.    That is when a patent, which has been issued,

11  goes through -- and goes through all the steps that

12  result in the patent being issued, goes through another

13  series of steps by -- within the PTO.

14          Again, I'm not a patent attorney nor a lawyer.

15  So it goes through another series of steps where a

16  request has been made and granted.  The USPTO takes a

17  look once again at that patent and the claims perhaps in

18  light of new prior art or other reasons to re-examine

19  the patent to see if it should have been issued.

20      Q.    Is it fair to say that it's a proceeding

21  before the Patent Office that looks at an already issued

22  patent to see whether it's still valid?

23      A.    Again, within -- within -- that's my

24  understanding as a non-attorney.

25      Q.    And you've participated in a couple

1  re-examination proceedings; isn't that correct?

2      A.    I've never -- I have provided consulting

3  services to assist in providing information to the PTO

4  for why a patent should be re-examined, if that's what

5  you are asking me.

6      Q.    Right.  Is it fair to say that you've prepared

7  statements for submission to the PTO in at least two

8  cases, arguing that there were substantial questions as

9  to the validity of issued patents?

10     A.    I don't know the exact number, but I have done

11 that.  Yes.

12     Q.    And other than this case, isn't it true that

13 in at least four other litigation matters, you have

14 prepared expert reports on the validity of patents in

15 those cases?

16     A.    Have I provided expert reports that opine on

17 the validity like I did in this case?

18     Q.    Correct.

19     A.    Yes.

20     Q.    And those four cases -- I think you might

21 remember, we discussed them at your deposition --

22 involved approximately maybe eight different patents,

23 among those four cases.

24          Do you recall that?

25     A.    I recall our discussion about that, and that

1  seems right.

2      Q.   So an aggregate between this case, those four

3  prior cases that you dealt with, and the two

4  re-examinations that we mentioned a moment ago, by my

5  count, there's sort of 13 opinions or statements that

6  you've been -- you've prepared on the validity of

7  patents.

8          Does that sound about right?

9      A.   Probably, yes.

10     Q.   And how many -- of those statements and

11  opinions that you rendered, out of those 13, how many

12  times did you find the patent valid?

13     A.   Well, if I'm writing an invalidity report,

14  then that -- that's not a conclusion that one would come

15  to.  So I'm confused by the question.

16     Q.   You rendered 13 opinions or statements

17  regarding whether a patent was valid or invalid,

18  correct?

19     A.   I don't recall ever -- when I'm working on

20  behalf of a Plaintiff and I'm -- and the Plaintiff is

21  asserting a patent -- a patent, then I would be arguing.

22  If I'm asked, I would -- I would provide opinions as to

23  why the patent is valid in light of prior art, so that

24  would be that kind of an opinion.

25          If I'm on the defense and arguing invalidity,

1  then I would write a report with the basis for arguing

2  invalidity.

3      Q.   Maybe I can put it this way:  Isn't it true

4  that you've never signed a report finding a patent to be

5  valid?

6      A.   I've never been asked to.

7      Q.   So that's a yes, right?

8      A.   Yes.

9      Q.   Do you recall traveling to D.C. a couple of

10  years ago to testify before the United States

11  International Trade Commission in a patent infringement

12  matter?

13      A.   I've done that, I believe, three times.  Yes,

14  three different times.

15      Q.   And in one of those -- at least one of those

16  times, you opined, is it not correct, to the

17  administrative law judge that the patent suit was

18  invalid?  Is that right?

19      A.   The what was?

20      Q.   That the patent was valid?

21      A.   On at least one of those occasions, I -- I

22  argued that way.  Correct.

23      Q.   And do you know what the International Trade

24  Commission found with respect to the patent's validity?

25      A.   Well, the one I'm remembering, actually, I

testified on two different occasions before the ITC,

and -- and I believe on the first time the actual -- the

hearing, I think it -- it was ruled -- the patent was --

they ruled against me, that the patent was valid.

         And it came back again in an enforcement

hearing about a year-and-a-half later.  And I believe I

was told at that time they found in my favor, that the

patent was invalid, the same patent.

    Q.   Now, we heard from Mr. Hamilton the other day.

Were you in the courtroom when he testified?

    A.   Yes.

    Q.   And did you hear when he testified that in his

work experience, he's actually designed large-scale

integrated circuits for direct digital televisions, for

example, when he was at ITT?  Do you recall that

testimony?

    A.   Yes.

    Q.   Have you ever personally designed a

large-scale integrated circuit for a digital television?

    A.   I've led design teams who have done that.

    Q.   But you weren't personally doing the design

work, were you?

    A.   No.  I was chief technical officer at TV/COM

at the time.

    Q.   And you've never personally designed an error

1  correction circuit, have you, Mr. Wechselberger?

2      A.   Yes.  Oh, yes.

3      Q.   Didn't you tell me at your deposition that you

4  didn't design such circuits?

5      A.   Well, I wouldn't have answered -- the question

6  you asked me just now was quite specific.  As a design

7  engineer working on digital audio systems in the early

8  '80s for communications, I designed signal processing

9  circuits, which included parity error correction on

10 them.

11         I think when you and I were talking before,

12 you were asking more about sophisticated things like

13 Reed-Solomon and whatnot for digital TVs.  There again,

14 I was supervising such activity but personally not

15 something I was doing.

16     Q.   Okay.  So what I'm understanding is you worked

17 on some simpler error correction systems for audio, but

18 you haven't worked on the more sophisticated ones for

19 digital televisions?

20     A.   In terms of actual circuit implementations,

21 that's correct.

22         In my master's work at San Diego State, I

23 designed paper algorithms for credit.  So I have

24 designed those, but I've not built them into chips.

25     Q.   And you have two patents but neither one of

1  which is in the area of error correction, are they?

2      A.   That's correct.

3      Q.   And do you have any published papers on, for

4  example, trellis coding or convolutional coding?

5      A.   I have a paper that I presented at the NCT --

6  NCTA on QAM -- on QAM and QPSK digital TV modems.

7      Q.   Okay.  But you told me at your deposition,

8  though, that you didn't have actually any publications

9  on trellis coding or convolutional coding; isn't that

10  right?

11      A.   Specific to trellis or convolutional coding

12  and publications, I do not have a paper on those.  Those

13  are part of a QAM modulator or a QPSK modulator.

14      Q.   Now, during today's -- your direct testimony,

15  you repeatedly made some comments, for example, about

16  the '310 and '375 patents being about videotape

17  recorders and high-speed recording.

18          Do you recall that?

19      A.   Yes.  Yes.

20      Q.   Is there anything in the claims that limits

21  them to recorders?  Does the word recorder appear in the

22  claims anywhere?

23      A.   I'd have to look at each claim.  The ones we

24  looked at today, I don't believe so.

25      Q.   Are you aware of any Court claim construction

1  that limits the claims in suit to videotape recorders?

2      A.   No.

3              MR. PLIES:  Could I please get DD 125

4  from the direct?

5      Q.   (By Mr. Plies) So, Mr. Wechselberger, I was

6  just going to use the figure on this slide as exemplary,

7  but what comes in here on the antenna, what kind of

8  signal?

9      A.   The ATSC-compliant modulated signal.

10     Q.   And does that signal include digital, video,

11 and audio information?

12     A.   Well, it includes everything on the -- on the

13 multiplex.  And if the multiplex is programming, then

14 yes.  It doesn't have to be programming, but, typically,

15 it is.

16     Q.   So for a television signal, it's going to --

17 you would expect it to have video and audio?

18     A.   Yes.

19     Q.   And on this end, we have the bit-expanders,

20 correct?

21     A.   Yes.

22     Q.   And that would include a video bit-expander

23 and an audio bit-expander, correct?

24     A.   Correct.

25     Q.   So the input to the bit-expander would be a

1   signal that has video and audio information, correct?

2       A.   So one type is used for each, so it would be

3   video or audio.

4       Q.   So at every stage in the signal processing

5   process, in one form or another, the signal's going to

6   contain video and audio all the way through the chain so

7   that it can reach those bit-expanders at the end; isn't

8   that correct?

9       A.   Well, the -- the interface in yellow there is

10  a specific signal.  What is under the hood with that

11  signal, these signal processing blocks don't know about.

12  All they know about are the 1s and 0s.

13          So the 1s and 0s are a coded representation

14  that will eventually emerge at the end of the chain as

15  the audio or video information.  But at any given

16  interim stage, there's no audio or video signal there.

17      Q.   But there's information at each stage that

18  ultimately must represent the video and audio, correct?

19          It can't get lost or else there wouldn't be

20  anything to input into the bit-expanders; isn't that

21  right?

22      A.   Are you saying that -- are you asking me if

23  within the signals at each chain, there is ultimately

24  going to be a representation of audio and video?  I'll

25  agree.

1                MR. PLIES:  Can you bring up the slides,

2  please, my slides?

3      Q.   (By Mr. Plies) I wanted to see what maybe is

4  not in dispute.

5            You would agree, wouldn't you,

6  Mr. Wechselberger, that the accused products all include

7  a reception circuit, would you not?

8      A.   I need you to define what you mean by

9  reception circuit.

10     Q.   A circuit for receiving an ATSC signal

11 containing bit-compressed video and audio information.

12     A.   Like -- well, the problem -- the caveat I was

13 putting was a reception typically includes a device

14 called a tuner and another device called a demodulator.

15           So I wasn't sure if you were referring to both

16 of them together or one separately.

17     Q.   Okay.  Well, would you agree they all include

18 a tuner?

19     A.   The accused televisions?

20     Q.   Yes.

21     A.   Yes.

22     Q.   And do you have your laser pointer with you?

23     A.   Yes, I do.

24     Q.   Can you identify the tuner, please, on this --

25 first of all, do you know what's shown on the current

1   overhead slide?

2       A.   No, I don't.  It looks like a board out of a

3   television set.

4       Q.   You're correct.

5           Could you identify the tuner, please?

6       A.   Typically, that is a device shown in that

7   silver box there.  I heard Mr. Hamilton call it a

8   cannon.  That's indeed what we call them.  It's a radio

9   frequency shielded module that receives the input.

10  You see the F-connector that's typically what -- you

11  screw in the cable coming out of your wall or attached

12  to your antenna, so I would assume that's the tuner.

13      Q.   And is that tuner a separate and distinct

14  component from the SOC?

15      A.   Yes, it is.  In this case, it looks like it

16  is.

17      Q.   And who would place that tuner on the main

18  board?

19      A.   Well, if this question has to do with the

20  manufacturing of TVs, it's -- this is not something that

21  I opined on or -- or studied.  So when you asked me who

22  would place a tuner on the board, I -- I don't know.

23      Q.   Also, when I asked you at your deposition in

24  January what brands TPV made televisions for, you

25  weren't able to name a single one for me, were you?

1       A.    I don't recall if I named any for you.  The

2  specific brand of television really has nothing -- was

3  outside the scope of what I was asked to do and what I

4  did.

5       Q.    Perhaps, but -- but you are aware what the

6  brands were that TPV sold to at the time.

7       A.    Well, I've heard some television brand names,

8  but, like I said, I didn't pay any attention.  It was

9  out of the scope of my report.

10      Q.    All right.  Turning back to the figure,

11  though, on the -- the tuner, you would agree, again,

12  that that is a distinct component from the SOC, correct?

13      A.    I'm looking at the figure, and it identifies

14  the SOC as this ARM chip on the right -- upper

15  right-hand corner.  I believe I see that same chip

16  mounted in the center of the board.  And it -- a chip

17  like that would not have a tuner as part of it, so a

18  tuner would be separate.

19      Q.    And do you understand from Mr. Hamilton's

20  presentation that Hitachi is, in its contentions and

21  Mr. Hamilton, in his opinion, have indicated that it's

22  that tuner which satisfies the receiver limitations?

23      A.    Yes.

24      Q.    So when Mr. Dacus walks around the courtroom

25  holding an SOC above his head saying that Hitachi is

1  accusing the SOC, is accusing the SOC, that's not

2  entirely accurate, is it?

3      A.   I wasn't here for that.  I don't know.

4      Q.   Would you agree that the accused products all

5  include a demodulation circuit?

6      A.   Yes.

7      Q.   Would you agree that all the accused products

8  include a circuit that does Reed-Solomon decoding?

9      A.   Ask me again, please.

10      Q.   Is it fair to say that the accused products

11  include a Reed-Solomon decoder?

12      A.   Not as used in the asserted claims.

13      Q.   But they do include a Reed-Solomon decoder,

14  don't they, Mr. Wechselberger?  I understand that it's

15  your view that there is no infringement, but would you

16  agree that there is a circuit in a television that does

17  do Reed-Solomon decoding?

18      A.   Not as used in the claim.  If you want to

19  hypothetically ask me, is Reed-Solomon decoding a parity

20  correction process, I would agree it is, but as soon as

21  you attach it to the accused TVs, I have to put a

22  qualification in there.

23      Q.   Okay.  So I'm asking you just as an expert in

24  the field, if somebody asked you on the street, without

25  any perspective of our claims -- I'm not asking you to

1  look at it with respect to the claims, just based on the

2  ATSC Standard, for example -- would you be able to

3  answer whether the television included a Reed-Solomon

4  decoder?

5      A.   I would say that if any television is

6  compliant to ATSC signal processing, then Reed-Solomon

7  decoding functions would be part of what's in that TV

8  somehow.

9      Q.   And are Reed-Solomon decoding circuits

10 commonly known or understood to be error correction

11 circuits?

12     A.   In textbook -- in textbooks, Reed-Solomon

13 decoding is called an error correction process.

14     Q.   And how about a trellis decoder?  Do the

15 accused products include a trellis decoder?

16     A.   Yes.  The accused products include trellis

17 decoders.

18     Q.   And in the art, are trellis decoders known as

19 a type of error correction circuit?

20     A.   That's part of what a trellis decoder does.

21 They typically also doing symbols-to-bits translation.

22     Q.   So they do error correction along with some

23 other things; is that fair?

24     A.   Trellis decoders perform error correction,

25 yes.

1      Q.    And do the accused products include MPEG 2

2  video decoders?

3      A.    If they're ATSC-compliant, they must do MPEG 2

4  video compression.

5      Q.    To your knowledge, are all the products

6  ATSC-compliant televisions?

7      A.    Yes.

8      Q.    Is the term decoder and expander -- are those

9  sometimes used interchangeably?

10     A.    Yes.  It's context driven, but we've been

11 using them in this case interchangeably.

12     Q.    And how about decompression?  Is that perhaps

13 another synonym?

14     A.    Yes.

15     Q.    Do the accused televisions include an AC-3

16 audio decoder?

17     A.    AC-3 decompression is required for them to be

18 ATSC-compliant.

19     Q.    Now, for a digital television, is it true that

20 RF reception that is reception that the radio signal is

21 going to come before demodulation, which is, in turn,

22 going to come before error correction, which is, in

23 turn, going to come before decoding in the video and

24 audio?

25     A.    Yes.

1    Q.   In your slides earlier, you had some mentions

2  of Grand Alliance, and I believe you also had some of

3  that in your expert reports.

4         Do you recall that?

5    A.   Yes.

6    Q.   Can you identify the companies on the

7  left-hand portion of your overhead slide?

8    A.   Those are the seven Grand Alliance companies.

9    Q.   Now, where is Philips based; do you know?

10   A.   I believe Philips World headquarters in The

11 Netherlands.

12   Q.   Einhoven, isn't it?

13   A.   Yes.

14   Q.   How about Thomson; do you know where Thomson

15 is from?

16   A.   Are you talking about Thomson Corporate

17 headquarters?

18   Q.   Yes.

19   A.   I believe they're in France.

20   Q.   So Mr. Dacus said I believe during opening

21 statement said the Grand Alliance were all these

22 American companies.  That actually wasn't accurate, was

23 it?

24   A.   My understanding is the U.S. divisions of each

25 of those companies, in my personal knowledge, is -- the

1  U.S. division of each of those companies were Grand

2  Alliance members.

3          But, yeah, Thomson has a parent company in

4  France and Philips -- Philips North America, Philips,

5  which I had business relationships at the time, was

6  based in Manlius, New York.

7      Q.   Now, what's being shown on the left-hand

8  portion of the overhead slide -- I'm sorry --

9  right-hand?

10     A.   I see a bunch of company names.  I -- I -- I

11  don't know what -- why you're showing these to me.

12     Q.   Well, didn't these appear in your rebuttal

13  expert report at Paragraph 569?

14     A.   I'm happy to look at it.  I don't remember.

15     Q.   Do these appear to you to be the MPEG LA ATSC

16  patent pool licensors?

17     A.   My recollections of the MPEG LA ATSC -- the

18  ATSC pool or the MPEG pool?

19     Q.   This is the ATSC pool.

20     A.   Okay.  When I studied that pool on the

21  website, I saw hundreds of patents.  And what I recall

22  is being dozens of entities.  If these are from that

23  pool, then that's fine.  I -- I just remember them being

24  a lot more companies than this, but I -- I could be

25  wrong.

1         MR. PLIES:  Your Honor, may I grab my --

2         THE COURT:  Yes.

3     Q.   (By Mr. Plies) All right.  So just to refresh

4  your recollection, this is Paragraph 569 of your expert

5  rebuttal report.

6         Do you recall this?

7     A.   Yes.

8     Q.   And this is identifying the companies in the

9  MPEG LA ATSC patent pool?

10    A.   Yes.  It -- it -- it says the current patent

11  pool includes patents contributed by Cisco Technology,

12  et cetera.  I thought your question to me earlier was

13  limited to these, and that's all I was saying, is I'm

14  not sure if this is the total list of companies.

15         MR. PLIES:  Switch back, please.

16    Q.   (By Mr. Plies) Well, let me represent that we

17  got the list basically from your rebuttal report, and

18  what I'm interested in, is how many of these companies

19  are common between the Grand Alliance members and the

20  licensors in the MPEG LA patent pool?

21    A.   This is not something that I studied.  I -- I

22  wouldn't be competent to answer that.  I don't know.

23    Q.   Well, do you remember us discussing this at

24  your deposition in January?

25    A.   No, I don't.

1      Q.   Okay.  Well, from looking at the list, we can

2   see that Philips is in common and Zenith is in common,

3   correct?

4      A.   I see Philips Electronics NV.  I would assume

5   that's The Netherlands corporate -- one of the

6   corporate's bodies.  On the left, Philips Consumer

7   Electronics, I'm not sure if that's, as a corporate

8   standpoint, the same entity.  It's part of Philips.  I

9   would not disagree with that, but I wouldn't know that

10   the top two items are, in fact, different

11   representations for the exact -- the same business

12   entity.

13      Q.   Let's back up a second.

14           First of all, why don't you describe who the

15   Grand Alliance was again for everybody.

16      A.   They were the seven companies that united

17   their efforts at the request of the FCC to stop

18   competing against each other in promotion -- promoting

19   their own proprietary digital TV solution, to pool the

20   technologies, and provide the best of the best, best

21   compression, best modulation, so on, in a unified

22   proposal to the FCC as a candidate for adoption for a

23   standard for North American broadcasting.

24           And it turns out at that time in that location

25   and place, there were seven proponents who aligned

1   themselves.  And from that point on was mostly referred

2   to and currently referred to as the Grand Alliance.

3        Q.   So they're the companies that basically

4   prepared the ATSC standard; is that fair?

5        A.   They're -- I'm sure there was other -- perhaps

6   not entities like this, corporate entities, but I'm sure

7   that they had other help.  And the ATSC system is a

8   result, as I alluded to earlier, also of MPEG

9   technology, which came into that.

10            So I'm sure there were MPEG folks that knew

11  about MPEG video compression and transport stream

12  standards and so forth, who were assisting behind the

13  screens.  These guys just didn't operate in a vacuum.

14       Q.   Now, the MPEG LA patent pool includes licenses

15  that have been determined to be essential to practice

16  the ATSC standard; isn't that correct?

17       A.   That's my understanding.

18       Q.   And that essentiality determination is made by

19  some independent experts.  Is that your understanding?

20       A.   Yes.

21       Q.   And what we see in these two lists, correct me

22  if I'm mistaken, but the MPEG LA patent pool members

23  that are listed here from your expert report include

24  seven companies that were not members of the Grand

25  Alliance; isn't that correct?

1      A.    Six or seven.   There are people -- there are

2  companies on the right-hand side that are not part of

3  the Grand Alliance.   I agree.

4      Q.    So isn't a fair takeaway point from this that

5  there are companies that have essential ATSC technology

6  that were actually not members of the Grand Alliance?

7      A.    Yes.

8      Q.    In your expert rebuttal report, you mentioned

9  being a voting member of ATSC.

10           Do you recall that?

11     A.    Yes.

12     Q.    And do you recall at your deposition, when I

13  asked you how many ATSC meetings you attended, you

14  indicated it was none?

15     A.    That's correct.

16              MR. PLIES:   Nothing more.

17              THE COURT:   Redirect?

18              MR. BERLINER:   It will be very brief,

19  Your Honor.

20                  REDIRECT EXAMINATION

21  BY MR. BERLINER:

22     Q.    Mr. Wechselberger, does TPV hire you because

23  of your familiarity with the products that it sells?

24     A.    Yes.   Well, that's -- I've never asked them,

25  but my assumption is I've been through the learning

1  curve.  I've been through the drill, when I -- I assume

2  so, because it saves time and money.

3      Q.   How long did it take you to become familiar

4  with their products?

5      A.   Years.

6      Q.   Do you recall a company called RCA?

7      A.   Sure, Radio Corporation of America.

8      Q.   Big electronics company.  It was an American

9  company, right?

10     A.   Yes.

11     Q.   Do you recall that they were acquired several

12  years ago?

13     A.   Yes.

14     Q.   Do you know who acquired them?

15     A.   I believe Thomson.

16     Q.   And wasn't it the Thomson participants in the

17  Grand Alliance who were really engineers that were from

18  the RCA Company?

19     A.   Yes, that's a fact.

20     Q.   And how about Philips; does Philips have a

21  North American subsidiary?

22     A.   At that time, they had a facility with a

23  research lab and -- and a research group in New York at

24  that time.

25     Q.   Do you recall anything about that research lab

1   in terms of its size?

2       A.   I had done some joint development programs

3   with them once under communication and once under

4   TV/COM, and it seemed to me there were a couple hundred

5   folks at that time.  It was large.

6       Q.   And were any of those folks any of the folks

7   that participated in the ATSC?

8       A.   Well, I can't speak to the people personally,

9   but the last time I was at the lab I was being shown

10  their new DVI, digital video interactive, consumer

11  product, and there were specialists in compression

12  technology.  And that's the same time that the -- just

13  before the Grand Alliance stuff fired up, so I'm

14  assuming it's the same people.

15      Q.   So even though Thomson and Philips have

16  European parents, would you say that there were a lot of

17  American engineers in those companies that was involved

18  in the ATSC?

19      A.   Everybody that I met was United States

20  citizen.

21              MR. BERLINER:  Pass the witness.

22              THE COURT:  Further cross?

23              MR. PLIES:  Nothing further, Your Honor.

24              THE COURT:  All right.  You may step

25  down.

1              Defendants call your next witness.

2              MR. DACUS:  Yes, Your Honor.  We call Dr.

3    Keith Ugone.

4              THE COURT:  Am I correct this witness has

5    been sworn?

6              MR. DACUS:  Yes, Your Honor.

7              THE COURT:  Okay.  If you'll come forward

8    and have a seat, please.

9              All right.  You may proceed, Mr. Dacus.

10             MR. DACUS:  Thank you, Your Honor.

11    <u>KEITH R. UGONE, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY</u>

12                         <u>SWORN</u>

13                    <u>DIRECT EXAMINATION</u>

14   <u>BY MR. DACUS:</u>

15        Q.   Dr. Ugone, would you introduce yourself to the

16   jury by telling them your name, please.

17        A.   Sure.  My name is Keith Raymond Ugone, last

18   name is spelled U-G-O-N-E.

19        Q.   And where do you live, Dr. Ugone?

20        A.   I actually live in Grand Saline, Texas.  So if

21   you've ever gone to Trade Days, it's the next exit east

22   of Canton where Trade Days are.

23        Q.   Just so the jury knows a little bit about you,

24   do you have children?

25        A.   I do.  Son No. 1, Kyle, is a captain in the

1  United States Marine Corps, and Son No. 2, Casey, lives

2  with me and goes to University of Texas at Tyler.

3       Q.   So what do you do for a living?

4       A.   Well, the way I describe it is I say that I

5  wear two hats, that I'm a forensic economist and a

6  damage quantifier.

7       Q.   Okay.  I'm not sure that I know what either

8  one of them are.

9            So the jury understands, would you tell us a

10 little bit more about that.

11      A.   Sure.  So it's not -- it's not uncommon that

12 companies get in disputes, much like we have this

13 dispute in the courtroom.  And usually one of the

14 companies is claiming that another company has done

15 something improper or has engaged in some kind of

16 conduct that they think has harmed one of the companies.

17 And so what I do is I try to figure out what the

18 forensic economics part is.  I figure out what happened

19 financially or would have happened financially in the

20 absence of the alleged wrongful conduct.

21           And the damages part of it is one of the

22 companies is usually in the dispute such as this,

23 claiming economic harm.  And if there's a remedy for

24 that, it's often called damages.  So the quantification

25 of that, those are all fancy words, but putting all that

1  together is the damage quantification part.

2         So the forensic economics, figuring out what

3  was going on, and then adding up the numbers to figure

4  out what the harm is or the damage is.

5      Q.   Is it that type of work that brings you to

6  this courthouse to testify to this jury?

7      A.   Yes.

8      Q.   And so what -- what -- what have you been

9  asked specifically to do in this case?

10     A.   Well, I was -- I was asked to evaluate the

11 damages that was put forth by Hitachi's expert,

12 Mr. Bratic, who you heard yesterday, and then also to

13 give an evaluation of what I think would be an

14 appropriate number, if the jury were to find that the

15 patents are valid and infringed.

16     Q.   And then let's stop right there, because

17 you're here to testify about damages, correct?

18     A.   That's correct.

19     Q.   Now, I want to be clear.  You understand that

20 TPV as a Defendant believes there are no damages.

21 You understand that?

22     A.   That's my understanding.

23     Q.   Because we believe we don't use Hitachi's

24 invention, and we don't believe that at least two of the

25 patents are valid.

1          Do you understand that?

2      A.   I understand that.

3      Q.   But you're here because the law requires us,

4  in case the jury disagrees with us, to put forth a

5  number that we think is reasonable, true?

6      A.   That's correct.

7      Q.   Now, have you reached conclusions in this case

8  with respect to the work that you've done?

9      A.   Yes.

10     Q.   Okay.  And what are those conclusions?

11     A.   Well, my first conclusion is that Hitachi's

12 expert, Mr. Bratic, who you heard testify yesterday, has

13 overstated the claimed damages.  So I don't agree with

14 the number that he put forth.  And I'll explain why in

15 my testimony today.

16          So that's one of my primary, first opinions.

17     Q.   Okay.  I'm -- we're going to talk in detail

18 about that opinion, but before we do, I need to talk to

19 you a little bit about your background.

20          Would you just briefly describe for the jury

21 what your educational background is, please, sir.

22     A.   Sure.  So on the left-hand side, there you can

23 see I went to the University of Notre Dame, and I got a

24 bachelor's degree in economics in 1977.

25          And then I went to the University of Southern

1 California, and I got my master's degree in economics in

2 1979, kind of a contradiction having to go to those two

3 schools, because they're football rivalries.

4          And then I got my Ph.D. Arizona State

5 University in 1983, and that Ph.D. is in economics.  So

6 I went to college for 10 straight years and all of three

7 of my degrees are in economics.

8      Q.   Tell us or give the jury some indication of

9 what your work history and background has been since you

10 obtained your Ph.D.

11      A.   Well, after I graduated from Arizona State

12 University in 1983, I taught for a couple of years

13 full-time at one of the California State University

14 System's schools, Cal State Northridge.  So I taught

15 there full-time teaching economics in the Department of

16 Economics.  I did that for two years.

17          I also then in 1985 joined

18 PricewaterhouseCoopers.  You've heard a little bit about

19 that yesterday, but I also continued to teach part-time

20 at Cal State Northridge, evening classes, for about

21 seven more years.  But I was with PricewaterhouseCoopers

22 for 18 years, from 1985 through 2003.

23          And then at the very end of 2003, beginning of

24 2004, I joined Analysis Group, and I've been there about

25 nine years now.

1      Q.    Is that the same PricewaterhouseCoopers that

2  Mr. Bratic testified he'd worked at?

3      A.    Yes.  Yes.

4      Q.    And I think somebody asked him if ever got to

5  help count votes at the Grammys or go to the Grammys.  I

6  guess I'd better ask you the same question.

7      A.    We have to be a little bit more careful.  The

8  Academy Awards.

9      Q.    Is that what it is?

10     A.    Yeah, Academy Awards.

11     Q.    That shows you how much I pay attention.

12     A.    So I didn't count the ballots, but I

13  actually -- I was very fortunate to get to go to the

14  Academy Awards once.  That was fun.

15     Q.    Tell us a little bit specifically about your

16  work history in these damage analysis and forensic

17  economy -- economics.

18     A.    Sure.  So I started doing the work that I do

19  today, whatever it was, 27, 28 years ago when I started

20  at PricewaterhouseCoopers.  So this economics that I do

21  in a dispute environment, I call that forensic

22  economics, and this damage quantification work I've been

23  doing since 1985.  And I've worked on a large number of

24  cases, patent cases, intellectual property cases over

25  that period of time.

1    Q.   In these patent cases, do you necessarily work

2 for one side or the other, or do you work for both

3 sides?

4    A.   So not at the same time, but on some cases,

5 I'll be on the patent holder's side; and other times,

6 I'll be on the alleged infringer's side.  It just

7 depends on the nature of the engagement.

8    Q.   Okay.  Let's explain for the jury, if you

9 will, sort of what you looked at, what evidence you

10 looked at to be able to come here and talk to them today

11 about your conclusions.

12    A.   Well, there was a large amount of

13 documentation that's available in a dispute such as

14 this, and this documentation that's produced by the

15 companies, or it could be independently obtained

16 documentation, but -- or Hitachi documents, TPV

17 documents.

18         There were legal documents.  There were sales

19 records.  There were license agreements.  So those are

20 all the things that you would take into account when

21 you're doing the nature of the work that I performed.

22    Q.   And the jury may remember that Mr. Bratic told

23 them that he used something called Georgia-Pacific

24 Factors.

25         Can you tell the jury whether or not you used

1   those, and if so, how?

2        A.   Yes.   So for some reason, the numbering got

3   off on the slide there, but if you take 8 plus the 7,

4   there's 15.   So there's 15 Georgia-Pacific Factors.   And

5   those are factors that courts look to for guidance to

6   try to solve this puzzle or this problem of what would

7   be a reasonable royalty, if in this case, TPV and

8   Hitachi had got together in a room and -- and negotiated

9   a license agreement.

10           So this is -- the courts encourage you to look

11  at these factors.   They're what are called

12  non-exclusive.   You can look at other factors that might

13  be important for a particular case, or you don't have to

14  take into account all of these if -- given the facts and

15  circumstances of the case.   They may not be as relevant,

16  but it's sort of a framework that's used when you're

17  doing this type of work.

18       Q.   Okay.   I want to start focusing in on, if I

19  could, what you told us earlier, and that is your --

20  your opinion primarily that you're here to render is the

21  fact that Mr. Bratic overstated the claimed royalty

22  rate, correct?

23       A.   Yes.   That's my opinion, yes.

24       Q.   At a high level -- at a high level, can you

25  explain to the jury sort of the bases for coming to that

1  conclusion.

2      A.   So there's really four things we're going to

3  talk about, and that's what's on this slide here.   And

4  the reasons why I reached the conclusion that

5  Mr. Bratic's royalty rate is too high -- and remember,

6  what you have to do here, you take a royalty rate times

7  the number of accused units gives the royalty damages.

8          So we're talking about the royalty rate part

9  of it.

10     Q.   Let me stop you right there, Dr. Ugone,

11 because I skipped over something that I should have

12 allowed you to comment.

13         When you say royalty rate times royalty base,

14 it's this equation we have on this slide; is that right?

15     A.   Right.   So there's -- if you don't mind,

16 there's no disagreement over the royalty base.   That's

17 about 11,094,000, relatively speaking.   And so what

18 we're really talking about is the royalty rate.   In

19 other words, what rate should be paid or applied to

20 those 11 million units should the jury find that the

21 patents valid and infringed.

22     Q.   Yes, sir.   Now you were going to tell us the

23 reasons you think his rate is too high.   And I apologize

24 for interrupting.

25     A.   Sure.   And it goes through the four -- the

four considerations that I have there.  One has to do

with the licensing agreements that he used as sort of a

benchmark licensing agreements to come up with his

5-dollar-per-unit rate.

So there was a -- a benchmarking that he kind

of did.  I'm going to use that word, but we'll get back

to that.  So he used certain license agreements, and I

disagree with his use of those license agreements.  So

that's Item No. 1.

There was another license agreement that he

did not place enough weight on, so I'm going to comment

on that.  That's called the Amtran license agreement.

This third thing is, I use the term portfolio

rates.  He was using this term called a threshold rate,

but it has to do with his use of some of the rates that

were in the license agreements and the fact that they

applied to many, many, many patents versus the few

number of patents that we have in dispute in this case.

And then the fourth just is sort of a

reasonableness test.  When you look at his conclusion in

light of the gross profit earned by TPV on average on

their televisions, that his conclusion doesn't make any

sense.

So those are the four areas that I'm going to

comment on.

1      Q.    Okay.   Let's -- is it true that essentially

2  those license agreements that Mr. Bratic looked at,

3  you've characterized here is what you call DTV

4  agreements?

5      A.    Yes.   And, in fact, what I've tried to do here

6  is this is some verbiage that was taken out of

7  Mr. Bratic's report, so I was trying to stay true to

8  that.   So, yes, that's how it was called in his report.

9               MR. DACUS:   Can we pull up Slide 13,

10  please?

11      Q.    (By Mr. Dacus) And you were here when

12  Mr. Bratic testified?

13      A.    Yes.

14      Q.    You remember this slide from his presentations

15  to the jury?

16      A.    I do, yes.

17      Q.    Okay.   And what I want to do is, is talk about

18  each one of these, if that's okay with you, please, sir.

19      A.    Okay.

20      Q.    Let's -- let's actually just start with

21  Tatung.   Can you tell the jury what your opinion is as

22  to whether or not Tatung is a comparable license that

23  the jury should be considering, when trying to determine

24  what a reasonable royalty is?

25      A.    Okay.   So these are Hitachi patents that were

1  licensed.  So it goes along with Georgia-Pacific Factor

2  No. 1.  The Tatung license agreement had a royalty rate

3  of 1.25 percent that was utilized by Mr. Bratic.

4           But what's interesting is, is that particular

5  license agreement had -- I think it was 72 U.S. patents,

6  and I think there were 126 foreign patents.  So there's

7  a large number of patents associated with that

8  particular license.  It's not just four.  So it's

9  important to -- to keep aware of that fact.

10          The other thing is, is that Tatung really

11  makes computer monitors.  Now, as part of the license

12  agreements, televisions were licensed, but to the best

13  of my knowledge, Tatung has made no royalty payments to

14  Hitachi on any television sets.

15          So this was really a computer monitor-type

16  arrangement for a large number of patents.  Now, within

17  those patents, it did have the patents-in-suit, and it

18  had some other patents.  But the point is, there was --

19  you know, if you add the 72 and the 126, you're getting,

20  you know, a lot of patents.  There are almost 200

21  patents, and it's mainly on computer monitors.

22          So for that reason, you have to be very, very

23  careful if you're going to use that as a benchmark, and

24  so I have some issues with that.

25      Q.   Let's cover this globally, because I think we

1 can cover it for the first four licenses there that Dr.

2 Bratic relied on, and that is, how many patents did

3 these folks get rights to, when they paid whatever

4 amount they paid?

5    A.   Yeah.  Well, I'm going to be a little specific

6 on the Wistron one, because there were, I believe, 31

7 patents, U.S. patents on the Wistron license agreement.

8 And I think I counted up 80 foreign patents.

9         On the remaining ones, it was 31 BOE, 31

10 patents again, U.S. patents and Amtran, I believe, was

11 31 again.  And it said all the foreign counterparts.  So

12 I couldn't add those up, but I don't think it would be

13 an unreasonable assumption to say it would be at least

14 in the neighborhood of 80 again.

15        Those are the explicitly stated patents that

16 are covered by the license agreements.

17    Q.   And then did you hear Mr. Bratic say that

18 these folks actually got rights to 3,000 patents?

19    A.   Right.  So it's just a fancy term.  There's

20 something called a non-assertion provision, that Hitachi

21 would not sue these entities relating to intellectual

22 property associated with 3,000 other patents.  And

23 that's -- that's a valuable right to obtain in a license

24 agreement.

25    Q.   And so do you agree with Mr. Bratic, when he

1   says that whatever Tatung, Wistron, BOE, and Amtran

2   paid, they got the rights to 3,000 patents for that

3   payment?

4        A.   I would agree with his phraseology on that.

5   Somebody, a legal person might describe it differently,

6   but from an economic perspective, that's the equivalent

7   of what you just said.

8        Q.   Okay.  Let's -- and the right-hand column over

9   there, I guess we can all read that.  It says real

10  world, correct?

11       A.   Yes.

12       Q.   Okay.  And that's what I want to spend a

13  little bit of time talking about.

14            MR. DACUS:  I can't seem to get this to

15  move forward.  Well, there we go.  That's the one I need

16  right there.

17       Q.   (By Mr. Dacus) I want to talk about this

18  Wistron rate, and you remember from the slide that we

19  were looking at and what Mr. Bratic told the jury

20  yesterday is that that 1-percent rate was the equivalent

21  of 3 to $5 for a Wistron and BOE.

22       A.   Yes.

23       Q.   Do you remember that?

24       A.   Yes, I do.

25       Q.   Tell the jury what it is we see on the screen

1  right now.

2      A.   Well, essentially -- and I believe you saw

3  this chart yesterday, but this is what's calculating

4  sort of an effective royalty rate or, you know, if we

5  want to say it a little differently with math, sort of a

6  weighted average royalty rate.

7           In other words, if you take that 1 percent and

8  multiply it by the TV prices, and given the TV prices of

9  the Wistron products, when you get to the very, very

10 bottom line, you'll see that $2.34.  But if you remember

11 yesterday in these patent agreements for licenses, 25

12 percent, everybody agrees, goes to some other patents

13 that are not in dispute here.

14          So you're left with 75 percent for the

15 remaining patents, so 75 percent of the $2.34 leaves

16 $1.76.  So let me -- let me just summarize that.

17          So if you looked at the TVs that Wistron was

18 selling and if you say what effectively have they paid

19 on a per-TV basis that go to the non-DDC patents, if

20 everybody remembers that, that's $1.76 for Wistron.

21      Q.   So to the extent the jury was left with the

22 impression that the real world was that Wistron was

23 paying or is paying between 3 and $5, that's not

24 accurate, is it?

25      A.   That's -- that's correct.  Now, they had --

1  they had -- they were given options in the license

2  agreement, but given the option they chose, it ended up

3  being $1.76 net.

4      Q.   And let's talk about this in detail.  There's

5  a bunch of numbers under an exhibit number.

6          Can you explain to the jury just very briefly

7  what that -- what those numbers represent?

8      A.   Under exhibit numbers, so those would be

9  Defendants' exhibits and it lists some numbers, and so

10 that's how you find those documents.  And then the page

11 number tells you where to look in that particular

12 document.

13     Q.   And that's what I want the jury to know.

14 These are documents that were produced in this case, and

15 you actually looked at them, correct?

16     A.   Yes.  Yes.

17     Q.   And so that the jury understands, these

18 documents are the same ones that they put on the

19 overhead and asked -- asked Mr. Matsuo about, and he

20 pointed to the 5-dollar number, correct?

21     A.   I'm sorry.  Just ask that question again.

22     Q.   Sure.  These DX numbers, these documents that

23 you looked at --

24     A.   Yes.

25     Q.   -- it's the same document that was put on the

1  overhead when Mr. Matsuo testified, and he pointed to

2  the 5-dollar number?

3       A.   I think I remember that.  Yes.

4       Q.   Okay.  So --

5            MR. DACUS:  Your Honor, this is DX 722,

6  DX 723, DX 724, DX 725, and DX 726.

7            Do we have this same one for BOE,

8  Mr. Lodge?

9            There we go.  Thank you.

10      Q.   (By Mr. Dacus) I want to do the same thing

11 with respect to that BOE license.  And you remember what

12 Mr. Bratic said is, the 1 percent equates to somewhere

13 between 3 and $5.

14           And did you do -- go through the same

15 calculation for BOE that you went through for Wistron?

16      A.   Well, if you look at the BOE royalty reports

17 and you do the same sort of calculations where you look

18 at the 1 percent times the price of the TVs, and then

19 you adjust for this 25 percent you have to carve out for

20 unrelated -- these unrelated patents, when you're all

21 done -- and it's called on a weighted average basis, so

22 across all the different TVs, they're -- they, on

23 average, are paying $1.22 per TV royalty under that

24 agreement.

25      Q.   Okay.  Now, I failed to ask you something

1   about that 3,000-patent issue.

2           Do you have an understanding as to the number

3   of patents this jury is going to be asked to value if

4   they find infringement?

5       A.   Yes.

6       Q.   And what number is that?

7       A.   That's four patents.

8       Q.   Okay.  And you heard Mr. Bratic say yesterday

9   that his position to the jury is that you pay the same

10  for four as you do for 3,000.

11      A.   That's correct.

12      Q.   Okay.  Do you agree with that?

13      A.   No, I do not agree with that.  And that's one

14  of the issues that I have, is how he treated the royalty

15  rates in those license agreements.

16          So remember what I said.  There were 31

17  explicitly stated patents covered by the license

18  agreement.  So that's more than four.  There's the

19  foreign counterparts, and then there's what's called

20  this non-assertion provision, which is basically 3,000

21  patents.  So that's what you're getting for those

22  royalty rates.

23              THE COURT:  Counsel, approach the bench,

24  please.

25              (Bench conference.)

1            THE COURT:  I don't want to slow this

2   down, but you can't ask him, do you agree with that, and

3   then he gives a five-minute dissertation.  You're going

4   to --

5            MR. DACUS:  Yes, sir.

6            THE COURT:  You're going to have to ask

7   direct questions.

8            MR. DACUS:  Yes, sir.

9            (Bench conference concluded.)

10            THE COURT:  All right.  Let's continue.

11            MR. DACUS:  Thank you, Your Honor.

12   I need Slide 13 again, please, Mr. Lodge, so we can

13   complete this.

14    Q.    (By Mr. Dacus) We talked about Tatung,

15   Wistron, and BOE and what's happening in the real world.

16            I want to focus, Dr. Ugone, on Panasonic,

17   Sanyo, and Sharp, and we'll come back to Amtran.

18            Can you tell the jury whether or not, in your

19   opinion, these are license agreements that they should

20   be relying on in making a determination as to the

21   reasonable royalty?

22    A.    Yeah.  I would not -- I would encourage the

23   jury not to rely on those license agreements.  Those are

24   what are known as very broad cross-license agreements.

25            In other words, you have Hitachi and Panasonic

1  making a license agreement; Hitachi and Sanyo; Hitachi

2  and Sharp; but there's a huge number of patents going

3  back and forth.

4          I think there was deposition testimony that

5  Hitachi's side of it had like 6,000 patents.  So you

6  have very, very large companies having these broad

7  what's called cross-licensing agreements.

8          Now, sometimes there's something called a

9  balancing payment.  One side is going to say, hey, we

10  contributed a little bit more, so you need to make a

11  payment in addition to the license, and that was going

12  on in these, but there's a large number of patents in

13  each of these agreements.

14              MR. DACUS:  We can move on now,

15  Mr. Lodge, to the next slide, if we could.  Let me back

16  up.

17      Q.   (By Mr. Dacus) Does that -- that covers the

18  category there of the DTV agreements, Dr. Ugone?

19      A.   Yes.  Yes.

20      Q.   Now, I'd like to talk to you about these other

21  data points or data (pronouncing) points that Mr. Bratic

22  asked the jury to consider.  But the first one there

23  is -- it's got a line through it.  Can you tell us what

24  that license agreement is and why it has a line through

25  it?

1      A.    He originally had that as supporting his

2  opinion in his report, but then he ended up not talking

3  about that at trial yesterday.

4               MR. DACUS:  And I've got a note.  I need

5  to back up to the BOE and read in for the record so that

6  the record's complete that the exhibit numbers

7  referenced are DX 727, DX 728, DX 729, and DX 796.

8      Q.    (By Mr. Dacus) And I interrupted you,

9  Dr. Ugone.  On the -- on the MPEG 2 agreement, is -- is

10 that a patent pool like Dr. Bratic was talking -- I

11 mean, Mr. Bratic was talking about yesterday?

12     A.    Yes.  So there's actually two line items there

13 where you see at the beginning MPEG LA, and I think the

14 jury has heard that they're the administrator of some

15 patent pools.

16          The one with the line through it is this MPEG

17 2 patent pool, and I think we have a slide that just

18 shows some economic-related information related to that

19 patent pool.

20     Q.    Let me ask you this:  Do you know what -- for

21 televisions, do you know what amount of royalty is paid

22 by licensees related to the MPEG LA MPEG 2 pool?

23     A.    Right, during the relevant time period.  So

24 there was a bit of mistake in Mr. Bratic's report, but

25 it's like $2 to $2.50, that range.

1      Q.   Okay.  And so that we stay clear -- it's a

2  little confusing -- there's an MPEG 2 pool and an MPEG

3  ATSC pool, correct?

4      A.   That's correct.

5      Q.   All right.  So I'll try to keep those

6  straight.  I want to talk about the MPEG 2 pool and what

7  licensees get when they pay this $2 to $2.50.

8           MR. DACUS:  I'm having a hard time

9  getting that to forward, Mr. Lodge.  If you could help

10  me, please, sir.

11           Thank you.

12      Q.   (By Mr. Dacus) Can -- can you explain to the

13  jury, for that $2 and $2.50 that licensees pay, how many

14  companies contribute patents to that particular pool?

15      A.   All right.  So this -- again, we're keeping in

16  mind sort of the comparability to the four

17  patents-in-suit from an economic perspective.

18           And in the MPEG 2 patent license program

19  administered by MPEG LA, you can see on the left that

20  there's 27 different companies that are part of that

21  what's called a consortium, that are part of that, and

22  the patent pool has 750 unexpired patents, 90 of which

23  are in the United States.

24           So if you think about it, just, again, from an

25  economic perspective -- we're not talking the technical

1  side -- there's a 2 to $2.50 royalty payment per unit,

2  but there's 27 different people -- companies that that

3  royalty rate gets split among, and that's across a very

4  large number of patents.

5          MR. DACUS:  Your Honor, may I use the

6  whiteboard, please?

7          THE COURT:  You may.

8          MR. DACUS:  Flip chart?

9      Q.   (By Mr. Dacus) Something that Mr. Carroll did

10  the other day, Dr. Ugone, was a reasonableness check,

11  and the jury is here to find what a reasonable royalty

12  is, correct?

13     A.   Yes.

14     Q.   So if we wanted to do a reason --

15  reasonableness check related to this particular patent

16  pool, what you're telling us, as I understand it, is

17  that for MPEG 2, each company in there, since they paid

18  roughly $2.50, received 10 cents for each television

19  approximately; is that correct?

20     A.   Right.  So the money comes in.  If there's a

21  $2.50 payment and if that gets split equally among the

22  firms, that would be just a little under the 10 cents

23  you put on the board there.

24     Q.   Okay.  And if we wanted --

25     A.   I'm sorry.  Per company.

1      Q.   And if we wanted to do it on a per-patent

2   basis, we'd have to divide the 200 and -- the $2.50 by

3   the 750 patents, correct?

4      A.   Yes.  And that would be about a third of a

5   cent or so.

6      Q.   Okay.  So somewhere around .003 for each

7   television sold?

8      A.   Yes.

9      Q.   And -- and so that -- so that I make sure I

10   understand, the --

11      A.   I'm sorry.  I'd make your decimal point a

12   little bit darker so people can see it.

13      Q.   Okay.  I'd be happy to do that.  I certainly

14   don't want them to miss that decimal point.

15           So --

16              THE COURT:  All right.  Questions and

17   answers, not statements.

18              MR. DACUS:  You bet.

19      Q.   (By Mr. Dacus) All of the patents that are in

20   this pool, do you have an understanding as to whether or

21   not an independent expert reviewed those patents and

22   determined that they were essential to the standard?

23      A.   That's my understanding, yes.

24      Q.   Okay.  I want to talk to you about the MPEG

25   ATSC standard, different from MPEG 2.

1          How many companies contribute patents to the

2  ATSC pool?

3     A.    So as we see in the chart here -- so this is

4  the ATSC patent pool, still administered by MPEG LA, but

5  in this pool, there's eight licensors that belong to the

6  pool, 129 essential patents -- now, that's total of

7  which 48 are U.S. patents.

8     Q.    Okay.  So on our reasonableness check -- well,

9  let me ask this:  How much does a licensee pay for the

10 rights to the patents in the pool?

11    A.    If you were to sign a license for the ATSC

12 patent pool, that would be $5.

13    Q.    Okay.  And on a per-company basis, how much

14 does, on average, each company receive?

15    A.    That would be eight into the $5.  So it's a

16 little over 60 cents, probably like 62 cents or so.

17    Q.    And, again, there's 129 patents, so we'd have

18 to divide that $5 by 129 to know, on average, what they

19 get per patent?

20    A.    That's correct, yes.

21    Q.    Have you done that math?

22    A.    Well, I could do it in my head real quick, if

23 it's -- we're talking about maybe 4 cents.  If there are

24 125, it would be the 4 cents.

25    Q.    And, again, has each one of these patents in

1  the pool been independently determined to be essential

2  to the ATSC standard?

3       A.   That's my understanding, yes.

4       Q.   Have you seen any evidence in this case that

5  any of these patents have been evaluated by an

6  independent expert and been determined to be essential?

7       A.   When you're talking about these patents,

8  you're talking about the patents-in-suit in the case?

9       Q.   The four patents-in-suit?

10      A.   Yeah.  I'm not aware of that.

11      Q.   The third data point down here, I guess it's

12 the fourth data point that Dr. -- I mean, Mr. Bratic

13 talked about is the Zenith agreement.  Tell the jury

14 whether or not you have an understanding as to whether

15 or not licensees actually pay this $5 for patents -- for

16 a license to the patents -- the Zenith patents?

17      A.   The easiest way to describe it is, there's a

18 little bit of double counting going on in this chart,

19 because there's the MPEG LA ATSC, which are $5, and then

20 the Zenith agreement, which is $5.

21           But if you can maybe go back to the one chart,

22 you'll see that there's Zenith, if you look on the

23 left-hand side, and Zenith actually joined the

24 consortium.  So there isn't a separate payment to Zenith

25 of $5 and a separate MPEG LA for the ATSC patent pool.

1          So that's a little bit of double counting,

2    looking at it twice when it's really just one payment.

3        Q.   So to the extent that the jury was left with

4    the impression that Zenith is receiving $5 for its

5    patents, that's not accurate, is it?

6        A.   That would be correct.

7        Q.   In fact --

8               MR. DACUS:  Nay I approach the chart,

9    Your Honor?

10              THE COURT:  You may.

11       Q.   (By Mr. Dacus) In fact, Zenith is part of this

12   MPEG ATSC, and on average, they're receiving 60 cents

13   for their pool of patents, correct?

14       A.   Correct.

15       Q.   And you know from your work in this case and

16   sitting in this courtroom that Zenith was actually a

17   member of the Grand Alliance, correct?

18       A.   Yes, that's my understanding.

19       Q.   And you know that their patents have been

20   independently determined to be essential to the ATSC,

21   correct?

22       A.   Yes, and they're part of the alliance or part

23   of the consortium.

24       Q.   All right.  The last agreement I need to talk

25   to you about is this QAM-related agreement.  Is that an

1  agreement that you believe the jury should consider if

2  they get to make a determination on reasonable royalty?

3      A.   Well, I think there's important information

4  that the jury should consider that's associated with

5  that license agreement, yes.

6      Q.   Okay.  What is it?

7      A.   If I remember correctly, there were 15 U.S.

8  patents, and I think 34 foreign patents, and as

9  Mr. Bratic testified yesterday, that dealt with cable

10 rather than digital TV.

11     Q.   So do you believe that's a comparable

12 agreement that they should be giving heavy consideration

13 or weight to?

14     A.   Well, I would not put heavy weight on it,

15 that's correct.

16     Q.   I think that covers all of those agreements.

17 I want to ask you, Dr. Ugone, when we were talking about

18 a reasonableness check, do you take -- in your analysis,

19 do you take into consideration at all the amount of

20 gross profit that TPV would make and how that would

21 affect the amount of reasonable royalty that should be

22 paid?

23     A.   Well, that's -- it's certainly a

24 consideration.  In other words, companies are in

25 business.  There's market forces that determine how much

1  you can sell a television for.  You've got costs of

2  production.  You ultimately subtract your costs from

3  your revenues, and you get what's called profits.

4        One measure of profit is called a gross

5  profit.  And there was some testimony that TPV's gross

6  profit is $7.43 on average for the TVs that they sell.

7  So that's their gross profit.

8     Q.   And how -- how does the gross profit affect

9  how you, as an economist, analyze what might be paid as

10 a reasonable royalty?

11    A.   Well, if you think about it -- again, we're in

12 a very competitive industry.  We're talking about these

13 television sets and selling them, and companies, in

14 order to stay in business, have to earn a profit.  They

15 have to earn a return on their investments.  They have

16 to be able to invest in the future, those sort of

17 things.

18        And if you also think about what companies

19 contribute to getting a product to the market, they

20 might have to do the R&D.  They establish their customer

21 relationships.  They build the television sets.  There's

22 all the things that a company does.

23        And the return on that is certain measures of

24 profit.  Here we're looking at a gross profit measure.

25 But the point I wanted to make is that Mr. Bratic's

1  opinion was that $5 of that $7.43 should go to a royalty

2  payment.  And if you think of the scale and the way of

3  the relative contributions and in a sense of what the

4  parties are doing, that's unreasonably high.

5      Q.    And can you tell the jury what we're looking

6  at here, please, sir?

7      A.    So this is kind of an exploding piechart, but

8  if you take that $7.43, what Mr. Bratic is saying is

9  that $5 should go to Hitachi and only $2.43 should go to

10  TPV.

11      Q.    I need to back up.  On this MPEG ATSC, I

12  failed to -- to mention, Dr. Ugone, so that the jury

13  understands what's in the record, and that is the actual

14  patent pool license agreements you've reviewed, correct?

15      A.    Yes.  Yes.

16      Q.    And those are marked as DX 43.  And then the

17  attachment which identifies the companies is PTX 64,

18  correct?

19      A.    Yes.

20      Q.    And likewise on the MPEG 2, you've reviewed

21  those actual agreements, correct?

22      A.    Yes.

23      Q.    They're DX 447 and PTX 66, correct?

24      A.    Correct.

25      Q.    Now, you've heard some -- we've heard some

 1  discussion about this Amtran agreement.

 2          Is that an agreement that you considered in

 3  your analysis in this case?

 4      A.   Yes.

 5      Q.   Okay.  And how does -- how -- what should the

 6  jury take from the Amtran agreement, in your opinion?

 7      A.   Well, the first thing I want to do is just

 8  describe sort of the financial end of the agreement.

 9          Now, keep in mind that the agreement had 31

10  different patents that were licensed as part of the

11  agreement.  Three of those were the DDC patents.  They

12  were the patents-in-suit.  And then there's 25 other

13  patents.  So that just gives you a little bit of

14  framework around the license agreement in terms of

15  numbers of patents.

16          But I'll phrase it as the original agreement.

17  There was an 18.5-million-dollar payment.  Now, it

18  occurred in sort of two segments, two lump sums of a

19  10-million-dollar payment and then an 8.5-million-dollar

20  payment.

21          But essentially, from an economic perspective,

22  the agreement allowed Amtran to produce 18.5 million TVs

23  for that combined 18.5-million-dollar payment.  So the

24  effective royalty rate was a dollar per TV in the --

25  what I'll call this initial part of the agreement.

1    Q.   Now, what I need you to help explain to the

2    jury, Dr. Ugone, is if they decide these patents are

3    infringed, is the Amtran license one in which you think

4    they should pay particular attention to, and if so, why?

5    A.   The answer is yes, and for a number of

6    reasons.  Because Amtran and TPV are big players in this

7    market in terms of manufacturers of the TVs.  They're

8    competitors, so they go head-to-head.  They produce very

9    similar TVs, so I've looked at that.  And they also sell

10   to some of the same companies.

11        So you have a competitive situation where

12   Amtran -- I won't use the word proxy, but in a sense is

13   a proxy for what would have happened with TPV for the

14   reasons that I just said.  And so that's why I put

15   weight on this license agreement.

16   Q.   So in other words, if we go back to this

17   hypothetical negotiation that both you and Mr. Bratic

18   are required to construct your analysis within, this

19   would be a representation of perhaps the same seat that

20   TPV would be sitting in.

21        Is that what you're saying?

22   A.   Yes.  And that's what I meant by using the

23   word proxy, so...

24   Q.   Understood.  Understood.

25        So did -- using this Amtran license agreement,

did you make your own independent calculation of what a
reasonable royalty would be?

    A.   Yes.

    Q.   Okay.  And I want to talk a little bit about
that.  We've got this slide.

        Can you explain what this shows, please, sir?

    A.   So we've got Hitachi's DTV patent license.
That's what we're talking about.  And remember what I
said; there were 31 explicit patents in that agreement,
not counting the -- the foreign counterparts.

        We know from other testimony that three of
those patents are what are called the DDC patents, and
there's been testimony and it's in the record and
deposition, that 25 percent of the royalty is carved off
for those patents.

        And so what you're left with is the 75 percent
of the royalty rate.  So remember, we saw the dollar,
and there was also $1.75 up there that I haven't quite
mentioned yet.  But there's a dollar and $1.75, but 75
percent of that is for the remaining patents.

        The question is, what's the remainder?  So
that 75 percent, what does it get you?  That's really
the question.

        It gets you the non-asserted 25 patents.
That's that other bucket of patents when you carve out

1  the DDC and you take out the patents-in-suit.  In this

2  case, there's 25 left over.

3          There's the four patents-in-suit, and they

4  also get this non-assertion provision where Hitachi is

5  not going to assert any -- let's just say they're not

6  going to get upset at the Amtran, if they violate or use

7  any of the intellectual property of 3,000 other patents.

8      Q.   Did -- one question I failed to ask you about

9  this Amtran agreement.

10          Were you in the courtroom when Mr. Matsuo and

11  Mr. Bratic testified that Hitachi gave Amtran a

12  discount, some sort of discount related to this

13  agreement?

14      A.   Yeah.  My recollection is on Mr. Bratic's

15  chart, I'm thinking he put special discount.

16      Q.   Right.  And Mr. Matsuo, I think, testified

17  that it was related to a revenue shortfall at Hitachi.

18          Do you remember that?

19      A.   Or at least I've seen discussion that that's

20  one of the reasons, yes.

21      Q.   In the course of your work here, did you come

22  to know approximately what Hitachi's annual revenues

23  are?

24      A.   In the last couple of years, it was very high.

25  It was about $112 billion --

1      Q.    Okay.

2      A.    -- as a total company.

3      Q.    Okay.  Now, did you -- this framework that you

4    gave us, did you actually put numbers to this to come up

5    with your own independent calculation of a reasonable

6    royalty?

7      A.    Yes.  So this -- this is helping us kind of

8    get the mindset of what's going on, and then I've done

9    some calculations.

10     Q.    Okay.  So is that what's shown on the board

11   here?

12     A.    Yes.

13     Q.    And can you explain this to us?

14     A.    Yes.  So in one of the charts, we saw that

15   the -- the royalty rates in the Amtran agreement range

16   from a dollar to $1.75.  And so that -- you see that

17   those -- at the top there, it says Amtran royalty per

18   TV, I've got a dollar column and $1.75.

19            Now, we know 25 percent comes off the top,

20   because that's for these other DDC patents.  That leaves

21   a remainder of 75 percent.  Well, 75 percent of a dollar

22   is 75 cents, and 75 percent of 1.75 is 1.31, so that's

23   really what we're talking about for everything else that

24   doesn't have to do with these DDC patents.

25                  THE WITNESS:  So if we could just go back

1  one slide, if you don't mind.

2      A.   So that 75 cents and the $1.31 now gives you

3  coverage on what was at the bottom there, the 25

4  non-asserted patents, the four patents-in-suit, and,

5  frankly, the 3,000, the provision that says Hitachi

6  won't get upset if you use the intellectual property on

7  the other 3,000 patents.

8          And so if you do an allocation and we know

9  that there's some similar patents in the 25 that are

10 non-asserted relative to the patents-in-suit, so if you

11 just split the 75 cents and the 1.31, that gives you

12 37.5 cents as a lower bound and 65.6 cents as an upper

13 bound, using the Amtran license agreement as a guidepost

14 for what TPV and Hitachi would have agreed to for these

15 four patents-in-suit.

16     Q.   So that I make sure I understand, your

17 independent calculation of a reasonable royalty would be

18 between -- let's just call it 37 cents and 65 cents for

19 each television sold, correct?

20     A.   Yes.  And there's a reason why it's

21 conservative.  I've given a range to the jury, so I'm

22 not just giving them just one number.  I'm saying the

23 answer would have been between 37.5 and 65.6 cents.

24          MR. DACUS:  And may I approach, Your

25 Honor?

1              THE COURT:  You may.

2       Q.   (By Mr. Dacus) If we were doing a

3  reasonableness check, since it's a reasonable royalty,

4  for these patent pools that have independently

5  determined essential patents within them, each company

6  is receiving between 10 cents and 60 cents per

7  television, correct?

8       A.   Right.  And -- and it -- I think that's

9  important to point out that what we're saying here is,

10  when that $5 on MPEG ATSC is paid, when you now look at

11  that on a per-company basis, it's going to be in that

12  range that you have on the board there.  So that's kind

13  of the reasonableness test.

14      Q.   Great.

15      A.   So -- I'm sorry.  Each company is not getting

16  $5.  That's the point I was trying to make.

17      Q.   Understood.

18           Like you recommend for Hitachi here 37 cents

19  to 65 cents per television, correct?

20      A.   Yes.

21      Q.   That's the same as what's being paid in these

22  essential pools to each company, correct?

23      A.   Correct.  Correct.  Correct.

24      Q.   Okay.

25           MR. DACUS:  That's all the questions I

1   have, Your Honor.  I pass the witness.

2                THE COURT:  All right.  Ladies and

3   Gentlemen, I think we all will be well-served with

4   another short break.  It's late in the afternoon.  So

5   before cross-examination begins, let's take about a

6   10-minute recess.  Allow you to stretch your legs and

7   get a drink of water, but obviously don't discuss the

8   case.

9                We'll be back in shortly to continue with

10  cross-examination, but until then, we stand in recess.

11               COURT SECURITY OFFICER:  All rise.

12               (Jury out.)

13               (Recess.)

14               COURT SECURITY OFFICER:  All rise.

15               THE COURT:  Be seated, please.

16               Mr. Shadden, would you bring in the jury,

17  please.

18               Mr. Black, you can go to the podium, if

19  you like.  I assume you're going to do the cross.

20               MR. BLACK:  Yes, Your Honor.

21               COURT SECURITY OFFICER:  All rise for the

22  jury.

23               (Jury in.)

24               THE COURT:  Be seated, Ladies and

25  Gentlemen.

```
 1              All right.  Cross-examination of the

 2  witness by the Plaintiff.

 3                   CROSS-EXAMINATION

 4  BY MR. BLACK:

 5      Q.   Good afternoon, Mr. Ugone.  How are you?

 6      A.   I'm doing all right.  How are you?

 7      Q.   Great.  Great.  What's your hourly rate?

 8      A.   $5 -- or $570 an hour.

 9      Q.   You have no actual experience in license

10  negotiations, right?

11      A.   I have helped in the background, but I haven't

12  sat at a table and negotiated.  I'm a forensic economist

13  and damage quantifier.

14      Q.   You haven't sat at the table actually

15  negotiating real-world licenses like Mr. Matsuo has,

16  right?

17      A.   That's correct.

18      Q.   Or your former colleague, Mr. Bratic, who's

19  actually done that work, correct?

20      A.   He's done that work.  I don't disagree with

21  that.  I do forensic work and damage quantification in a

22  dispute setting.

23      Q.   I understand.

24           Your actual background is in economics, as you

25  mentioned during your slide presentation, correct?
```

1      A.   Yes.

2      Q.   And one of the things that economists do is

3  they think really hard about what real-world motivations

4  are and how people come together and transact business,

5  right?

6      A.   I would agree with that.  Sure.

7      Q.   That's actually the fundamental piece of

8  economics, isn't it?

9      A.   Well, with economics, you talk about -- in

10 microeconomics, you talk about the theory of the firm,

11 how companies go about maximizing profits, or you talk

12 about consumers and how they go about maximizing the

13 satisfaction they get from the goods they consume.

14          So those are all motivations, and that's why I

15 agree with what you said.

16     Q.   And -- and you understood that your job here

17 was to construct a hypothetical negotiation between

18 Hitachi and TPV, correct?

19     A.   I will agree with you.  The end -- the end

20 result was what's a determination of a reasonable

21 royalty, and that's one framework for doing that.  Yes.

22     Q.   Right.  You kind of started at the end with

23 what you thought the rate should be, something like

24 37-and-a-half cents, but you didn't --

25     A.   No.

1      Q.   -- you didn't really spend a lot of time

2  talking about what the actual motivations of the parties

3  would be in the hypothetical negotiation, did you?

4      A.   I'm sorry.  I can't agree with the -- I don't

5  understand the question.  I didn't start with a

6  37 cents.  I knew what I would have to come up with as a

7  reasonable royalty, and after my analysis, I came up

8  with a range I presented to the jury.

9      Q.   Okay.  Let's take -- let's just get some

10  fundamentals down first.  Did you --

11                 MR. BLACK:  May I go to the board, Your

12  Honor?

13                 THE COURT:  You may.

14      Q.   (By Mr. Black) You heard Mr. Houng testify,

15  correct?

16      A.   Yes.

17      Q.   And Mr. Houng testified that the average

18  price, average price of a TPV television in the United

19  States was $285.

20            Do you remember that?

21      A.   I believe that's currently, but yes.

22      Q.   Actually, a lot higher than the prices of some

23  of the other licensees that you put up there before,

24  isn't it?

25      A.   There was a range of prices for each of the

1    licensees, but that average price is higher.  Yes.

2        Q.    Correct.  It's actually significantly higher,

3    and you did not mention that to the jury, did you?

4        A.    It's $285 versus you can back into some prices

5    on the other ones.  I didn't explicitly say that.  I'm

6    not going to disagree with you.  I didn't explicitly say

7    that.

8        Q.    And $2.85 times 1 percent is -- that's pretty

9    easy math -- that's $2.85 (sic) cents?

10       A.    I'll agree with you, you've some problems with

11   your decimal points there, but I'll agree with what

12   you're saying, the words you're saying.

13       Q.    Okay.  You know, you're right.  That will fix

14   that.  Two -- so if TPV had entered into the agreement

15   and PTX 92 that was proposed to it by Hitachi, rather

16   than entering in litigation, the rate they would have

17   paid under the agreement would have turned out to be

18   $2.85, right?

19       A.    If you're asking me to make some assumptions,

20   that they had agreed to 1 percent.  Now, I want to be

21   careful, because there's the 25-percent deduction off of

22   that, but I want to be careful with your question.

23            But if you're asking me mathematically, if

24   it's 1 percent times $285, mathematically that gives

25   $2.85.  But we need to be careful conceptually with that

1  25 percent that comes off the top of everything else.

2      Q.    So if you apply TPV's base and product

3  pricing, you'd start with 2.85, and then you would

4  allocate, as Mr. Bratic did, 75 percent to the

5  patents-in-suit and 25 percent to DDC, right?

6      A.    If I start with the assumption you asked me to

7  make and we go through the math, you would take

8  75 percent of -- of that, recognizing that that's also

9  to a whole lot more than the four patents-in-suit.

10     Q.    Let's talk about that, but for now, the 70 --

11 the 75 percent would make it -- if we did the math at

12 the table before here, and it's 2.14.  I'll represent

13 that to you.  Get it wrong, Mr. Dacus can run his

14 calculator and correct me on redirect, all right?

15         All right.  So the TPV rate is actually

16 significantly higher than the rates you were showing the

17 jury before from some of the other agreements, because

18 TPV's product price is a lot higher, right?

19     A.    If my definition we're calling this the TPV

20 rate, that's not what I believe the TPV rate would be.

21 But I'm going along with your math, and the math that

22 would be 2.14 before any adjustments for the fact that

23 there's a lot more licenses -- or a lot more patents in

24 the benchmark licenses.  But I will agree with your

25 math.

1          MR. BLACK:  Could you put the -- my slide

2  with the door up, please?  The door.

3      Q.   (By Mr. Black) Okay.  Patents, when they are

4  licensed, give the licensee access to technology, right?

5      A.   I'll agree with that.  Yes.

6      Q.   And if TPV, Mr. Houng, had been standing in

7  front of this door with four locks, one for the '243,

8  one for the '310, one for the '375, and one for the

9  '497, trying to get into the door to the technology

10  behind it --

11      A.   Uh-huh.

12      Q.   -- they would need four keys, right?

13      A.   In your analogy, since there's four locks, one

14  lock for each patent, in your analogy, there's four

15  keys.  So it would be required.

16      Q.   And since what TPV wants to do is to get

17  inside to the technology, it doesn't do them any good to

18  buy one key, right?

19      A.   In your analogy, they would need four keys.

20      Q.   If they were to buy the key from Hitachi and

21  unlock the '497 patent, they'd still be standing outside

22  the door, wouldn't they?

23      A.   In -- in your analogy.

24      Q.   They wouldn't have access to the technology,

25  right?

1     A.    I mean, there's a lot of other things going

2  on, but I'll accept your analogy, and I'm answering the

3  question.  But there's a lot of other things going on.

4     Q.    And no sane licensee would purchase a key for

5  the '497 patent without, at the same time, getting the

6  other keys, right?

7     A.    I'm sorry.  I just missed your question.  I

8  just didn't get it.

9     Q.    No sane licensee who wants access to the

10  technology would purchase a key only to the '497 and not

11  to the other patents, right?

12     A.    If -- if your products are deemed to use the

13  technology of the four -- your four locks, the four

14  patents, if you're going to use that technology, then

15  you would need a license to the four patents.

16          So that's what we're talking about here, but

17  you would not ignore all the other market dynamics, all

18  the other license agreements, the ATSC agreements, and

19  what you would have to pay for those as well as a

20  benchmark.

21          So I'm not disagreeing with your analogy, but

22  there's a lot of dynamics and other considerations to

23  take into account.

24     Q.    But we want to focus here on the dynamics in

25  the hypothetical negotiation between Hitachi and TPV,

1 right?

2     A.   I agree a hundred percent with that.

3     Q.   And Hitachi says if you want to get through

4 the door to our technology, we'll let you do that for a

5 price.  And that price isn't going to vary by the number

6 of keys you buy.  We're not going to try to sell you a

7 key to the '497 and come back the next day and sell you

8 a key to the '375, and the day after that.

9     And conversely, TPV would never accept such a

10 thing, right?

11     A.   If you're saying would they negotiate for the

12 four patents at the same time, I would agree with that.

13     Q.   That's exactly what I'm saying.  And.

14 It's true that the number of patents has no relevance to

15 the value to the licensee; the number does not matter?

16     A.   I have to disagree with you.  When we're using

17 market indicators for the value of these four, that's

18 where I was bringing in the number of patents.

19     When you're using other benchmarks, you've got

20 to make sure your comps, what you're comparing it to,

21 you have apples and apples, not apples and oranges.

22 That was the point of the discussion I was making.  So I

23 wasn't splitting these four apart.  I was keeping these

24 four together, but I was saying if you're going to

25 compare these four to these other benchmarks, you've got

1    to make sure the benchmarks are comparable.

2              That was the point of my testimony.

3         Q.   Did you hear Mr. Matsuo's testimony that

4    Hitachi has approximately 1500 digital television

5    patents --

6         A.   I --

7         Q.   -- in the United States?

8         A.   Yeah.  I thought the number was like 3,000.

9         Q.   I think he said 1500 in the United States,

10   3,000 overall.

11        A.   I'll accept that representation.

12        Q.   But let's just clear one thing off the table

13   right now.  You spent some time talking about numbers of

14   license -- numbers of patents and dividing them into

15   amounts paid.  You included some foreign patents in that

16   analysis.

17             Do you remember that?

18        A.   It depends which calculation you're talking

19   about.  Some of them -- and it depends which licenses

20   you're talking about.  If you make it a little bit more

21   specific, I can answer your question.

22        Q.   But nobody has to pay a royalty in the United

23   States -- for a United States patent, if they sell the

24   product in Japan or Korea or China or France, right?

25        A.   Yeah.  If we're only talking about the U.S.

1   and we're not talking about elsewhere, I'm not going to

2   disagree with you.  I'm trying to say that if you look

3   at the benchmark licenses, there were foreign components

4   there.  And that's why I brought that up.

5       Q.   But those foreign components are irrelevant to

6   the hypothetical negotiation you were asked to construct

7   between TPV and Hitachi, correct?

8       A.   I will agree 100 percent that what we're

9   talking about here is the use or the alleged use of the

10  technology within the United States, and so that's what

11  we're trying to figure out.

12          My only point was all of those other license

13  agreements were worldwide, and that's a dynamic that you

14  would take into account.

15      Q.   But the payment -- the payment, the royalty

16  payments would only be due upon sale in the United

17  States, correct?

18      A.   Yeah.  I'm not going to disagree with that.

19      Q.   Now, let's talk about the number of patents.

20  If I were to bring in Hitachi's 1500 patents into the

21  courtroom, assuming the folks at the front gate didn't

22  stop me --

23      A.   Okay.

24      Q.   -- they would probably reach up to the

25  ceiling.  If I were to take TPV's 14 U.S. patents and

1  put them on the floor right here, you'd barely be able

2  to see them, right?

3      A.   I'm not going to disagree that 1500 is a

4  higher stack than 14.

5      Q.   And do you think that TPV should pay more or

6  less money simply because Hitachi has a lot of patents?

7      A.   I'm not -- I'm not sure if I understand your

8  question.

9           I was not comparing at all -- I never compared

10  TPV number of patents to the number of Hitachi patents.

11  I never spoke to that.

12      Q.   The hypothetical negotiation would be

13  conducted not based on the number of patents somebody

14  can put down on the table but on the value of those

15  patents; isn't that right?

16      A.   I'll agree with you on the value of the

17  patents, and so that's what I was trying to calculate.

18      Q.   And the value of the patents here to TPV is

19  something that's absolutely critical to understanding

20  the dynamics -- the economic dynamics of the

21  hypothetical negotiation, correct?

22      A.   If you're asking me did I assume that the

23  patents were valid and infringed as I must -- as I must

24  make that assumption, yes, I made that assumption.

25      Q.   And you've heard the testimony in this case

1  that the patents-in-suit are essential to TPV's desire

2  to sell digital televisions in the United States, right?

3       A.   I've heard, I think, some of the experts talk

4  about different types of essentiality.  Sometimes they

5  said essential; sometimes they said commercial

6  essentiality.

7            So we have to be careful with that definition,

8  but I think I heard some of those phrases.  They didn't

9  say they were all essential.

10       Q.   And that, in the real world, that in the

11  hypothetical negotiation you were asked to construct

12  would give Hitachi tremendous leverage; isn't that

13  correct?

14       A.   There would -- you'd look at the weights.

15  When you go in and you're negotiating, where are the

16  forces and pressures?  So Hitachi would say, I've got

17  these patents and you need the technology.

18            What TPV would be doing is and what the

19  construct of the hypothetical negotiation is, what's a

20  reasonable royalty?  And a reasonable royalty is not a

21  situation where somebody comes in and just asks for the

22  sky.

23            The point I was trying to make is when you use

24  market benchmarks and you look at those market

25  benchmarks, you get something very different than the

1  $5.  You get the numbers that I was talking about.

2      Q.   In the hypothetical negotiation, what's

3  important to the licensee?

4      A.   I'm sorry.  What's important to the licensee?

5      Q.   Yes.

6      A.   I would say there are a number of things that

7  are important to the licensee.  So under the construct,

8  assuming that the patents are valid and that you're

9  going to use the technology, just making that

10 assumption, they're going to need a license, but also

11 they're going to take into account -- it's kind of like

12 when you sell or buy a house, you look at what other

13 comparable houses have sold for.

14          So part of the negotiating dynamic would be,

15 what are some benchmark licenses?  You'd also look at

16 making sure that the company is still able to earn a

17 rate of return on their investment.

18          So those are all the things that go into these

19 negotiations.

20     Q.   Actually, in every negotiation -- this is the

21 fundamental point of economics -- the negotiation is

22 driven by people's alternatives; isn't that right?

23     A.   I would say that there's more fancy words that

24 economists use, but I'm going to agree with that.  Sure.

25     Q.   When a seller sells a house, he can only sell

1   it once, right?

2       A.   Legally.

3       Q.   Yes.   When Hitachi sells the right to enter

4   that door, it can do it as many times as it wants; isn't

5   that right?

6       A.   When it licenses, not when -- I wouldn't use

7   the word sell in that context, but they can give what's

8   called non-exclusive licenses.  You can license your

9   technology to a number of different entities just like

10  they did.

11      Q.   On the other hand, TPV doesn't have the option

12  to go buy another house.  They need a key to get into

13  the U.S. market; isn't that right?

14      A.   I would agree that they -- in your analogy

15  that they need to a key to get through the door, just

16  like they need a key to the ATSC standards that are part

17  of MPEG, and MPEG was charging the $5 divided by the

18  number of firms, which brings us back to that 60 cents.

19           So that's a real-world benchmark.

20      Q.   We're going to come back to that.

21      A.   Okay.

22      Q.   But for now, you did not discuss at all the

23  dynamics that were going on at TPV who retained you in

24  this case at the time of the hypothetical negotiation in

25  your testimony, did you?

A.   You have to be a little bit more explicit, but I don't think I went into detail on that.  No.

Q.   No.  When was the hypothetical negotiation?

A.   It would be August 2004.

Q.   And how big was TPV's United States television business at that time?

A.   Well, they were just entering into the market. As the jury heard, they purchased Philips' basically television business, but that was part of the strategy to get into the market at the time.

Q.   It was a key strategy for them, right?

A.   Among other things.  They also had a lot of prominence -- a lot of prominence in the market with computer monitors at the same time.

Q.   Right.  They had generated tremendous profits in the computer monitor business; isn't that right?

A.   That they -- they were a very big player. Yes.

Q.   And, in fact, they had amassed enough cash that they could purchase the entire television business of Philips; isn't that right?

A.   I believe there was some testimony with respect to purchasing Philips' television -- television business.  Yes.

Q.   For $400 million, right?

1    A.    That's what I recall the testimony to be.

2 Yes.

3    Q.    And at the time, Hitachi and Philips had an

4 agreement where they would share their technology,

5 correct?

6    A.    I heard some testimony to that, that there was

7 a licensing agreement or something was going on.  I do

8 remember that testimony.

9    Q.    And TPV got no rights to Hitachi's technology,

10 when it bought the Philips business; isn't that right?

11    A.    The best I can say is I heard some of the

12 testimony that was presented at trial here.  I didn't --

13 I don't have any independent knowledge of what you're

14 asking about.

15    Q.    And TPV never came to Hitachi and said we'd

16 like a license to your essential patents in the digital

17 television field, did they?

18    A.    Yeah.  I can just say what I've heard here at

19 trial, that there is some commentary on the purchasing

20 of the business.  There was some testimony about Philips

21 having a license, and that I think there was some

22 testimony that that wasn't necessarily transferred to

23 TPV.

24         MR. BLACK:  Would you put my other slide

25 up, please?

1      Q.   (By Mr. Black) Do you remember being deposed

2  in this case?

3      A.   I do.

4      Q.   And Mr. Edwards over there asked you the

5  following question:  Will you agree with me that a lot

6  of companies at the point that they know they're going

7  to enter a market to sell a particular product, seek out

8  all the proper intellectual property rights that they

9  need in order not to infringe somebody's patents?

10          Do you remember that question?

11     A.   I believe I do.  Yes.

12     Q.   And you said:  I would agree with you, and

13 maybe even say it more strongly, that a prudent business

14 person wouldn't wait until the day before they're going

15 to sell a TV and ask the question, do I need -- you

16 know, is there some intellectual property rights that I

17 need to get?

18          They would want to negotiate those -- the

19 earlier on as -- as a prudent business person.  So I

20 agree with the proposition.

21          Is that your answer?

22     A.   That's my answer.  It's a different context.

23 I absolutely said those words.  I believe those words.

24 It was in a different context, but I said those words.

25     Q.   A prudent business person would have gotten

1  the intellectual property rights they need before

2  entering the business, right?

3      A.  Yes.  And the point I was making here was that

4  you should -- in the hypothetical negotiation, you can't

5  just say, oh, here's the day before -- before you make

6  the first sale and negotiate a license then, because

7  that would create certain outcomes that are not -- would

8  not be part of a reasonable construct, because --

9      Q.  TPV did not act prudently within your

10  definition here, did they?

11     A.  You know, I can't agree with the inferences

12  you're making, because that goes into other aspects of

13  the case as to whether they thought they needed

14  intellectual property or not.  That's not part of what

15  my -- my work was in this area.

16     Q.  What percentage of the worldwide monitor

17  market does TPV control now?

18     A.  Well, I'm not sure, but I think they're a

19  major player.

20     Q.  Something like 35 percent, isn't it?

21     A.  I was going to say somewhere between, yeah,

22  20 and that number, but...

23     Q.  Almost roughly one-third of every computer

24  monitor in the world is made by TPV; isn't that right?

25     A.  I don't -- I can't say the exact numbers, but

1   I don't disagree with the relevant range that you're

2   saying.  I just don't know the exact number.

3       Q.   And TPV's business plan is to do the same

4   thing in the TV industry, isn't it?

5       A.   We heard testimony that they thought there

6   were complementarities between the monitor business and

7   TVs, and they decided to enter into the market.

8       Q.   And in a couple of years, they became the

9   largest OEM manufacturer of televisions in the world,

10  correct?

11      A.   I believe -- yes, I -- they are large.  Amtran

12  is large, but they're --

13      Q.   Have you not heard several times at this trial

14  that TPV is the largest -- larger than Amtran?

15      A.   I think -- I think they're close, but I'm not

16  going to disagree with you.

17      Q.   And one way that someone can become the

18  largest in the world is by keeping their costs

19  artificially low by not paying for intellectual property

20  rights; isn't that right?

21      A.   There's -- I think we heard some testimony as

22  to the mission statements and strategy of TPV in terms

23  of R&D quality products, low costs, getting a good

24  product to the consumers.  So if we take away this

25  concept of one way to keep costs low is not to pay for

1  intellectual property, if we just talk about what do

2  firms try to do in terms of put out a low-cost product

3  that still has high quality, I'm not going to disagree

4  with you.

5      Q.   And low costs are very important to TPV,

6  right?

7      A.   I would say the television industry is a very

8  competitive industry, so it's important to everybody in

9  the industry.

10      Q.   Right.  So if everybody else in the industry

11  is paying 1 percent or three-quarters of a percent or

12  1-and-a-quarter percent, and TPV isn't paying that, that

13  gives them a tremendous competitive advantage, doesn't

14  it?

15      A.   It depends on the numbers you're saying.  It

16  could be that if it turns out that the intellectual

17  property is being used, then I've given an opinion as to

18  what the payment should be.  But you've made the

19  assumption that, you know, the intellectual property is

20  being used.

21      Q.   Well, for the hypothetical negotiation, we are

22  all required to make that assumption, aren't we?

23      A.   That's correct, but I thought you were talking

24  about the real world.

25      Q.   With respect to the patent pool licenses that

1  you referred to, you provided some testimony, and Mr.

2  Dacus did some math up here showing how much each patent

3  would be worth or each entity would receive from the

4  patent pool.

5          Do you recall that?

6     A.    Under different allocation methodologies, yes.

7     Q.    Well, actually the allocation methodology was

8  the same every time.  You just took the dollars divided

9  by the number of entities in the pool, right?

10    A.    No, because once we did it by the number of

11  entities and once by the number of patents.  That's why

12  I said the different allocation methodologies.

13    Q.    Have you examined the allocation, the pool

14  allocation --

15    A.    The --

16    Q.    -- agreements?

17    A.    I've done some research on that, and they

18  don't say exactly how they do the allocation.  That's

19  why we gave that boundary.  If you do it just based on

20  the number of firms, here's the answer.  If you do it on

21  the number of patents, here's the answer.

22          It's probably somewhere in between.

23    Q.    Do you find it odd that Zenith was getting $5

24  for its ATSC patents, but then they joined the pool, and

25  you said that they would have been allocated something

```
 1  like 60 cents?  Does that bother you?
 2      A.   No, because that's what they did as a business
 3  decision.
 4      Q.   Well, they joined the pool.
 5      A.   Right.
 6      Q.   But you didn't check the pool allocation
 7  between Zenith and the other members of the pool, did
 8  you?
 9      A.   Would I -- well, that's not quite true.
10      Q.   You don't know that Zenith gets $3.75 out of
11  the ATSC pool?
12      A.   What I know is that I've seen documentation
13  that there was -- for certain entities that were paying
14  Zenith, they didn't have to pay into the pool.  They got
15  the rights to all the patents without having to make an
16  extra payment into the pool.
17      Q.   I want to address one last point with you,
18  this profit margin point.
19              MR. BLACK:  May I go to the board, Your
20  Honor?
21              THE COURT:  Yes, you may.
22      Q.   (By Mr. Black) You put up a pie chart, and you
23  told the jury that TPV cannot afford to pay the rate
24  because it has a low profit margin, right?
25      A.   I did not use those words.  That's not what I
```

said.

Q.   You said that -- that TPV had a profit margin

of -- what was it?  7 point --

A.   $7.43.

Q.   $7.43.

A.   And that the royalty was $5.

Q.   Right.

A.   And so the point I was making is, the $5 in

relation to the 7.43 was unreasonable for a variety of

reasons.

Q.   Let's talk about the hypothetical negotiation,

okay?  That takes place before the first sale, right?

A.   Actually, that goes back to the answer I was

giving in my depo.  But, yes, it's -- in the extreme,

you could say, okay, the day before you first sell your

TV, you'd have this hypothetical negotiation.

Now, what I was trying to say on the screen

was that nobody would do it that way, but I'll accept

that for our questions here.

Q.   Okay.  But the day before the -- the day

before the start of infringement, what is TPV's profit

margin on televisions?

A.   Well, I'm not sure if I understand your

question.

Q.   That's right.  Because it's zero.  They don't

1 have a profit margin at that time; isn't that right?

2     A.   Well, but -- I don't disagree with you that

3 they wouldn't have the TVs, but you look at expected

4 profits going forward.

5     Q.   Right.

6     A.   Nobody would go in and say, I'm not making any

7 money.

8     Q.   So let's say TPV decided that they were going

9 to enter the television business.  They'd have to pay

10 for a number of things.  They'd have to pay for the

11 parts to make a television, right?

12     A.   Material, yes.  Material.

13     Q.   They'd have to pay for labor --

14     A.   Yes.

15     Q.   -- right?

16     A.   Yes.

17     Q.   They would have to pay for -- I don't know --

18 shipping costs and transportation and sales and

19 administration, things like that, right?

20     A.   Sure.  General administrative and selling

21 costs, marketing costs, all of those types of costs,

22 yes.

23     Q.   There's one more thing they need to be in the

24 television business, isn't there?

25     A.   I know where you're going, but yes.

 1      Q.   Can you think of what it is?

 2      A.   Well, those would be royalty payments, if

 3 they're using -- if they're going to use technology --

 4      Q.   Okay.

 5      A.   -- another cost would be a royalty payment.

 6      Q.   Technology.

 7           Now, if TPV decides they're going to go into

 8 the business and they're going to add up material,

 9 parts, labor, and the SG&A and come up with a price,

10 that they have no profit.

11      A.   I'm sorry.  I missed your question.

12      Q.   Let's say they decide to go into the market

13 with a low-cost strategy.

14      A.   Okay.

15      Q.   They decide to enter the market -- we'll give

16 them a profit.  A profit of a dollar on every

17 television.

18      A.   Okay.

19      Q.   They're going to undercut the market, expand

20 dramatically over a short period of time and take over

21 the market and become number one.  That's the strategy,

22 okay?

23      A.   Okay.

24      Q.   So they've got a 1-dollar profit margin.

25      A.   In your example here?

1      Q.    Yeah.   And then -- and they're doing that

2  without paying anybody for the technology that they

3  need.

4            Do you see the problem?

5      A.    I'm not sure if I understand your example, but

6  I'm willing to keep going with it.

7      Q.    And -- and then somebody like Hitachi knocks

8  on the door and says:  Hey, wait a second.   If you want

9  the technology, you have to pay for it.

10     A.    Okay.

11     Q.    And TPV says:  But my profit margin is only a

12  dollar.   Let's go to court, and we'll say that we can't

13  pay you anything.

14            Does that seem right to you?

15     A.    Let's try it this way:  There's intellectual

16  property laws in the United States.   And if someone's

17  using a technology, my understanding of the law is that

18  there's compensation that can be paid for that.

19            The point I was making with the $7.43 and the

20  $5 is that there's market dynamics.   There's a

21  competitive market.   There's pricing pressures of how

22  far you can up the price.   And that would be part of the

23  hypothetical negotiation.

24     Q.    And all of TPV's competitors had those same

25  pricing problems, right?  Same low-cost issues, same

1  pricing pressures, same customers, right?

2      A.    I'm not going to disagree with you that

3  they're all in the same market.  We heard yesterday in

4  cross-examination from Mr. Bratic that a lot of those

5  companies aren't using the technology.

6      Q.    But TPV has an advantage that they don't have,

7  right?  They don't pay for technology, right?

8      A.    There's that allegation.  That's why we're

9  here.  And I've given opinions, as to with the Court, if

10 the jury finds that the patents are valid and infringed,

11 and if it's deemed that a payment should be made, that's

12 the guidance I've given to the jury for their

13 consideration.

14     Q.    Thank you.

15              MR. BLACK:  Pass.

16              THE COURT:  Redirect?

17              MR. DACUS:  Briefly, Your Honor.

18              May I stay at the board, Your Honor?

19              THE COURT:  You may.

20                    REDIRECT EXAMINATION

21 BY MR. DACUS:

22     Q.    Let's talk, Dr. Ugone, about whether or not

23 what Mr. Black just said, that TPV doesn't pay for

24 technology, is actually a true statement.

25              Do you remember the MPEG ATSC pool of patents?

1      A.   Yes.

2      Q.   That's the -- that's the patents that an

3  independent expert has determined are essential to

4  practice the ATSC?

5      A.   Yes.

6      Q.   Does TPV have a license to those patents?

7      A.   Yeah.  And, in fact, I reviewed that license.

8  So TPV has an MPEG LA ATSC license.

9      Q.   Okay.  So -- so they do pay for technology,

10  correct?

11      A.   Yes.

12      Q.   Do you know that TPV also pays a license to a

13  company called Dolby?

14      A.   Yes.

15      Q.   Right?

16      A.   Yes.

17      Q.   So -- so the fact is, TPV has a lot of

18  licenses and pays for a lot of this technology, don't

19  they?

20      A.   That's correct.

21      Q.   They just refuse to pay for technology that

22  they don't use; isn't that right?

23      A.   That's my understanding.

24      Q.   Okay.  Now, one other thing.  These licensees,

25  like Wistron, BOE, Tatung, Amtran -- Amtran

1   (pronouncing), when they paid -- and we keep saying

2   1 percent.  It's really .75 percent for the TV patents,

3   correct?

4        A.   That's correct, yes.

5        Q.   So when they allegedly pay .75 percent, if we

6   put Mr. Black's door up there, they get 3,000 keys,

7   don't they?

8        A.   Yes.

9        Q.   And there's one other point to that.  When

10  this jury decides, if they do decide, that we need four

11  keys, and they assess whatever reasonable royalty should

12  be, Hitachi's position is, we still don't get in the

13  door, correct?

14       A.   I'm not sure if I understand your question.

15              MR. DACUS:  May I have the ELMO, please?

16  Can you blow up the second paragraph there?  And for the

17  record, this is PTX 115.

18              THE COURT:  You can't blow it up on the

19  ELMO, Mr. Dacus.

20              MR. DACUS:  I'm sorry, Judge.

21              MR. BLACK:  Your Honor, may I approach

22  for a moment?

23              THE COURT:  All right.

24              (Bench conference.)

25              MR. BLACK:  Looks to me like he's about

1    to argue that we have other patents that they might have

2    to pay for.  It goes against the MIL on dropped claims,

3    claims which have been severed into another case.

4               MR. DACUS:  I'm not going to say that

5    they've been dropped or dismissed.  They claim that they

6    have a lot of essential patents and that we should have

7    to pay for them.

8               MR. BLACK:  Your Honor, that claim is no

9    longer in this case.

10              THE COURT:  But they're not at issue in

11   this case, are they?

12              MR. DACUS:  No, they're not, but the

13   problem is, we're not getting 3,000 keys; we're getting

14   4 keys.  And they claim they have other essential

15   patents that we would have to pay for to get in the

16   door.  That has nothing to do with whether they dismiss

17   claims or not.

18              MR. BLACK:  Well, that will be for the

19   next case, but there's also an MIL on this.

20              THE COURT:  All right.  What's the motion

21   in limine?

22              MR. BLACK:  The motion in limine is, no

23   one can refer to dropped claims.

24              THE COURT:  Hang on a second.

25              Is this agreed to, or is this --

 1                    MR. BLACK:  I thought there was an agreed

 2   MIL on that.

 3                    MR. DACUS:  There is, no doubt, but it --

 4                    MR. BLACK:  But it's also irrelevant.

 5                    THE COURT:  Yeah.  The parties will also

 6   not offer evidence or elicit testimony referring to any

 7   expert's reports specific to such claims and defenses

 8   and no negative inferences should be asserted or

 9   applied.

10                    MR. DACUS:  I'm not referring to his

11   expert report, Your Honor.

12                    THE COURT:  He's an expert.  He's on the

13   witness stand.  You better be referring to his expert

14   report.  That's what he's there to talk about.

15                    MR. DACUS:  No.  He's talking about a

16   fact in the case.  These are demand letters.

17                    MR. BLACK:  It's not in the case.

18                    THE COURT:  I find that the motion in

19   limine covers severed or dropped claims.  Those are

20   severed and dropped, so they're covered by the MIL,

21   okay?

22                    MR. DACUS:  Thank you.

23                    (Bench conference concluded.)

24                    MR. DACUS:  May I proceed, Your Honor?

25                    THE COURT:  Yes, you may.

1      Q.    (By Mr. Dacus) So the answer -- or the

2  question is, Dr. Ugone, those licensees like BOE,

3  Wistron, Amtran, they get 3,000 keys, correct?

4      A.    Right from -- from an economic perspective I'd

5  agree with you, that the non-assertion clause gives them

6  3,000 -- the rights to 3,000 patents.

7      Q.    And based on Mr. Black's door and the patents,

8  this jury is only valuing 4 of those keys, correct?

9      A.    That's right.

10     Q.    All right.

11             MR. DACUS:  That's all I have, Your

12  Honor.  I pass the witness.

13             THE COURT:  All right.  Additional cross?

14             MR. BLACK:  No, Your Honor.

15             THE COURT:  All right.  You may step

16  down, Dr. Ugone.

17             All right, Defendant.  Call your next

18  witness.

19             MR. DACUS:  Your Honor, the Defendants

20  rest at this time.

21             THE COURT:  All right.  Defendants having

22  rested.  Does the Plaintiff have a rebuttal case to put

23  on?

24             MR. BLACK:  Yes, we do, Your Honor.

25             THE COURT:  Are you prepared to go

1  forward with that at this time?

2              MR. BLACK:  We'd like to make a motion,

3  and we would -- may I approach, Your Honor?

4              THE COURT:  I understand the motion needs

5  to be made outside the presence of the jury.

6              MR. BLACK:  Yes.

7              THE COURT:  Notwithstanding that motion,

8  do you have your rebuttal witnesses ready to proceed?

9              MR. PLIES:  Yes, Your Honor.

10             THE COURT:  All right.  Ladies and

11 Gentlemen, as you've just heard, there's a matter -- and

12 these occur from time to time in a trial like this.

13             There's a matter I must properly take up

14 outside your presence.

15             So even though this is -- even though

16 this is your third break this afternoon -- I don't think

17 anybody will complain about that -- I'm going to ask you

18 to retire for the jury room for about 10 minutes.  And

19 then we'll have you back in, and we should be able to at

20 least start the Plaintiffs' rebuttal case this

21 afternoon.

22             So I'll ask you to retire to the jury

23 room at this time.  Don't discuss the case among

24 yourselves.

25             COURT SECURITY OFFICER:  All rise.

```
 1                    (Jury out.)

 2                    THE COURT:  All right.  Does the

 3   Plaintiff have a motion to offer under Rule 50?

 4                    MR. BLACK:  Yes, Your Honor.  Give me one

 5   moment to find the paper.

 6                    THE COURT:  We're not in recess, ladies

 7   and gentlemen.  Take your seats.

 8                    You may proceed, Mr. Black.

 9                    MR. BLACK:  Thank you, Your Honor.

10                    Plaintiffs move under Rule 50(a) for

11   judgment as a matter of law with respect to infringement

12   on the '310, '375, '497, and the '243 patent claims in

13   suit.

14                    We move for judgment as a matter of law

15   on invalidity with respect to the '310, '375, '497, and

16   '243 patents-in-suit.

17                    That's our motion.  We'd like to file a

18   written submission as well.

19                    THE COURT:  I'll afford you the same

20   privilege I afforded the Defendants at the time you

21   rested.

22                    For purposes of clarification, let me

23   hear a response from the Defendants and clarify

24   specifically for me whether all four patents are

25   challenged on the basis of validity.  My understanding
```

1  was that only a portion of them were challenged on

2  validity grounds.

3          MR. LANDIS:  Your Honor, your

4  understanding is correct.  The '243 and the '479, I do

5  not believe were challenged on invalidity grounds.

6          THE COURT:  Those numbers are again what?

7          MR. LANDIS:  I'm sorry.  The '243 and the

8  '497.  I always get that backwards.

9          THE COURT:  So do we have a dispute of

10 the parties as to whether there's any live challenge

11 before the jury on those two patents as to invalidity?

12         MR. LANDIS:  No, we do not, Your Honor.

13         THE COURT:  All right.  Proceed with your

14 response.

15         MR. LANDIS:  Your Honor, on infringement

16 on the '310 and '375 -- and I can't remember if he

17 listed the rest of them, but the Defendants have

18 presented ample evidence to go to the jury on those

19 patents.

20         We've heard from several experts on the

21 stand who have disagreed and given their own opinions

22 about elements of the claims of each of those patents

23 that have not been met, which we believe is sufficient

24 enough in order for this case to go to the jury and

25 avoid the judgment as a matter of law that Mr. Black has

1  just presented.

2           On the invalidity portion of the '375 and

3  the '310, we had Mr. Wechselberger testify about how all

4  the elements of the claim were met by both the

5  DigiCipher reference and the -- DigiCipher, in

6  combination with another reference, which I can't

7  remember the name of at the moment.

8           We've also had testimony about the fact

9  that the DigiCipher system was known by others.  We have

10  Mr. Lery, Mr. Hamilton's testimony.  I know Your Honor's

11  already talked to us a little bit about this, that we're

12  going to be taking this up at some point in time anyway.

13  But I think, given that testimony of what we've had,

14  there's ample evidence for which this jury could

15  conclude that those patents are invalid.

16           MR. BLACK:  May I respond, Your Honor?

17           THE COURT:  You may, briefly.

18           MR. BLACK:  Specifically with respect to

19  the DigiCipher reference, we -- we move for JMOL on

20  invalidity.  DigiCipher was not established to be prior

21  art.  No reasonable jury could conclude that the

22  DigiCipher reference was publicly available and prior

23  art, and the issue should not be submitted.

24           THE COURT:  All right.  Defendants have

25  said, in response to a query from the Court, that they

1  do not deem validity at issue with regard to the '243 or

2  the '497 patent.

3              You concur with that, Plaintiff?

4              MR. BLACK:  Yes.

5              THE COURT:  Then I'll consider -- though

6  you recited all four patents in your motion, that's not

7  a part of the motion, since there is agreement that

8  there is no live dispute as to validity of those two

9  patents.

10             Otherwise, the Defendant -- the

11 Plaintiffs' motion for judgment as a matter of law is

12 otherwise overruled.  This case is going to the jury,

13 Ladies and Gentlemen.

14             All right.  Anything else before we bring

15 the jury back in and start the infringement -- or the

16 rebuttal -- excuse me -- case?

17             MR. DACUS:  Your Honor, one point of

18 clarification, and I apologize for being dense, but with

19 respect to the Court's earlier ruling that the rebuttal

20 case can rebut our case-in-chief, we want to

21 understand -- we understand our case-in-chief to have

22 been an invalidity case that they can rebut, not our

23 defense to the -- to the infringement allegations for

24 which they are not entitled to rebut.

25             I'm just trying to get a clarification

1  from the Court as to whether or not our interpretation

2  is correct.

3              THE COURT:  Well, we may disagree,

4  Mr. Dacus, but it's my understanding that the rebuttal

5  case is to rebut what you put on, whether it's

6  infringement or whether it's invalidity.

7              MR. DACUS:  I understand, Your Honor.

8  And we don't disagree --

9              THE COURT:  Just like that's what your

10  case is, to rebut their case-in-chief.

11             MR. DACUS:  Understood.  I just wanted

12  clarification.  I'm not --

13             THE COURT:  And they have the burden, so

14  they get to go last.

15             MR. DACUS:  Understood.

16             THE COURT:  That's the way it works.

17             MR. BLACK:  Your Honor, if you'd just

18  advise us how much time we have left.

19             THE COURT:  Give me just a second.  We're

20  getting close.

21             MR. BLACK:  I'm aware of that.

22             MR. DACUS:  Your Honor, may I -- one

23  other thing.  I'm advised that the slides, with respect

24  to these -- the rebuttal case, that we received

25  midafternoon this afternoon, and we've not had a chance

1  to review those.

2             MR. BLACK:  We'd be quite happy to

3  restart in the morning on the rebuttal case when we're

4  more organized, but we can do it now.

5             THE COURT:  Well, let's see what the time

6  is.  Just a minute.  I'm told that the Plaintiffs have

7  41 minutes left and the Defendants have an hour and 54

8  minutes.

9             Can we get the rebuttal done if we start

10  in the morning so that we can get this case charged and

11  to the jury?

12             MR. BLACK:  Without a doubt.

13             THE COURT:  How long do you honestly

14  expect the rebuttal case to be, best guess?

15             MR. BLACK:  39 minutes.

16             THE COURT:  Mr. Dacus, an hour and 52?

17             MR. DACUS:  Well, I could not imagine

18  that, Your Honor.

19             THE COURT:  All right.  Well, it does

20  seem that we've got a little more latitude than I

21  thought we had, and I don't want to put the Defendants

22  at any disadvantage by not having an opportunity to

23  review the Plaintiffs' slides.

24             Therefore, I'm inclined to grant what I

25  perceive to be the Defendants' request that we delay the

1  start of the rebuttal case until the morning, give you

2  proper time to review those.

3          MR. DACUS:  That's what we would

4  respectfully ask for, Your Honor.

5          THE COURT:  All right.  Then we'll bring

6  the jury back in and send them home.  We'll start

7  promptly at 8:30, and we'll go from there.

8          Anything further?

9          MR. BLACK:  No, Your Honor.

10         MR. DACUS:  No, Your Honor.

11         THE COURT:  Would you bring the jury back

12  in, Mr. Shadden?

13         COURT SECURITY OFFICER:  All rise for the

14  jury.

15         (Jury in.)

16         THE COURT:  Be seated, please.

17         Ladies and Gentlemen, thank you for your

18  patience and understanding.  I've taken up the matter

19  that needed to be handled outside your presence.

20         I've inquired of the attorneys as to

21  their best estimation for the time required to cover the

22  rebuttal case that will be put on by the Plaintiffs, and

23  I'm satisfied that we can do that with adequate time to

24  get this case to you tomorrow if we delay the start of

25  the rebuttal case until in the morning.

1                  And out of an abundance of caution, to

2    make sure that both sides have an opportunity to review

3    the materials they expect the other side to use before

4    in the morning so that nobody's at a disadvantage, I'm

5    going to delay the start of the rebuttal case until

6    first thing in the morning.

7                  All that means is that the Defendant

8    having rested and us having taken up the matters we

9    needed to and delaying the start of the rebuttal case

10   until the morning means we're finished today.  But I'm

11   sorry to get you in and out and bring you out just to

12   send you home again, but that's where we are.

13                 I'm going to release you for the evening.

14   I'm going to remind you again not to discuss the case

15   with each other or anyone else, ask you to drive safely

16   and be careful and ask you to assemble in the jury room

17   by about 8:20 in the morning so that we can start

18   promptly at 8:30.

19                 With that, have a good evening, and we'll

20   see you in the morning.  You're excused until tomorrow

21   morning.

22                 COURT SECURITY OFFICER:  All rise.

23                 (Jury out.)

24                 THE COURT:  All right, counsel.  We stand

25   in recess until tomorrow morning.

1            (Court adjourned.)

2            * * * * * * * * * * * * * * * * * * * *

3

4

5                    <u>CERTIFICATION</u>

6

7            I HEREBY CERTIFY that the foregoing is a

8   true and correct transcript from the stenographic notes

9   of the proceedings in the above-entitled matter to the

10  best of my ability.

11

12

13

14  /s/_____                _____
    SHELLY HOLMES, CSR                         Date
15  Official Court Reporter
    State of Texas No.:  7804
16  Expiration Date  12/31/14

17

18  /s/_____              _____
    SUSAN SIMMONS, CSR                     Date
19  Official Court Reporter
    State of Texas No.:  267
20  Expiration Date  12/31/14

21

22

23

24

25