```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3  HITACHI CONSUMER ELECTRONICS *    Civil Docket No.
                                 *    2:10-CV-260
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    April 12, 2013
    TOP VICTORY ELECTRONICS      *    8:30 A.M.

 6
                    TRANSCRIPT OF JURY TRIAL
 7       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                UNITED STATES DISTRICT JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:        MR. OTIS CARROLL
                              MR. PAT KELLEY
11                            Ireland Carroll & Kelley
                              6101 South Broadway
12                            Suite 500
                              Tyler, TX   75703
13
                              MR. MARTIN BLACK
14                            MR. JEFFREY EDWARDS
                              MR. VINCENT GALLO
15                            MS. SHARON GAGLIARDI
                              Dechert
16                            2929 Arch Street
                              Cira Centre
17                            Philadelphia, PA   19104

18                            MR. JEFFREY PLIES
                              Dechert
19                            300 West 6th Street
                              Suite 2010
20                            Austin, TX   78701

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:          MS. SHELLY HOLMES, CSR
                              MS. SUSAN SIMMONS, CSR
23                            Official Court Reporters
                              100 East Houston, Suite 125
24                            Marshall, TX   75670
                              903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

```
FOR THE DEFENDANT:          MR. MARK SAMUELS
                           MR. BRIAN BERLINER
                           MR. VISION WINTER
                           MR. JORDAN RAPHAEL
                           MR. JOHN WOO
                           O'Melveny & Myers
                           400 South Hope Street
                           Los Angeles, CA   90071

                           MR. DERON DACUS
                           The Dacus Firm
                           821 ESE Loop 323
                           Suite 430
                           Tyler, TX   75701

                           MR. TODD LANDIS
                           MR. ERIC KLEIN
                           Akin Gump Strauss Hauer &
                              Feld
                           1700 Pacific Avenue
                           Suite 4100
                           Dallas, TX   75201

                           MR. DANIEL MOFFETT
                           Akin Gump Strauss Hauer &
                              Feld
                           300 Convent Street
                           Suite 1600
                           San Antonio, TX   78205
```

                    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

P R O C E E D I N G S

     (Jury out.)

     COURT SECURITY OFFICER:  All rise.

     THE COURT:  Be seated, please.

     Let me ask the Plaintiff to go to the podium and read into the record the exhibits they used during yesterday's portion of the trial.

1          MS. GAGLIARDI:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. GAGLIARDI:  Plaintiffs would like to

4    move PTX 007 into the evidence.

5          THE COURT:  Is there objection or

6    disagreement from the Defendants?

7          MR. WINTER:  No, Your Honor.

8          THE COURT:  All right.  Those will be

9    considered part of the record, and I'll ask Defendants

10   to do the same thing.

11         MR. WINTER:  Good morning, Your Honor.

12   Defendants request to move into evidence DX 15, 34, 35,

13   43, 447, 599, 615, 723, 724, 726, 727, 728, 729, 756,

14   758, 762, 796, 766, PTX 901, JTX 002, DPHX 017.

15         THE COURT:  All right.  Is there

16   objection from the Plaintiff?

17         MS. GAGLIARDI:  No, Your Honor.

18         THE COURT:  Those will also be considered

19   part of the record in this case.

20         All right.  Is there anything else that

21   either side has for the Court before we bring in the

22   jury and start the Plaintiffs' rebuttal case?

23         MR. DACUS:  Nothing from the Defendants,

24   Your Honor.

25         MR. BLACK:  No, Your Honor.

1            THE COURT:  All right.  Then if you'd

2  bring in the jury, Mr. Shadden.

3            COURT SECURITY OFFICER:  All rise for the

4  jury.

5            (Jury in.)

6            THE COURT:  Good morning, Ladies and

7  Gentlemen.  Have a seat, please.

8            All right.  Is the Plaintiff ready to go

9  forward with its rebuttal case?

10            MR. PLIES:  Your Honor, Plaintiffs call

11  Jeff Hamilton.

12            THE COURT:  All right.  If you'll come

13  forward, Mr. Hamilton.  You remain under oath.

14            And you may proceed when you're ready,

15  Mr. Plies.

16  JEFFREY HAMILTON, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

17                  DIRECT EXAMINATION

18  BY MR. PLIES:

19     Q.   Good morning, Mr. Hamilton.

20     A.   Good morning.

21     Q.   Were you in the courtroom yesterday for

22  Mr. Wechselberger's testimony?

23     A.   Yes, I was.

24     Q.   Have you also reviewed Mr. Wechselberger's

25  expert reports in this case?

1      A.    Yes, I have.

2      Q.    Would you like to respond to some of the

3  points that Mr. Wechselberger raised yesterday in Court?

4      A.    I would.

5      Q.    What sorts of issues would you like to

6  discuss?

7      A.    The -- his assertions on infringement and

8  validity.

9      Q.    Now, with respect to infringement, I believe

10  Mr. Wechselberger used a figure similar to this one to,

11  as I understand it, argue that a signal that's output

12  after each stage of the signal processing is a different

13  signal than the signal that goes in to each stage of the

14  signal processing.

15          And I wanted to know if you agreed with Mr.

16  Wechselberger on that point.

17      A.    I do not agree.

18      Q.    And what's your reason for that?

19      A.    These are digital signal processing blocks,

20  the signal flows through these different processing

21  steps.  So you tune to Dancing with the Stars on the

22  left, and it comes down the antenna.  It's demodulated.

23  So I went through this in my presentation Tuesday.  This

24  signal is demodulated.  Comes out in the form of bits.

25  Goes out through the error decoder, the trellis decoder

1  in the first block.

2       What comes out is different bit, but it

3  represents the same signal.  It's still the TV channel.

4  It's still the audio and the video that was transmitted.

5  And similarly through each other step, the signal flows

6  from the antenna to the television screen, and it's --

7  it's the same signal.

8       Q.   Now, I thought I also heard Mr. Wechselberger

9  discuss, that inclusion of certain unclaimed elements in

10 the accused products, for example, the data

11 de-interleaver or data de-randomizer, prevented the

12 accused products from infringing.

13       Do you agree with that contention?

14       A.   I do not.

15       Q.   And what's your basis for that?

16       A.   The -- so the -- his -- his argument was if

17 there's an intervening element there and you take it

18 away -- he had two arguments.  First, you take the

19 intervening element away --

20            THE COURT:  Mr. Hamilton, please slow

21 down just a little bit.  It would help everyone if we

22 could hear it a little slower.

23       A.   What was the question again?

24       Q.   (By Mr. Plies) Yeah.  So Mr. Wechselberger was

25 describing the inclusion of certain components in the

1  accused products, for example, the data de-interleaver

2  and the data de-randomizer and seeming to argue that the

3  inclusion of those additional elements somehow prevented

4  the accused products from infringing the claim.

5       I wanted to know if you agreed with that.

6       A.   I do not.

7       Q.   And can you provide an explanation for your

8  reason?

9       A.   The -- the presence of other elements does not

10  affect my infringement analysis.  The -- the word

11  comprising is highlighted behind you on the screen

12  there.

13       The claim requires the elements stated in the

14  claim to be present.  It doesn't matter if there are

15  other elements also present.

16            THE COURT:  Not to comment on what you

17  said, but you said it much better.

18       Q.   (By Mr. Plies) And, Mr. Hamilton, what's your

19  understanding of how to perform an infringement analysis

20  such as you did in your -- your presentation?

21       A.   So as I went through on Tuesday, my task

22  during infringement analysis was to look at the text of

23  the claim and try to determine if each of the elements

24  of the claim appear in the product -- in the accused

25  products.

1          And so here's a diagram showing for the first

2    element -- it's kind of a lot of words, but we went

3    through it, and that element is present in the products

4    in the form of a tuner, and the next element is there in

5    the form of a demodulator, and then the next element --

6    well, this particular claim is met by the -- this is the

7    one that's in common, I think, so it's met by the

8    trellis decoder.

9          I have an extra arrow there because the other

10   claims address the Reed-Solomon decoder.  But perhaps

11   you get the idea.

12         And then the -- the -- the green and blue

13   elements are met by the bit-expanders, audio and video.

14   And we don't show it here, but the video is DCT.

15         So each of these elements is present in the

16   product, and that's why I determined that the product

17   infringes.

18      Q.    Now, you may recall that Mr. Wechselberger was

19   removing certain elements of the accused product in his

20   presentation and was saying that the accused product

21   would not work.  In his explanation of that, did you

22   perceive any flaws in his argument?

23      A.    Yeah.  It just seems kind of backwards.  So,

24   you know, he looks at the block diagram of the things

25   that you build a TV receiver out of, and when some of

the -- there are elements in a TV receiver that are not

represented in the claim, that seems to -- he forms the

opinion that the product doesn't infringe.  But, of

course, that's not the way infringing analysis works.

    Q.   So based on anything you heard in Court from

Mr. Wechselberger, has any of that changed your opinion

with respect to whether the accused products infringe

the '310 and '375 patents?

    A.   No, it does not.

    Q.   Turning to validity, did you opine -- can you

please provide your opinion as to what the level of

ordinary skill in the art would have been back at the

time of filing of the patents?

    A.   A bachelor's degree in electrical or computer

engineering and four years of experience with digital

signal processing or digital television or equivalent

education and experience.

    Q.   And did you apply that level of skill from the

perspective of one of ordinary skill in 1990 at the time

the patents were filed?

    A.   I did.

         MR. PLIES:  Mr. Pickett, if you could

pull up DX 599.  I'm sorry.  599.

    Q.   (By Mr. Plies) Mr. Hamilton, is DX 599 the

DigiCipher document that Mr. Wechselberger was relying

1   upon for his invalidity analysis?

2        A.   Yes, it is.

3        Q.   And do all of Mr. Wechselberger's invalidity

4   arguments rely upon this DigiCipher document?

5        A.   Yes.  All -- all of his arguments rely on this

6   document.

7        Q.   So do you know if all the Defendants'

8   invalidity arguments rise or fall with this document?

9        A.   It would seem so, yeah.

10       Q.   And what is the standard of proof that the

11  Defendants must meet to invalidate and take away

12  Hitachi's patents?

13       A.   Clear and convincing evidence.

14       Q.   And do you know if that standard applies to

15  proving whether DX 599 was publicly available or

16  publicly known before July 20, 1990?

17       A.   My understanding, that it does.

18       Q.   Now, is DX 599 a United States patent?

19       A.   No.

20       Q.   Are there any names listed on the document?

21       A.   No.

22       Q.   Are there any recipients listed on the

23  document?

24       A.   No.

25       Q.   Do you know if this document was submitted to

1 the FCC?

2     A.   I have no personal experience of that.  I

3 understand that this seems to be the document that was

4 sent.

5     Q.   Do you have any personal knowledge that DX 599

6 became publicly known or available prior to July 20,

7 1990?

8     A.   I do not.

9     Q.   Now, what company prepared DX 599?

10     A.   General Instrument, VideoCipher Division.

11 It's the San Diego Division.

12     Q.   And I believe you indicated you worked at

13 General Instrument?

14     A.   Yes.  I worked in the Cable Division in

15 Pennsylvania.

16     Q.   When did you start at General Instrument?

17     A.   June 4th, 1990.

18     Q.   And when you joined General Instrument, did

19 you become aware of any corporate culture concerning the

20 protection and security of technical documentation?

21     A.   Yeah.

22     Q.   And what was your understanding of that --

23 that culture?

24     A.   Well, both divisions were involved in the

25 business of security and secure delivery systems.  The

1   Cable Division sort of not such high-level security.  We

2   were protecting cable TV delivery to the home.

3          The VideoCipher Division, the word cipher in

4   VideoCipher comes from encryption, and they had a

5   history in making products for the U.S. military for

6   encrypting and securing communications.

7          They -- they had very well-established

8   document control and secrecy policies and military

9   background.  They had very much of a need-to-know

10  philosophy on releasing documents.

11     Q.   Did you have any personal experience and

12  interactions with the VideoCipher Division?

13     A.   Yeah.  So they invented a digital TV system --

14  digital TV delivery system, and I wanted to build a

15  system using the same technology on cable, and our

16  division had a -- quite a difficult time getting them to

17  share that -- the specifications with us.

18     Q.   Now, based upon your experiences at General

19  Instrument, do you believe that an interested member of

20  the public could have contacted General Instrument,

21  requested technical documentation, such as DX 599, and

22  GI would have provided it to them?

23     A.   No, not at all.

24     Q.   Did you know a Chris Heegard?

25     A.   Yes, I did.

```
 1          Q.   How do you know him?

 2          A.   I hired him in '91 or '92 to work on our QAM

 3     development or cable-to-cable transmission system.

 4          Q.   Do you know what a non-disclosure agreement

 5     is?

 6          A.   I do.

 7          Q.   What is it?

 8          A.   NDA.  So it's a contract that you sign

 9     promising not to share any information.  So when we

10     hired Chris, he had designed an NDA promising the work

11     he was doing for us would be kept secret or private from

12     else.

13          Q.   To your knowledge, would that have been the

14     standard practice at General Instrument?

15          A.   Yeah, certainly.

16               MR. PLIES:  Go back to the slides,

17     please.

18          Q.   (By Mr. Plies) So based on that, to your

19     knowledge, have you seen any evidence that would

20     indicate that DX 599 was publicly available before

21     July 20, 1990?

22          A.   No, I have not.

23          Q.   Have you seen evidence suggested to you that

24     it would not have been?

25          A.   Yes.  In particular, I have this slide which
```

1    implies or I -- I read into it that it probably -- that

2    the information in the June 8th document probably was

3    not available.

4         Q.    Now, what are we seeing on the left-hand of

5    this slide as PTX 1087?

6         A.    On the left side is the -- a publication of

7    Dr. Woo Paik from General Instrument Corporation

8    describing the DigiCipher system.  This is published in

9    an IEEE technical journal, and it's -- abrogated, it's

10   almost word for word the same as the June 8th paper.

11        Q.    What is the IEEE?

12        A.    Institute of Electrical and Electronic

13   Engineers.

14        Q.    And what is their status within the academia?

15        A.    Well, academia -- so they published lots of,

16   you might say, high-level or very detailed technical

17   papers.  So this is transactions on broadcasting for a

18   broadcast engineer.  There are 400,000 members of IEEE

19   worldwide on one -- I'm sure there are other members in

20   the audience here.

21             So this is where people skilled in the art

22   publish their information -- new information about what

23   they're working on when they're ready to make it public

24   so that the readers who want to stay informed in their

25   field would get information from the actual place.

1      Q.    And, again, what is the date of the IEEE paper

2  on DigiCipher on the left side of the slide?

3      A.    December 1990.

4      Q.    So would this or would this not be prior art

5  to the '310 and '375 patents?

6      A.    This would not be prior art.

7      Q.    And what are we seeing on the right-hand

8  portion of this slide?

9      A.    At the bottom, we have highlighted the

10  editorial policy.  So it says:  Do not submit a reworked

11  version of a paper you have submitted or published

12  elsewhere.

13          So, you know, the IEEE policy says that you're

14  not to submit, at least papers that have been published

15  elsewhere.  Here, they're publishing almost identical

16  information or really very, very close to the June 8th

17  paper.

18          And so according to this policy, I expect that

19  this had not been published before.  I actually recall

20  when this was published.  It was informative to me.

21      Q.    Even though you were at GI, it was informative

22  to you coming out in the IEEE publication in December;

23  is that right?

24      A.    Yes, it was.

25      Q.    Let's talk a little bit about DX 599 itself.

1    There was a lot of discussion about what it teaches.  I

2    wanted to focus on one aspect of that, which is what it

3    teaches concerning error correction.

4           And could you describe what you have on Slide

5    7?

6      A.   So this is a figure from the DigiCipher -- the

7    June 8th DigiCipher paper.  And it shows an FEC decoder

8    and a block diagram.  And I went through recently and

9    looked at the paper again for exactly what it describes

10   about error correction, and -- and these are the only

11   substantive elements.

12          So it appears in another encoder block diagram

13   in a list at the end, but these are the only -- this is

14   the only description of the FEC decoder.

15          So it says:  Error correction for all

16   DigiCipher-transmitted bits is performed in a separate

17   decoder block and is not integrated with the audio

18   processing.

19          So I -- I found that a little confusing when I

20   first read it, and I remember being confused by it.  And

21   the Reed-Solomon coding of rate 130 over 154 equals 12.

22   So there's a very limited amount of disclosure of the

23   FEC in the DigiCipher paper.

24     Q.   And when you looked at what is disclosed, did

25   you find any issues or problems with the disclosure?

1    A.    Yes, I did.  One of the confusing things was

2  that they specify Reed-Solomon block size.  You might

3  remember the -- the sort of chunky way that Reed-Solomon

4  operates.  A block of data goes into the encoder, and

5  then parity bytes are added.

6            So 130 -- well, samples is what they're

7  called -- 130 units would go into the encoder, and 24

8  would be added, 24 parity samples.  And so it has a

9  certain structure to it.

10            Normally, you would expect that to have been

11  chosen to fit the data structure.  So the black lines

12  there are the data structure actually cut and pasted

13  from the paper.  So it shows their structure based on

14  504 bits.

15            And we engineers do a lot of math, especially

16  in error correction.  They need to match up, and this

17  simply doesn't match up.

18            Just to be a little more clear about that, at

19  the bottom, in the table, one Reed-Solomon block had 130

20  bits in it.  That would take 130 out of 504.

21            The second block would take the next 130 bits,

22  the third block, another 130 bits, and the fourth block

23  doesn't have 130 bits to operate on, so it doesn't --

24  the frame structure doesn't fit into the Reed-Solomon

25  block size.

1    And so when I read this back in -- sometime in

2    1990, I remember thinking, I don't know how they're

3    doing this.  They haven't actually told me how they're

4    doing the Reed-Solomon coding.

5    Q.   Did you find any other issues with the

6    disclosure concerning error correction?

7    A.   Perhaps you can imagine, when I read this, I

8    was thinking already about using it in cable, so it

9    mattered to me.  When I -- I don't remember when I got

10   this, but when I did, I analyzed it carefully, because I

11   was desperate to have information on this system,

12   because I really wanted to implement it in our system

13   for cable.

14   So I went through this very carefully, and I

15   looked at these numbers, and -- and I have -- it's a

16   similar problem, not exactly the same problem.  But the

17   relationship between -- the total data rate is listed

18   there 5 -- 15.84 megabits, and the data transmission

19   rate.  So what gets transmitted out of the encoded

20   stream is 19.43 megabits.

21   And so I kind of have the same problem I had

22   before.  It just doesn't add up.  15.84 divided by 30

23   over 154 doesn't equal 19.43, as it says in the diagram.

24   It equals 18.77.

25   I don't know what they were thinking, but I

 1  can tell that it's not straightforward.  It's not

 2  what -- what you would have expected.

 3         So I remember at the time -- and it's still

 4  obvious now -- there's something missing in the

 5  disclosure of the FEC.  They don't really say how they

 6  do it.  My thought at the time, and still is, that

 7  apparently something is missing.

 8         It's going around the FEC decoder,

 9  something -- although the wires are shown going into the

10  FEC block and coming out, it doesn't mean it's being --

11  it's acting on all of the data that goes through.

12     Q.   All right.  So based upon your reading of

13  DX 599, do you have an opinion as to whether it

14  anticipates Claim 7 of the '310 patent?

15     A.   I don't believe it anticipates.

16     Q.   And I see that your first sub-bullet is,

17  quote, error correction signal added commonly to both

18  the video signal and the audio signal.

19         Do you have an opinion as to whether

20  DigiCipher teaches that limitation?

21     A.   I don't believe it teaches that limitation.

22     Q.   And then we see the next sub-bullet is error

23  corrector, which corrects an error of the digital signal

24  demodulated by the demodulator based on the error

25  correction signal.

1              Do you have an opinion as to whether

2  DigiCipher teaches that limitation?

3       A.   I don't.  I believe it does not.

4       Q.   All right.  And then with respect to Claims 26

5  and 30, do you have an opinion as to whether DigiCipher

6  teaches the limitation error correction information

7  added to the video information and separately added to

8  the audio information respectively?

9       A.   It does not teach that.

10      Q.   And do you have an opinion as to whether the

11 DigiCipher reference teaches that the requirement error

12 corrector configured to correct an error of the digital

13 information demodulated by the demodulator based on the

14 error correction information as recited in Claim 26?

15      A.   I believe that limitation is not -- does not

16 appear in the DigiCipher paper.

17      Q.   And then finally, for Claim 30 of the '375

18 patent, do you have an opinion as to whether the

19 DigiCipher paper discloses an error corrector configured

20 to correct an error of a digital information which is

21 previously demodulated by the demodulator based on the

22 error correction information?

23      A.   I do not.

24      Q.   I'm sorry.  Do you -- what --

25      A.   I don't think that the DigiCipher paper

1   teaches that claim limitation.

2       Q.   Thank you.

3            Now, did you understand Mr. Wechselberger,

4   with respect to the '375 patent, to also advance what's

5   known as an obviousness argument?

6       A.   Yes.

7       Q.   And was he combining the teachings of multiple

8   references and making that argument?

9       A.   He was.

10      Q.   And what were the two references that he was

11  combining?

12      A.   The June 8th DigiCipher paper and the

13  Shikakura '503, which is a patent.

14      Q.   And in your opinion, did he provide a

15  persuasive argument for why, one of ordinary skill would

16  have combined the teachings of Shikakura '503 with

17  DigiCipher?

18      A.   I -- I do not believe he presented such an

19  argument.

20      Q.   And do you, having read those documents, have

21  any view as to whether one of ordinary skill would have

22  been motivated to combine the teachings of Shikakura

23  '503 with DigiCipher?

24      A.   So when I look at whether one in -- skilled in

25  the art at the time would have been motivated to combine

1    these two references, I -- I didn't hear any arguments

2    that swayed my opinion as to why they wouldn't combine

3    them.

4             And when I look at the two references

5    together, I see good reasons that you would not have

6    combined them.

7        Q.    And can you please articulate some of your

8    reasons?

9        A.    So I've discussed that -- how the numbers

10   didn't match.  Well, the reason I knew that is because I

11   was trying to make the numbers match, as we engineers

12   do.  We try to put everything together.

13            It's quite a complicated system that was

14   described in the DigiCipher paper, and there are lots of

15   pieces that have to fit together very precisely.  If you

16   get something wrong, the system won't work.  And so I --

17   I looked carefully at it to -- to see how the -- how --

18   how it was -- how the pieces matched so that they would

19   work.

20            And so when I'm looking at the Shikakura

21   paper, it discloses error correction that's very

22   complicated, adds functional elements, adds -- so if you

23   were to add them to the DigiCipher paper, you would mess

24   up that carefully balanced set of parameters.

25            The word link budget describes the

1    allocation -- there's a big word -- of how -- so you're

2    only going to transmit so many bits through that

3    broadcast pipe.  And so they're very carefully

4    allocated.

5            In particular, they were trying to get HDTV

6    through that broadcast pipe.  That was a very difficult

7    thing at the time.  Everybody else in the industry

8    thought it was impossible.  And so they very carefully

9    allocated bits.

10           You -- if you -- you can't go upset this and

11   have the system still work.  And so adding the proposals

12   in the Shikakura patent would throw this out of kilter,

13   would make the whole system corrupted or not -- not as

14   they describe it.

15           And so in particular, one of those things is

16   that there's a very large memory buffer.  The IDF HDTV

17   was -- it would be for television receivers people could

18   afford to buy.  If you put extra cost in -- I'm speeding

19   up -- people can't afford it.  So you need it to be as

20   low cost as possible.

21           You also want it delivered in a reasonable

22   amount of time, and so you don't want to put a lot of

23   features in that are going to delay the provision of

24   this -- of TVs to people.

25           And -- and so you don't want cost.  You don't

1  want complexity.  The things that are in the Shikakura

2  patent add cost and complexity without providing any

3  benefit, as far as I can see.

4       So it seems to very much teach away from -- I

5  can see very good reasons that motivate against adding

6  the FEC system of Shikakura to the DigiCipher patent.

7  Sorry it was so many words.

8       Q.   Thank you.

9       Let's turn to some other aspects that the jury

10 might consider in their obviousness or non-obviousness

11 determination.

12      Did you look at any factors that might weigh

13 additionally in favor of non-obviousness?

14      A.   Yes, I did.

15      Q.   And I see the first bullet you have at the top

16 is called:  Long-felt but unsolved need.

17      Can you explain what you mean by that in the

18 context of the '310 and '375 patents?

19      A.   Yeah.  I was in the digital television signal

20 processing world very early.  It wasn't a big deal -- it

21 wasn't a big part of the television industry.  TV was

22 all analog.

23      And I very much was aware, when I was at ITT,

24 for example, and we had those digital signal processing

25 chips in the television, that, boy, it would be really

```
 1  great.  There would be huge advantages if we could use
 2  digital transmission.
 3          And so I very much personally felt the need,
 4  and my company felt the need, but we didn't see a method
 5  to do it.
 6          And so this was true of many companies around
 7  the world.  A lot of people were working on this, and
 8  Hitachi was certainly working on it.
 9          There were Japanese systems for high-quality
10  television, and they -- they had to sort of cobble
11  together a hybrid of analog and digital.  It wasn't
12  clear how to do all-digital systems.
13          So there was a very, very well-established
14  need for this.
15      Q.   And was that need solved when the Hitachi
16  inventions were patented?
17      A.   Yes, it was.
18      Q.   Now, the second major bullet you have is:
19  Industry respect through licensing.
20          And what do you mean by that?
21      A.   The '310 and '375 patents have been licensed
22  to companies who are actually building televisions,
23  Panasonic, Sharp, Amtran, Wistron.  And so clearly these
24  companies feel the patents are important and needed in
25  order to build the TV.
```

1      Q.    And the third bullet is:  Commercial success.

2  And in your opinion, has the '310 and '375 patents, the

3  inventions that are claimed in those patents, including

4  the ones you described in your testimony, enjoyed

5  commercial success?

6      A.    Yeah.  Outstanding commercial success, of

7  course.  ATSC is the standard.  ATSC incorporates the

8  patent.

9          The FCC has actually said:  If you want to

10  sell a TV in America, it must be -- it must be able to

11  receive that signal.  And so it must have the elements

12  in this patent.

13          And -- and actually, that applies to all

14  televisions sold in the U.S. in 2007.

15      Q.    And then the final bullet on your slide is:

16  Nexus.  Can you sort of explain what that means?

17      A.    Sometimes there could be a patent and the

18  product that implements the patent is very successful,

19  but it may be successful because it's broadly marketed.

20  The patent that is in the product may not really be very

21  important.  Well, I can't think of an example, but

22  that's the idea.

23          And so it's important, I think, in the jury's

24  consideration that the -- the patent is the reason for

25  the success.  The patent substantially contributes to

1  the success of the product.

2      Q.   And do you have an opinion as to whether

3  that's the case for the '310 and '375 patents?

4      A.   I do.  I think the -- that these patents are

5  enabling of the features of high-definition -- of the --

6  the features that we buy when we go to the store and we

7  want this stuff -- I don't know how you feel, but I feel

8  that television has dramatically improved.  I take pride

9  in the improvements and those -- and my contribution to

10  those improvements.

11          And they're a big deal.  They're -- they're

12  the reason -- those improvements are the reason that

13  people buy the television.  And so this nexus seems to

14  be very much supported by the '310 and '375 patents.

15      Q.   And what are -- what are some of those

16  improvements that you're referring to?

17      A.   High-definition programming, multichannel

18  programming, freedom from snow and interference and

19  patterns on the screen.

20      Q.   And I'm sorry.  What did you mean by

21  multiplexing on your last bullet?

22      A.   That the local broadcasters -- three of the

23  local broadcasters are transmitting three choices.  Most

24  people don't get them.  You have to use an antenna TV to

25  get them, but the advantage is there if you use an

1    antenna.

2         Q.    And I see that you also have a bullet that

3    says that the '310 and '375 patents were front and

4    center in licensing communications.

5              What do you mean by that?

6         A.    They -- I understand that when Hitachi and the

7    -- the companies listed there that license the patents

8    in those discussions, these patents were right at the

9    front.  They were, you know, at the top of the list of

10   what was being discussed to license.

11        Q.    So, Mr. Hamilton, do you have a final

12   conclusion or opinion as to whether you believe that the

13   '310 and '375 patent, the asserted claims -- do you have

14   an opinion as to whether or not they're obvious in view

15   of DigiCipher and Shikakura?

16        A.    I do not feel they're obvious.

17        Q.    Does this Figure -- or modified version of

18   Figure 4 from the '310 and '375 patents that has been

19   discussed in the case several times, do you recall

20   various testimony and -- and Defendants pointing out

21   that, you know, a receiver circuit may have been known

22   in the art, a demodulator circuit might have been known

23   in the art, expansion circuit might have been known in

24   the art, does the fact that individual elements alone

25   may have been known in the art, does that affect your

1  opinion as to whether or not the invention was

2  anticipated or obvious?

3       A.   No, it does not.

4       Q.   And why not?

5       A.   Well, almost all patents, not all patents, are

6  built out of existing elements, things -- old stuff.

7  Patents are about combining old stuff into something

8  new.

9            So it's the combination of these elements that

10 is the Hitachi patents.  Hitachi isn't claiming in this

11 patent to have invented the demodulator.  It was an

12 existing element.

13      Q.   Thank you.

14           MR. PLIES:  Pass the witness.

15           THE COURT:  Cross-examination.

16           MR. LANDIS:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. LANDIS:

19      Q.   Good morning, Mr. Hamilton.

20      A.   Good morning.

21      Q.   Good to see you again.

22           I'd like to start off by talking about the

23 very last comment you made, which is that all of the

24 components -- if I heard you correctly, all of the

25 components in the claims were known, true?

1     A.    All of the components -- yeah, I think that's

2  true, yeah.

3     Q.    And it's the combination that matters.  That's

4  what I heard you say, right?

5     A.    Yeah.

6     Q.    So if all of the components are known, then

7  the jury must have to look at the other claim language

8  to figure out whether or not our products infringe,

9  true?

10     A.    I think of the claim as built of the

11  components, so...

12     Q.    But we just agreed, sir, right, that the

13  components were known, correct?

14     A.    Yes.

15     Q.    So it's the other language of how the

16  components are combined together that matters in this

17  case.

18     A.    It's -- well, it is a combination that

19  matters.

20     Q.    And so the jury should look very carefully at

21  the claim language as to how they're combined together,

22  correct?

23     A.    Yes.

24          MR. LANDIS:  Can we go to rebuttal

25  Slide 3, please?

1      Q.    (By Mr. Landis) Now, this was a slide that you

2   put up for the -- for the jury members a little while

3   ago, correct?

4      A.    Yes.

5      Q.    Okay.

6            MR. LANDIS:  Now, I'd like, if I could,

7   just to remove those arrows for a minute.

8      Q.    (By Mr. Landis) Now, I think we just agreed

9   that the receiver, demodulator, error corrector, first

10  expander and second expander, those were all known

11  elements.  That's what we just agreed to, correct?

12     A.    Yeah, I think so.

13     Q.    Okay.  So we can put up that Hitachi did not

14  invent any of those individual components, correct?

15     A.    I don't know that.

16     Q.    Well, they didn't invent it in the '310 or the

17  '375 patent.  Would you agree with that?

18     A.    Yeah.  They're not -- the invention of those

19  is not claimed in either of these patents.

20     Q.    So it's the other language that follows those

21  various elements.  That's what matters to this jury.

22  That's what they have to look to decide whether or not

23  our products infringe this claim, correct?

24     A.    I don't -- I don't know if your

25  characterization is really -- I think the jury has many

1   things to consider.

2       Q.   Well, one of the things they have to consider

3   is all that additional language, true?

4       A.   Sure.

5       Q.   Okay.  And in the error corrector element, one

6   of the things they have to consider is that the error

7   corrector corrects an error of the digital signal

8   demodulated by the demodulator.  That's one of the

9   things they have to consider, correct?

10      A.   Yes.

11      Q.   Okay.  Now, I'd like to look on the right-hand

12  where it says reception.

13          Now, you said that this came from

14  Mr. Wechselberger, correct?

15      A.   I think it did.

16      Q.   You see all the things at the bottom of

17  this -- this slide where it says trellis-coded symbols.

18          Do you see that sir?

19      A.   Yes.

20      Q.   Right above that first did not invent.

21      A.   Yes, I see that.

22      Q.   You agree what comes out of the demodulator

23  are trellis-coded symbols, correct?

24      A.   I believe the digital signal at that point is

25  represented as trellis-coded symbols.

1        Q.   It's not really bits at that time, is it?

2        A.   I'm not sure what you're asking about.  So the

3   diagram doesn't specify how it's represented.  It's my

4   understanding that I think every product actually

5   represents those trellis symbols as bits.

6        Q.   Okay.  Let's just assume you're right for a

7   second.

8             You agree that what comes out of the trellis

9   decoder is corrected interleaved data, correct?

10       A.   So what -- when the signal comes out of the

11  trellis decoder, it has errors corrected by the function

12  of the trellis decoder.

13       Q.   And what we're looking at here is what the

14  signal looks like, the digital signal, true?

15       A.   Yes.  I'm not sure what -- I don't -- so...

16       Q.   The claim -- the claim talks about a digital

17  signal, correct?

18       A.   Yes.

19       Q.   So that's what we have to look at, the digital

20  signal, right?

21       A.   We -- yes.

22       Q.   And when we talk about a digital signal in

23  terms of 1s and 0s, we're talking about the number of 1s

24  and 0s we have, true?

25       A.   No.

1      Q.   So it doesn't matter how many 1s and 0s I

2  have?

3      A.   It's -- so the claim language isn't about how

4  many 1s and 0s there are.

5      Q.   Well, it's about a digital signal, correct?

6      A.   Yes.

7      Q.   And a digital signal is made up of 1s and 0s,

8  true?

9      A.   It is, but the information is not encoded in

10 the number of 1s and 0s.

11      You mean in the number of 1s versus the number

12 of 0s?  In some sense, it's represented that way.

13      Q.   If you change the 1s and 0s around, you have a

14 different signal?

15      A.   No.  You still have an audio and video signal.

16      Q.   Sir, I'm not asking what you believe the

17 underlying information is.  I'm asking about the signal.

18 If you change the 1s and 0s around, you have a different

19 signal; isn't that true?

20      A.   So I think the hypothetical is, if you went

21 into this decoder and you flipped some of the bits, you

22 would lose the signal.  And the answer is, yes, you

23 would.

24      Q.   And so if I understand how the trellis decoder

25 works from your testimony, if I had 36 bits coming in,

1   in the ATSC model, I would get 24 coming out, right?

2       A.   Well, so a minute ago you said you didn't

3   think the trellis-coded symbols were represented as

4   bits, and I disagreed with you.  I think they are

5   represented as bits.

6           If they are -- so if I'm correct about that,

7   the number of bits that represent the signal between the

8   demodulator and the trellis decoder would not be 36.

9           For the -- each 24 bits coming out of the

10  trellis decoder, it would be many more.  The trellis

11  decoder uses soft-decision logic decoding.  It needs to

12  have a higher resolution digitization, and so they're

13  actually many -- sorry.

14      Q.   It's okay.  Let me try my question again.

15  You would agree with me that the way the trellis decoder

16  works is, if you're correct and it gets bits to it, it

17  takes three and makes two, correct?

18      A.   No.  Interestingly enough, it does not.  I can

19  explain, if you would like.

20      Q.   That's all right.  We're going to move on from

21  there.

22          You would agree with me that if I took what I

23  have on this screen and I took the point coming out of

24  the demodulator and I went into the Reed-Solomon

25  decoder, in an ATSC signal, that would not work?

1    A.   So I have to guess what you're representing

2 here, just like when you used the demonstrative on the

3 board.

4         This -- you know, this block diagram there as

5 you've drawn it with the red line just doesn't make any

6 sense.  So I think what you mean is more like what Mr.

7 Wechselberger showed.  If you take the trellis decoder

8 and the de-interleaver out of the circuit and pass the

9 signal, the bits coming out of the demodulator directly

10 to the Reed-Solomon decoder, if that's what you mean,

11 which I don't think what's drawn, and then the question

12 was it wouldn't work, I agree it wouldn't work.

13    Q.   It wouldn't work.

14         MR. LANDIS:  Okay.  We can take that

15 down, Mr. Lodge.

16    Q.   (By Mr. Landis) Let's move on to talk about

17 your testimony about DigiCipher.

18         Now, if I heard you correctly, you knew

19 Mr. Chris Heegard, correct?

20    A.   Yes.  Yes.

21    Q.   And if I heard you correctly, you hired him in

22 1991 or 1992 in Hatboro, Pennsylvania?

23    A.   Hatboro, yeah.  Like a hat.  They used to make

24 hats there.

25    Q.   Hatboro, Pennsylvania; is that correct?

1      A.   Yes.

2      Q.   All right.  Now, you were not working at

3  General Instrument's VideoCipher Division in June of

4  1990, correct?

5      A.   I was not working -- I've never worked at --

6  well, I've been there on business trips, but I've never

7  been employed to work at VideoCipher.

8      Q.   So you have no information about when Mr.

9  Heegard started at the VideoCipher Division in June of

10  1990 that you can share with this jury, correct?

11      A.   No specific information.  I understand that

12  he -- so what -- when I hired him, I did that on the

13  recommendation of the San Diego division, that he was a

14  good guy, that he'd done work for them.

15      Q.   Let me try my question again, just so we can

16  get an answer for the jury.

17            You have no specific information to share with

18  this jury about Mr. Heegard's hiring or his activities

19  in June of 1990 at the VideoCipher Division, true?

20      A.   Okay.  Yeah.

21      Q.   Now, you said that you had seen -- seen no

22  evidence that the DigiCipher system was publicly

23  accessible; is that true?

24      A.   You're referring to 599?

25      Q.   Yes, sir.

1      A.   I have no information that it was publicly --

2  publicly accessible.  That's true.

3      Q.   Now, you've been sitting in this courtroom the

4  -- the entire time, right?

5      A.   No, I haven't been here for the whole trial.

6  No.

7      Q.   You were here for Mr. Lery's testimony?

8      A.   No, I wasn't.

9      Q.   You missed Mr. Lery's testimony?

10     A.   I did.

11     Q.   So if you had been here for Mr. Lery's

12  testimony, you would have heard and had some information

13  that, in fact, DX 599 was publicly available.  You

14  didn't get to hear that; you weren't in the Court; is

15  that right?

16     A.   I -- I did not hear him say that.  And I --

17  I'm trying to think.  I think somebody read me rather

18  than I read some of his testimony.  So in the -- what

19  I -- I guess that's hearsay.  I'm sorry.

20          So I don't know what he said.

21     Q.   Just to be clear, sir, you were not at the

22  VideoCipher Division in San Diego in June of 1990,

23  correct?

24     A.   Correct.

25     Q.   And you do not dispute that Mr. Lery was at

1  the VideoCipher Division in June of 1990, right?

2       A.   I don't know.  I don't dispute it.

3       Q.   Let's talk a little bit about what you showed

4  the jury.

5            MR. LANDIS:  Can we put up Hamilton

6  rebuttal Slide 6, please?

7       Q.   (By Mr. Landis) Before I ask you a question

8  about this, I want to ask you one more question.

9            You would agree with me that to make a

10 television, there are probably hundreds, if not

11 thousands, of patented technologies needed?

12      A.   A lot.  I don't know -- I never thought about

13 how many, but, yeah, a bunch of patents.  Yeah,

14 hundreds.  Actually, I've reviewed lots of patents that

15 apply to digital TV in this case.  And so, yes, there

16 are hundreds.

17      Q.   All right.  Thank you.

18           Now, this is a slide you put up and it shows

19 two documents.  One is PTX 1087, and the other is

20 PTX 1104.

21           Do you remember discussing these with

22 Mr. Plies?

23      A.   Yes.

24           MR. LANDIS:  Now, if we can pull up

25 PTX 1087.

1      Q.   (By Mr. Landis) This is an IEEE paper that

2  came from Woo Paik at General Instrument Corporation,

3  correct?

4      A.   Yes.

5      Q.   Just so the ladies and gentlemen of the jury

6  can understand, IEEE, that's a pretty well-respected

7  organization in your business, true?

8      A.   Yes.

9      Q.   People aspire to have papers published in the

10  IEEE, correct?

11     A.   Yes.

12     Q.   And to get a paper published in the IEEE, you

13  don't just submit it and the next day it's published,

14  true?

15     A.   True.

16     Q.   It actually has to go through a pretty

17  extensive process, correct?

18     A.   I -- I -- I don't know anything about the

19  process.  There is group -- somebody has to select which

20  papers get published.

21     Q.   So you don't know anything about the process?

22     A.   No.  I have a book chapter published by IEEE,

23  but I don't believe I have any publications in their --

24  in any of their transactions.

25          MR. LANDIS:  Can we go to PTX 1104,

1    please?

2              And can we go to Page 5, please?

3         Q.   (By Mr. Landis) Now, PTX 1104, that's the

4    other document you brought up when you wanted to say

5    that it doesn't matter -- you know, you think, based on

6    this document and what this document teaches, that it's

7    likely that no one else knew about the DigiCipher

8    system.

9              Did I get that correct?

10        A.   No.

11        Q.   Well, what did you -- you relied upon this

12   document in your testimony, true?

13        A.   Yeah.

14        Q.   And you relied upon it to say that based upon

15   this submission process to the IEEE, you believe that

16   DigiCipher was not publicly known; isn't that true?

17        A.   I don't know.  It's a funny way to say it.  So

18   I think this indicates to me that -- yeah, it wasn't --

19   this is an indication that it wasn't known.  Not as

20   though it establishes it as a rock-solid fact or

21   anything.

22        Q.   Now, let's look at some of the things you have

23   to do to get something published.  Let's look at No. 1,

24   authors should consider the following points:  Technical

25   papers submitted for publication must advance the state

1    of knowledge and must cite relevant prior work.

2            Do you see that?

3        A.    Yes.

4        Q.    So in order to get a paper published with the

5    IEEE, the IEEE has to determine that you have advanced

6    the state of knowledge, fair?

7        A.    Yeah, but --

8        Q.    All right.  Let's look at Point No. 3.

9    Authors must convince both peer-reviewers and the

10   editors of the scientific and technical merit of the

11   paper.

12           Did I read that correctly?

13       A.    Yes.  Well, I think, yeah.

14       Q.    Now, let's tell the members of the jury what

15   peer-reviewers are.  Peer-reviewers are experts in the

16   field, true?

17       A.    Characteristically, yeah.

18       Q.    In other words, they would be one of ordinary

19   skill in the art?

20       A.    Or -- yeah.  Maybe better; I don't know.  So

21   when they select peers, they try to pick people that are

22   particularly knowledgeable in the field.

23       Q.    And when you submit a paper to the IEEE, the

24   peer-reviewers are not people within your own

25   organization, correct?

```
 1        A.    I don't know if there's a limit on that, but
 2   ideally it would be independent.
 3        Q.    Independent, other people out in the public,
 4   correct?
 5        A.    No.  They're peers in the industry.
 6        Q.    They're peers in the industry, true?
 7        A.    Yeah.
 8        Q.    They'd be people that would be interested in
 9   the technology, correct?
10        A.    You said the public, and the peers aren't
11   members of the public per se.  They're the individuals
12   who are experts in the field.
13        Q.    Let me try my question again.
14              The peer-reviewers, they would be people that
15   would be interested in the technology within the
16   article, true?
17        A.    That's not a sufficient characteristic.  They
18   have to be knowledgeable of the field that they're
19   reviewing papers in.
20        Q.    Fair enough.  So they have to be knowledgeable
21   in the field, correct?
22        A.    Yeah.
23        Q.    And if they're knowledgeable in the field,
24   then they're probably interested in the field, correct?
25        A.    I don't know anything about their motivation.
```

1  Yeah, that's a reasonable assumption.

2      Q.   Now, let's go down to the fourth bullet point.

3              MR. LANDIS:  And if we could just

4  highlight the because sentence, please, all the way down

5  to results.

6      Q.   (By Mr. Landis) Now, this bullet says:

7  Because replication is required for scientific progress,

8  papers submitted for publication must provide sufficient

9  information to allow -- to allow readers to perform

10  similar experiments and calculations and use the

11  reported results.

12              Did I read that correctly?

13      A.   Yes.

14      Q.   So the IEEE would have had a belief that they

15  could use this paper for other people to perform the

16  same experiments and then eventually use those results,

17  right?  That's what this is saying?

18      A.   That these are the publication principles,

19  yes.

20      Q.   And Mr. Paik's paper that was published, your

21  testimony in your deposition, if I got it right, was

22  that it was word-for-word identical to the June 8th,

23  1990 paper.

24              Do you recall saying that?

25      A.   Almost word-for-word, yeah.

1        Q.    Almost word-for-word identical.  And the

2   experts at the IEEE, they found it worthy of

3   publication, didn't they?

4        A.    They -- they -- yes.  They must have, because

5   they published it.

6                MR. LANDIS:  We can take that down.

7   Thank you.

8        Q.    (By Mr. Landis) Now, I'd like to talk to you

9   for a little bit about the actual DigiCipher reference,

10  599, okay?

11       A.    Yes.

12                MR. LANDIS:  Can we pull up Plaintiffs'

13  Exhibit 2?

14                Can we pull up the Figure 1, please?

15       Q.    (By Mr. Landis) Now, last time you were on the

16  stand, you and I talked about Figure 1 for a little bit.

17           Do you recall that?

18       A.    I do.

19       Q.    And we talked in particular about Block 22 and

20  23 and 24.

21           Do you remember that?

22       A.    Yes.

23       Q.    And I think we agreed that Block 22 was for

24  video compression, and Block 23 was for audio

25  compression.

1          Do you remember that?

2     A.    Yeah.  You made reference to the text that

3     described it that way.

4     Q.    And Block 24, the parity-addition circuit,

5     that was where you would add error correction

6     information, correct?

7     A.    Yes.

8     Q.    Okay.  And I believe your testimony last time,

9     but I just want to make sure, is trellis coding, not

10    parity addition, true?

11    A.    I agree with that statement.

12    Q.    Now, would you also agree with me that absent

13    the claim language, the words commonly and separately do

14    not appear in the specification of either the '310 or

15    the '375 patents?

16    A.    I believe that's true, only the claims.

17    Q.    So when we look to figure out how something is

18    added commonly or separately, these figures, like Figure

19    1, that's where we have to look, right?

20    A.    I'm sorry.  When -- how did you -- what was

21    the question again?

22    Q.    Sure.  Let me try again.

23          When we want to determine how the patent

24    teaches adding commonly and separately, we're going to

25    have to look to the figures, because they don't use the

1  words added commonly and separately anywhere in the

2  patent itself in the actual words, true?

3      A.   Okay.  So they do refer to the figures and the

4  words.  The words describe the figures.  The words do

5  describe how error correction is added.

6          And so we don't only look to the figures for

7  understanding how parity or how add -- how information

8  is added to the signal to allow error correction at the

9  receiver.

10     Q.   But those words don't have the word commonly

11 or separately anywhere in the actual specification,

12 correct?

13     A.   I agree.

14              MR. LANDIS:  Can we pull up DX 599,

15 please?

16              Can we go to Figure 2-2, please?

17              And can you blow that up a little bit for

18 me, please?

19     Q.   (By Mr. Landis) This is a figure out of the

20 DigiCipher reference.  Do you recognize it, sir?

21     A.   Yes, I do.

22     Q.   There's a block on the left-hand side that's

23 labeled digital video encoder.

24          Do you see that?

25     A.   Yeah.

1     Q.   You would agree with me that that digital

2  video encoder is a video compression like we just saw?

3     A.   Yes, I would.

4     Q.   And there's a lookup here labeled digital

5  audio encoder.  Would you agree with that?

6     A.   Yes.

7     Q.   You would agree with me that that's a digital

8  audio compressor?

9     A.   Not in the way we think of it these days, but

10  yeah.

11     Q.   And on the other side of the multiplex,

12  there's an FEC encoder, correct?

13     A.   Correct.

14     Q.   And I believe you told this jury that FEC

15  stands for forward error correction, true?

16     A.   I did, yeah.

17     Q.   That FEC encoder, that's going to add error

18  correction for whatever comes into it, correct?

19     A.   I don't know that.  I mean, it could -- it

20  could add error correction.  Its job would be to add

21  error correction to at least something that comes into

22  it.

23     Q.   So its job would be to add error correction

24  information, true?

25     A.   Yes.

```
 1                    MR. LANDIS:  Can we go to Figure 2-1.
 2        Q.   (By Mr. Landis) Now, sir, this is 2-1 from the
 3   DigiCipher reference.
 4             Do you see that?
 5        A.   I do.
 6        Q.   On the right-hand side, it says HDTV receiver.
 7             Do you see that?
 8        A.   In the middle?
 9        Q.   On the right-hand side of the figure.  Let me
10   see if I can get that...
11        A.   HDTV receiver?
12        Q.   No.  HDTV receiver right at the bottom there,
13   do you see that?
14        A.   Oh, yes, I do, the label under the diagram.
15        Q.   Under the diagram, yes.
16             And the first block -- where that label is,
17   the first block there is VHF/UHF tuner.  Do you see
18   that?
19        A.   Yes.
20        Q.   And I believe you told the ladies and
21   gentlemen of the jury that the tuner is part of the
22   receiver, true?
23        A.   The receiver described in the patent claims,
24   yes.
25                    MR. LANDIS:  Can we go to Figure 2-3,
```

1    please?

2        Q.    (By Mr. Landis) The -- the first block we

3    see -- before I get there, sir, we see IF input.

4            Do you see that?

5        A.    Yes.

6        Q.    That's the signal that comes in from the

7    tuner, true?

8        A.    Yes.

9        Q.    The next block we see is 16-QAM demodulator,

10   correct?

11       A.    Yes.

12       Q.    So that's a demodulator.  You would agree

13   that's representing a demodulator?

14       A.    I would agree.

15       Q.    The next thing we see is an FEC decoder.  Do

16   you see that?

17       A.    Yes.

18       Q.    And you would agree with me that that stands

19   for forward error correction decoder?

20       A.    I would.

21       Q.    And its job is to decode and correct and do

22   the error correction process, true?

23       A.    Yes.

24       Q.    Over on the right-hand side, we have a digital

25   video decoder.

```
 1              Do you see that?

 2      A.    Yes.

 3      Q.    The digital video decoder, that's to reverse

 4 the compression and to expand the video bits, true?

 5      A.    Yes, it is.

 6      Q.    And below that, we have a digital audio

 7 decoder.

 8              Do you see that?

 9      A.    Digital.

10      Q.    And that job is to reverse the compression and

11 expand the audio bits, true?

12      A.    Yes.

13              MR. LANDIS:  I have no further questions,

14 Your Honor.

15              THE COURT:  Redirect from the Plaintiff?

16              You have about 9 minutes left.  You

17 wouldn't want to leave any of them unused.

18              MR. PLIES:  PTX 3, please.

19              Can you zoom on the right column, please?

20                   REDIRECT EXAMINATION

21 BY MR. PLIES:

22      Q.    Mr. Hamilton, is it correct that the June 8

23 DigiCipher paper was in the possession of the Patent

24 Office during examination of the '375 patent and is

25 listed here on the face of the patent?
```

1      A.    Here, it is.

2                MR. PLIES:  Left column, please.

3                MR. LANDIS:  Your Honor, may we approach?

4                THE COURT:  All right.

5                (Bench conference.)

6                MR. LANDIS:  Your Honor, yesterday, our

7    expert was precluded from saying anything about this

8    file history.

9                THE COURT:  He was prohibited from saying

10   what the Patent Office thought or -- or what they had in

11   their possession and was not prohibited.

12               MR. LANDIS:  Yes, sir.

13               THE COURT:  Their analysis of what they

14   considered was what we didn't get to.

15               MR. LANDIS:  I just want to make sure the

16   same rule applies.

17               THE COURT:  Same rule applies.  He's gone

18   as far as he can go.

19               MR. LANDIS:  Yes, sir.  Thank you.

20               (Bench conference concluded.)

21               THE COURT:  All right.  Continue, please.

22               MR. PLIES:  The left column, please.

23      Q.    (By Mr. Plies) And this Shikakura '503

24   reference, is that the document that Mr. Wechselberger

25   relied upon in his invalidity analysis?

1        A.    Yes, it is.

2        Q.    And is it correct that the Shikakura '503

3   patent was in the possession of the Patent Office during

4   examination of the '375 patent and is listed here on the

5   face of the patent?

6        A.    Yes, it is.

7        Q.    And those are the only two references that Mr.

8   Wechselberger relied upon; is that correct?

9        A.    Yes.

10              MR. PLIES:  Nothing further.

11              THE COURT:   Additional

12   cross-examination?

13              MR. LANDIS:  Briefly, Your Honor.

14   Can you pull up -- thank you.  Mr. Lodge is very fast

15   this morning.

16                    RECROSS-EXAMINATION

17   BY MR. LANDIS:

18        Q.    This is Defendants' Exhibit 15 on the screen,

19   Mr. Hamilton.

20              MR. LANDIS:  Now, if we could blow up the

21   center portion that has this marking on it.

22        Q.    (By Mr. Landis) Do you see the DigiCipher

23   reference in there, sir?

24        A.    Yes.  I see two DigiCipher references.

25        Q.    And -- and you see that there's lines drawn

1   across them, correct?

2       A.   Yes.

3            MR. LANDIS:  If we could go to the bottom

4   of the document, please.

5       Q.   (By Mr. Landis) Sir, do you see where it says

6   draw line there?

7            He's going to highlight it for you.

8            MR. LANDIS:  Mr. Lodge, right to there

9   (indicating).

10      Q.   (By Mr. Landis) Do you see that, sir?

11      A.   Yes, I do.

12      Q.   Could you read that to the jury, please?

13      A.   Draw line through citation if not in

14  conformance and not considered.

15      Q.   Thank you.

16           MR. LANDIS:  No further questions, Your

17  Honor.

18           THE COURT:  Additional direct?

19           MR. PLIES:  Nothing further, Your Honor.

20           THE COURT:  All right.  You may step

21  down, Mr. Hamilton.

22           Does the Plaintiff have an additional

23  witness to call on rebuttal?

24           MR. BLACK:  We have no further time and

25  no further witnesses, Your Honor.  Plaintiff rests its

```
 1   rebuttal case.
 2              THE COURT:  All right.  Does Plaintiff
 3   rest and close, subject to final argument?
 4              MR. BLACK:  Yes, Your Honor.
 5              THE COURT:  Does Defendant rest and
 6   close, subject to final argument?
 7              MR. DACUS:  We do, Your Honor.
 8              THE COURT:  All right.  Ladies and
 9   Gentlemen of the Jury, there are some matters
10   preparatory to the Court giving you its charge and the
11   parties offering their final arguments that I need to
12   take up with the attorneys and work with them on.
13              Looking at the clock, what I'd like to do
14   is give you about a two-and-a-half-hour break, and have
15   you back here at noon.  And toward the end of that
16   break, I'd like you to have an early lunch so you don't
17   come back hungry.
18              And my hope and plan is that when you
19   come back at noon, we can bring you in, let me give you
20   the Court's charge, proceed to have each side argue
21   their closing arguments, and then turn the case over to
22   your capable hands to retire, deliberate, and reach a
23   verdict.
24              That's the plan.  And I assume no one's
25   going to complain about having a two-and-a-half-hour
```

1  break in the middle of the morning.  Certainly, you're

2  welcome to leave the courthouse, but keep that time in

3  mind.  Don't go far enough to where you can't get back

4  and be ready to go by noon.

5              And this goes without saying, but we're

6  getting close.  So you won't have to hear me say it many

7  more times.  Don't discuss the case with each other or

8  anyone else.

9              So with that, we'll stand in recess, and

10  I'll excuse you until noon.

11              COURT SECURITY OFFICER:  All rise.

12              (Jury out.)

13              THE COURT:  All right.  Counsel, I'd like

14  you to take about a 10-minute recess, as will I.  And

15  about a quarter until 10:00, if I can have lead and

16  local counsel, and any additional counsel who has

17  specific experience working on the joint submitted

18  charge, to meet me in chambers for the informal charge

19  conference.

20              With that, we stand in recess.

21              COURT SECURITY OFFICER:  All rise.

22              (Recess.)

23              * * * * * * * * * * * * * * * * * * * *

24

25

CERTIFICATION

          I HEREBY CERTIFY that the foregoing is a
true and correct transcript from the stenographic notes
of the proceedings in the above-entitled matter to the
best of my ability.


/s/_____          _____
SHELLY HOLMES, CSR                       Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/14


/s/_____          _____
SUSAN SIMMONS, CSR                  Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/14